UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
LLEWELLYN S. GEORGE,

                                        Plaintiff,

                        - against -

CHRISTOPHER ROBERTS,

                                        Defendant.
-----------------------------------------------------------------------x

**OPINION & ORDER**

No. 17-CV-3684 (CS)

<u>Appearances</u>
David H. Chen
Westchester County Attorney
White Plains, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

Before the Court is Defendant's unopposed motion to dismiss the Amended Complaint.

(Doc. 13.)  For the following reasons, Defendant's motion is GRANTED.

## I.    **BACKGROUND**

### A.    **Facts**

I accept as true the facts, but not the conclusions, set forth in Plaintiff's Amended

Complaint.  (*See* Doc. 12 ("AC").)  Plaintiff Llewellyn S. George brings this suit against

Defendant Christopher Roberts, a corrections officer at the Westchester County Department of

Correction.  (*Id.* at 3.)  Plaintiff alleges that on April 25, 2017, while he was incarcerated at the

Westchester County Jail in Valhalla, New York, Defendant Roberts conducted a disciplinary

hearing.  (*Id.*)  Plaintiff was found guilty of all charges and Defendant imposed a penalty of

thirty days of cell confinement.  (*Id.*)  Plaintiff alleges that he was not notified of the date and

time of the disciplinary hearing, was not present for it, and was not provided with an explanation

1

for why he was not allowed to be present.  (*Id.*)  Plaintiff became aware of the hearing when he

was served with Defendant's disposition hours after it was held.  (*Id.* at 4.)  Plaintiff alleges that

Defendant's failure to notify him of the disciplinary hearing violated his rights under the First,

Sixth, and Fourteenth Amendments.  (*Id.* at 2.)

### B.    Procedural History

Plaintiff filed his original complaint on May 15, 2017, naming the County of Westchester

and Westchester County Department of Correction as Defendants.  (Doc. 2 at 1-2.)  In addition

to his claim that he was not informed of the April 25, 2017 disciplinary hearing, Plaintiff also

alleged that his constitutional rights were violated because he was not permitted to present

evidence or witnesses at, or record, the disciplinary hearing.  (*See id.* at 3-4.)  On June 5, 2017,

the Westchester County Department of Correction was dismissed as a Defendant, and service on

the County of Westchester was ordered.  (Doc. 6.)  On June 27, 2017, the County of Westchester

filed a letter seeking a pre-motion conference in anticipation of a motion to dismiss, (Doc. 7);

Plaintiff responded on July 7, 2017, (Doc. 11); and both parties appeared for a pre-motion

conference on July 12, 2017, (Minute Entry dated July 12, 2017).  At the conference, I reviewed

Defendant's grounds for dismissal with the parties and allowed Plaintiff the opportunity to

amend his complaint to address the potential deficiencies in his original pleading.  (*See* Doc. 18.)

On September 5, 2017, Plaintiff filed his Amended Complaint, which removed the

County of Westchester as a Defendant and added Defendant Roberts.  (*See* AC.)  Plaintiff never

obtained a summons for Roberts or served him with the Amended Complaint.  Defendant filed

the instant motion on September 28, 2017.  (Doc. 13.)  Plaintiff failed to oppose the motion, and

Defendant filed a reply brief on November 16, 2017.  (Doc. 19.)  Defendant argues that (1)

Plaintiff's claims against Roberts in his individual capacity cannot proceed because he has not

been served, (2) Plaintiff failed to plead a policy or custom necessary to sustain claims against Roberts in his official capacity, and (3) Plaintiff's claims should be dismissed with prejudice. (*See* Docs. 14 ("D's Mem."), 19 ("D's Reply").)

On October 4, 2017, Defendant filed a letter alerting the Court to a letter Plaintiff filed in other matters. (Doc. 16.) Plaintiff's letter stated that he was "tending to several personal issues that [we]re interfering with [his] obligations to pursue" three cases, each captioned *George v. County of Westchester et al.*, with docket numbers 17-CV-3632 (NSR), 17-CV-4364 (VB), and 17-CV-4217 (VB), and requested that those cases be dismissed without prejudice. (*Id.* Ex. 1 at 1.) Plaintiff's letter also noted a change of address. (*See id.* at 2.)

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(5)

Pursuant to Federal Rule of Civil Procedure 12(b)(5), a defendant may move to dismiss a case for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). "The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service." *Id.* 4(c)(1). Rule 4(m) requires that a defendant be served within ninety days or else the court must dismiss the action without prejudice or order that service be made within a specified time. "When a defendant raises a Rule 12(b)(5) challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (internal quotation marks omitted). *Pro se* plaintiffs are not excused from compliance with Rule 4. *See Meilleur v. Strong*, 682 F.3d 56, 61-63 (2d Cir. 2012).

**B.     Federal Rule of Civil Procedure 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Rule 8 "marks a notable and generous departure from the hyper technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).  "If a complaint is sufficient to

state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000).

Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted),[1] and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (internal quotation marks omitted). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

## III. <u>DISCUSSION</u>

### A. **Individual Capacity**

Defendant first argues that Plaintiff's claims against him in his individual capacity should be dismissed because he was not served with the summons and complaint. (D's Mem. at 4-5.) Defendant filed his motion to dismiss only three weeks after Plaintiff filed his Amended Complaint naming Roberts, so at the time of the motion, the time for service had not yet run. *See* Fed. R. Civ. P. 4(m). As of the date of this Opinion & Order, however, the docket reflects that no summons for Roberts has been issued and he still has not been served.

To sustain claims against a municipal officer in his individual capacity, a plaintiff has ninety days from filing the complaint to serve the summons and the complaint on the individual. *See id.*; *Jones v. Westchester Cty.*, 182 F. Supp. 3d 134, 143 (S.D.N.Y. 2016). Pursuant to Rule 4(e)(2), service upon an individual must be accomplished by (1) "delivering a copy of the

---

[1] Copies of all unpublished decisions cited in this Opinion & Order are attached.

summons and of the complaint to the individual personally," (2) "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or" (3) "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e)(2)(A)-(C). Rule 4(e)(1) also allows for service in accordance with the law of the state in which the district is located. Under New York law, a plaintiff has additional options, including leaving the summons with a person of suitable age and discretion at the Defendant's actual residence or place of business and following up with a mailing to the individual's last known residence or actual place of business. *See* N.Y. C.P.L.R. § 308(2) (McKinney).

The only proof of service in this case indicates that the former Defendant, the County of Westchester, was served with the original complaint at the County of Westchester Law Department at 148 Martine Avenue, White Plains, New York, on June 19, 2017. (*See* Doc. 10.) Nothing in the record indicates that this is or was Roberts's actual place of business,[2] or that the Amended Complaint was ever served. Nor is there any indication that Plaintiff ever requested that the United States Marshals Service serve Defendant, *see* Fed. R. Civ. P. 4(c), or requested an extension of time to effect service, *see id.* 4(m); *Meilleur*, 682 F.3d at 63.[3] Therefore, because there is no proof that Plaintiff served Roberts, all claims against him in his individual capacity are dismissed pursuant to Rule 12(b)(5). *See Norwood v. Salvatore*, No. 12-CV-1025, 2013 WL

---

[2] In fact, Plaintiff's Amended Complaint would suggest that Roberts's actual place of business is the Westchester County's Department of Correction, which is located at 10 Woods Road, Valhalla, New York.

[3] Plaintiff was aware of his obligation to ensure timely service and request an extension if necessary, because that requirement was explained in the Court's Order of Service of the original complaint, (Doc. 6), and in similar orders issued in some of the approximately twenty other cases brought by Plaintiff in this Court, (*see, e.g.*, Order of Service, *George v. Cty. of Westchester*, No. 17-CV-3632 (S.D.N.Y. June 7, 2017), ECF No. 6; Order of Service, *George v. Cty. of Westchester*, No. 13-CV-4511 (S.D.N.Y. Aug. 1, 2013), ECF No. 4).

1499599, at *4 (N.D.N.Y. Apr. 10, 2013) (dismissing claims against municipal officer in individual capacity for failure to serve).

## B.    Official Capacity

Defendant next seeks to dismiss the Amended Complaint against Roberts to the extent he is sued in his official capacity.  (D's Mem. at 5-6.)[4]  Suits against a municipal officer in his official capacity are, "in all respects other than name, suits against a government entity." *Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988); *accord Rossi*, 2005 U.S. Dist. LEXIS 47198, at *26 ("Official capacity suits are effectively suits against a governmental entity.").

Municipalities may be sued pursuant to § 1983, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but they cannot be held liable for acts of their employees "by application of the doctrine of *respondeat superior*," *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *accord Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (municipality may not be found liable simply because one of its employees committed a tort).  "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2009) (alteration and internal quotation marks omitted).  To allege such a policy or custom, a plaintiff may assert:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; *or* (4) a failure

---

[4] It is not clear that Plaintiff intended to bring a claim against Defendant in his official capacity.  Plaintiff is seeking compensatory and punitive damages and addressed how Roberts was personally involved in the alleged constitutional violations, suggesting that Plaintiff sought to bring the claims against Roberts only in his individual capacity.  *See Rossi v. Stevens*, No. 04-CV-1836, 2005 U.S. Dist. LEXIS 47198, at *27 (S.D.N.Y. May 2, 2005).  In an excess of caution, however, I will address Defendant's arguments.

7

by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013)

(emphasis in original) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

Plaintiff's Amended Complaint is devoid of facts that could plausibly support any of the above theories. The sole allegations in the Amended Complaint describe Defendant Roberts's conduct surrounding Plaintiff's April 25, 2017 disciplinary hearing. (*See* AC at 3-4.) Plaintiff does not point to an ongoing official policy or custom that led to Defendant's alleged failure to notify him of his disciplinary hearing, nor is there any indication that Roberts has final decision making authority. As Defendant correctly points out, (D's Mem. at 5-6), "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see Plair v. City of N.Y.*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) (collecting cases). Thus, to the extent Plaintiff sought to bring his claims against Roberts in his official capacity, they are dismissed.

### C. Leave to Amend and Dismissal With or Without Prejudice

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended once after a conference at which Defendant's motion was discussed. Plaintiff has not asked to amend again or otherwise suggested he is in possession of facts that would cure the deficiencies regarding the claims against Roberts in his official capacity. Accordingly, the Court declines to grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

Defendant argues that Plaintiff's Amended Complaint should be dismissed with prejudice, pointing to Plaintiff's letter that he filed in other, unrelated cases, (*see* Doc. 16), and Plaintiff's failure to fix deficiencies in his Amended Complaint as discussed at the July 12, 2017 pre-motion conference. (D's Reply at 2-3.)

First, Plaintiff's October 2, 2017 letter should not be construed to apply here. The letter refers to three specific cases and states that Plaintiff was unable to pursue "the above-referenced cases" due to personal issues. (Doc. 16 Ex. 1 at 1.) Nowhere in the letter does Plaintiff ask that *all* pending cases in which he is a plaintiff be dismissed without prejudice.

If it did, however, Plaintiff's letter could be construed as a notice of dismissal under Rule 41(a)(1) or a request to dismiss without prejudice pursuant to Rule 41(a)(2).[5] Under Rule 41(a)(1), a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A). A dismissal under that subsection is without prejudice unless stated otherwise. *See id.* 41(a)(1)(B). Courts have consistently held that "a motion to dismiss under Rule 12 does not terminate the right of dismissal by notice," and thus a plaintiff may dismiss an action without a court order even if the defendant has already filed a motion to dismiss. *See Ardnt v. UBS AG*, 342 F. Supp. 2d 132, 136 (E.D.N.Y. 2004) (alteration omitted) (collecting cases). A motion to dismiss under Rule 12(b)(6) may ripen into one for summary judgment for purposes of Rule 41(a)(1) "when matters outside the pleading are presented to and not excluded by the court." *Nat'l Cement Co. v. Mead Corp.*, 80 F.R.D. 703, 704 (S.D.N.Y. 1978). But Defendant's motion under Rule 12(b)(6) does not present matters outside Plaintiff's Amended Complaint for consideration, and a motion to dismiss for lack of personal jurisdiction does not preclude dismissal without prejudice under Rule 41(a)(1). *See Plains Growers, Inc. v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250, 254 (5th Cir. 1973.) Nor has Defendant filed an answer. Thus, if Plaintiff's letter were filed in this case, I could have considered it as a notice of dismissal under Rule 41(a)(1), which would operate as an automatic dismissal without prejudice and with no conditions. *See Thorp v. Scarne*, 599 F.2d 1169, 1171 n.1 (2d Cir. 1979); *Horton v. Trans World Airlines Corp.*, 169 F.R.D. 11, 14-15 (E.D.N.Y. 1996).

---

[5] Defendant does not specify whether Plaintiff's letter should be viewed under Rule 41(a)(1) or Rule 41(a)(2), but the cases to which Defendant cites refer to Rule 41(a)(2). (*See* D's Reply at 2-3.)

Rule 41(a)(2) provides that, "[e]xcept as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). If I construed Plaintiff's letter as a request to dismiss without prejudice pursuant to Rule 41(a)(2), as Defendant suggests, I could not grant a dismissal with prejudice. The Second Circuit has explicitly held that if a plaintiff moves under Rule 41(a)(2) for dismissal without prejudice, the Court cannot grant a dismissal with prejudice without giving the plaintiff "an opportunity to withdraw the motion rather than accept onerous conditions of a voluntary dismissal." *Gravatt v. Columbia Univ.*, 845 F.2d 54, 56 (2d Cir. 1988).[6] Plaintiff has been given no such opportunity here.[7]

---

[6] Defendant cites two out-of-circuit district court cases for the proposition that I may dismiss with prejudice even if the request was to dismiss without prejudice. (D's Reply at 2-3 (citing *Smith v. Sabol*, No. 11-CV-1697, 2013 WL 2371193 (M.D. Pa. May 30, 2013), and *Bauer v. City of Rossford*, No. 16-CV-722, 2017 WL 1179053 (N.D. Ohio Mar. 30, 2017), *appeal filed*, No. 17-3498 (6th Cir. 2017)).) But the Second Circuit has given clear instructions that a court must grant the plaintiff the opportunity to withdraw the motion for voluntary dismissal before dismissing the case with prejudice. Moreover, Defendant's citation to *Republic of Columbia v. Diageo North America, Inc.*, No. 04-CV-4372, 2011 WL 4828814 (E.D.N.Y. Sept. 30, 2011), is also unpersuasive as there the merits of the plaintiff's claims had been litigated, *see id.* at *3. Thus, I cannot grant Defendant's request under Rule 41(a)(2).

[7] Defendant has not made an application under Rule 41(b) to dismiss for failure to prosecute, which if granted would operate as a dismissal on the merits and could justify dismissal with prejudice. Rule 41(b) states that "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). "[W]here a plaintiff has failed to take any specific and concrete action over a length of time," a court may dismiss his complaint with prejudice for failure to prosecute. *West v. City of N.Y.*, 130 F.R.D. 522, 525 (S.D.N.Y. 1990). Courts within this Circuit have found that a plaintiff's inactivity for a period of six months to almost two years is sufficient to dismiss a complaint for failure to prosecute. *See id.* (collecting cases).

When deciding whether to dismiss a case for failure to prosecute, the Court must consider five factors: (1) the duration of Plaintiff's failure to comply with the Court's orders, (2) whether Plaintiff was on notice that failure to comply would result in dismissal, (3) whether Defendant is likely to be prejudiced by further delay in the proceedings, (4) a balancing of the Court's interest in managing its docket with Plaintiff's interest in receiving a fair chance to be heard, and (5) whether the Court has adequately considered a sanction less drastic than dismissal. *See Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014). Plaintiff has not failed to comply with any Court orders, as none have been issued regarding his failure to prosecute; he has only failed to oppose Defendant's motion to dismiss. Plaintiff was not on notice that failure to comply with the motion to dismiss briefing schedule would result in dismissal. While Defendant would be prejudiced if Plaintiff brought an action at a later date, this case has not proceeded into discovery, and thus Defendant has likely expended few resources. While Plaintiff's history suggests he is cavalier in terms of judicial resources, his conduct in this case has not had a particularly deleterious effect on the undersigned's docket management. Finally, instead of dismissing Plaintiff's claims with prejudice, I could dismiss without prejudice. Thus, even if Defendant had moved under Rule 41(b), which his counsel certainly knew how to do if intended, dismissal with prejudice would not be appropriate.

Defendant also argues that dismissal should be with prejudice because Plaintiff failed to address in the Amended Complaint the issues discussed at the July 12, 2017 pre-motion conference. (D's Reply at 2.) But Plaintiff in his Amended Complaint implemented most, if not all, of the changes suggested by Defendant and the Court. At the pre-motion conference, I informed Plaintiff that some of his objections to the disciplinary hearing process likely would not rise to constitutional violations, and that to sue the County of Westchester, Plaintiff had to allege a policy, custom, or decision by a policymaker, or else he should add a different defendant. Plaintiff made responsive changes in his Amended Complaint. Moreover, to the extent Plaintiff sought to sue Defendant Roberts in his official capacity (which I am not convinced that he did), Plaintiff was not told that a suit against a municipal officer in his official capacity operates as a claim against the municipality itself.

Accordingly, the dismissal of the individual-capacity claims is without prejudice regardless of whether Plaintiff's letter, (Doc. 16), applies here.[8]

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss for lack of personal jurisdiction is GRANTED without prejudice. To the extent Plaintiff intended to bring a claim against Defendant in his official capacity, it is dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 13), and close the case. The Clerk

---

[8] Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). Because Plaintiff has not participated in this case since he filed his Amended Complaint nearly six months ago, I will not *sua sponte* grant Plaintiff more time to properly serve the summons and Amended Complaint on Defendant Roberts.

of Court is also respectfully directed to mail a copy of this Opinion & Order, with the attached cases, to Plaintiff.[9]

**SO ORDERED**

Dated: March 26, 2018
      White Plains, New York

_Cathy Seibel_
_____
CATHY SEIBEL, U.S.D.J.

---

[9] Throughout the pendency of this case, Plaintiff has had multiple addresses. Mail was returned to the Court after it was sent to 86 E. Post Road, White Plains, NY 10601. In his original and Amended Complaint, Plaintiff listed his address as 25 Operations Drive, Valhalla, New York 10595. (*See* AC at 1.) In his October 2, 2017 letter, Plaintiff lists his address as C.H.O.I.C.E., 200 E. Post Road, White Plains, New York 10601. (*See* Doc. 16 Ex. 1 at 2.) In an excess of caution, the Clerk of Court should mail a copy of this Opinion & Order to each of the aforementioned addresses.

475 Fed.Appx. 807
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Shewaferaw S. SHIBESHI, Plaintiff–Appellant,

v.

CITY OF NEW YORK, Defendant–Appellee.

No. 11–4270.
|
Aug. 30, 2012.

Appeal from a judgment of the United States District Court for the Southern District of New York, (Preska, C.J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is AFFIRMED.

**Attorneys and Law Firms**

**\*808** Shewaferaw S. Shibeshi, pro se, Mifflin, PA, for Appellant.

No appearance, for Appellee.

PRESENT: ROBERT A. KATZMANN, GERARD E. LYNCH, DENNY CHIN, Circuit Judges.

**Opinion**

### SUMMARY ORDER

**\*\*1** Appellant Shewaferaw S. Shibeshi, proceeding *pro se,* appeals from the district court's judgment *sua sponte* dismissing his complaint pursuant to 28 U.S.C. § 1915(e) and Fed.R.Civ.P. 12(h)(3). We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

This Court reviews *de novo* both a district court's *sua sponte* dismissal of a complaint pursuant to § 1915(e)(2) for frivolity and failure to state a claim, *see Giano v. Goord,* 250 F.3d 146, 149–50 (2d Cir.2001), and a district court's dismissal of a complaint for lack of subject matter jurisdiction, *see Celestine v. Mount Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 79–80 (2d Cir.2005). The complaint must plead "enough facts to state a claim to

relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although *pro se* complaints must contain sufficient factual allegations to meet the plausibility standard, the Court will look for such allegations by reading *pro se* complaints with "special solicitude" and interpreting them to raise the "strongest arguments that they *suggest." Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam) (internal quotation marks omitted). In addition to the requirement that *pro se* complaints be liberally construed, this Court has held that district courts should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). However, leave to amend is not necessary when it would be futile. *See id.* (finding leave to replead would be futile where the complaint, even when read liberally, did not "suggest[ ] that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe").

On appeal, Shibeshi does not raise any arguments with regard to the alleged forfeiture of his vehicle, and he has therefore abandoned any such arguments. *See LoSacco v. City of Middletown,* 71 F.3d 88, 92–93 (2d Cir.1995). As for his remaining claims, having conducted an independent review of the record and relevant case law, we conclude that the district court properly dismissed Shibeshi's complaint for substantially the reasons stated by the district court in its well-reasoned order. Moreover, although the district court dismissed the complaint without providing an opportunity to amend, a *de novo* review of that complaint indicates that any amendment would have been futile.

**\*\*2** We have considered all of Shibeshi's arguments on appeal and find them to be without merit. Accordingly, the order of the district court is hereby **AFFIRMED.**

**All Citations**

475 Fed.Appx. 807, 2012 WL 3734771

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1499599
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Douglas NORWOOD, III, Leeann Norwood,
D.N., Minor Son of Plaintiffs Norwood, Paul
Orlowski, and Lena Orlowski, Plaintiffs,
v.

Michael SALVATORE, Individually and in his
capacity as Town of Hancock Code Enforcement
Officer and Town of Hancock, Defendants.

No. 3:12–CV–1025 (MAD/DEP).
|
April 10, 2013.

**Attorneys and Law Firms**

Office Of John V. Janusas, Esq., John V. Janusas, Esq., of
Counsel, Brooklyn, NY, for Plaintiffs.

Mackenzie, Hughes Law Firm, Jeffrey D. Brown, Esq., of
Counsel, Syracuse, NY, for Defendants.

**Opinion**

## MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

## INTRODUCTION

**\*1** The within action was commenced by unrelated
property owners in the Town of Hancock who claim
that they applied for certificates of occupancy, building
permits and other certificates/permits from defendants.
Plaintiffs commenced this action pursuant to 42 U.S.C. §
1983 alleging that defendants violated of their Fourteenth
Amendment rights to substantive due process and equal
protection. The Norwood plaintiffs also assert a cause
of action for declaratory relief seeking a building permit
and certificate of occupancy. The Orlowski plaintiffs
also assert malicious prosecution claims. Presently before
the Court is defendants' motion to dismiss plaintiffs'
complaint pursuant to Fed.R.Civ.P. 12(b)(5) and 12(b)
(6). (Dkt. No. 8). Plaintiffs have opposed the motion.
(Dkt. No. 12).

## COMPLAINT [1]

**The Norwood Plaintiffs**

In 1988, plaintiffs Douglas Norwood, III, Leeann
Norwood and D.N. ("the Norwood plaintiffs") purchased
real property, with a home, in the Town of Hancock.
In May 2009, the Norwood plaintiffs' home on said
property was completely destroyed as a result of a fire.
In July 2009, the Norwood plaintiffs contacted defendant
Michael Salvatore ("Salvatore"), the Town of Hancock
Code Enforcement Officer ("CEO"), to apply for a
building permit on said property. Salvatore stated that he
would visit the premises and then advise the Norwood
plaintiffs how to proceed. During the visit, Salvatore
told the Norwood plaintiffs that they needed to perform
"prep" work before a building permit could be issued.
Salvatore demanded a set of plans for the proposed
work, an elevation certificate and engineering plans.
Salvatore also directed the Norwood plaintiffs to install
concrete footings and piers with steel reinforcements.
After the piers were installed, Norwood plaintiffs installed
the floor plan to stabilize the concrete piers. Salvatore
then insisted upon the installation of flooding vents,
which required alterations to some previous work. The
Norwood plaintiffs completed all the aforementioned
work pursuant to Salvatore's direction and repeatedly
asked for the building permit. Salvatore stated that the
permit would be issued when "prep" work was completed.

On September 15, 2009, Salvatore arrived at the property
for one of many inspections and issued additional
demands for "prep" work. The Norwood plaintiffs claim
that Salvatore raised his voice, in the presence of their
fourteen year old son, and allegedly stated, "you really
do not want to rebuild at this location, because Angelo
Valenti is going to have niggers and spics moving
across the street". The Norwood plaintiffs contend that
Salvatore also yelled, "niggers and spics will be using all
the units that Angelo Valenti was planning to install".

In September 2009, after all of the "prep" work was
complete, Salvatore told the Norwood plaintiffs to halt
construction and stated that he would not issue a building
permit or certificate of occupancy.

**Orlowski Plaintiffs**

**\*2** In March 2009, Lena Orlowski contacted Salvatore, via telephone, about moving a manufactured home from one location on their property to another. The Orlowski plaintiffs initiated contact to determine whether a building permit from the Town of Hancock was necessary to relocate the home. Salvatore told Orlowski that if the home was being relocated without being re-occupied or connected to utilities then no building permit would be necessary. A few months later, the Orlowski plaintiffs relocated the home and Salvatore approved the new location.

In April 2010, the Orlowski plaintiffs received a letter from Salvatore warning that the relocation of the home violated the Town of Hancock Local Law # 1, Subdivision A, "Building without a Permit". [2] Salvatore allegedly threatened to fine the Orlowski plaintiffs $1,000.00 per day if the home was not moved. Upon receiving the correspondence, the Orlowski plaintiffs confronted Salvatore at the Town of Hancock Building Department and demanded an explanation. Salvatore responded by saying, "I don't remember speaking to you by phone" and asked "do you have anything in writing". The Orlowski plaintiffs indicated they did not and Salvatore responded, "then that's too bad".

In April 2010, the Orlowski plaintiffs received an appearance ticket charging them with Building without a Permit. During a September 2010 court appearance, The Orlowski plaintiffs indicated to Salvatore that the same requirements did not apply to their neighbor, Joel May, who installed a manufactured home without a building permit in 2008, connected it to utilities and has occupied it ever since without a certificate of occupancy. Salvatore did not respond. The Orlowski plaintiffs refused to pay the $600 fine and requested a trial date. On October 25, 2010, the Orlowski plaintiffs were found not guilty after trial.

On November 16, 2010, Orlowski plaintiffs again received a letter from Salvatore stating that the relocation of the home constituted a violation of the Town of Hancock Local Law # 1 and threatened to fine Orlowski plaintiffs up to $1,000.00 per day. [3] The Orlowski plaintiffs dismantled and disposed of the manufactured home.

On June 22, 2012, plaintiffs filed the within action and asserted claims against Salvatore in both his individual and official capacities. On October 2, 2012, plaintiffs served the complaint on the Town Clerk at Town Hall,

Melody Oliver, at 661 West Main Street, in the Village of Hancock. On October 23, 2012, defendants filed the within motion to dismiss plaintiffs's complaint, in its entirety based upon insufficient service or, in the alternative, for failure to state a claim.

## DISCUSSION

## I. DEFENDANTS' MOTION TO DISMISS UNDER 12(B)(5)

When a defendant moves to dismiss the complaint under Rules 12(b) (5) and 12(b)(6), the court must address the issue of proper service before the alleged failure to state a claim. *Schwasnick v. Fields,* 2010 WL 2679935, at \*2 (E.D.N.Y.2010). In considering a Rule 12(b)(5) motion to dismiss for insufficient service of process, the court "must look to matters outside the complaint to determine whether it has jurisdiction." *Allen v. Nassau Cnty. Executive Office,* 2011 WL 1061019, at \*4 (E.D.N.Y.2011). "[W]hen a defendant moves to dismiss under rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Id.* (citations omitted).

**\*3** On June 22, 2012, plaintiffs filed the complaint in this Court. (Dkt. No. 1). On October 18, 2012, plaintiffs filed Proof of Service with this Court indicating that the summons for the Town of Hancock and Salvatore had been served upon Melody Oliver, Town Clerk for the Town of Hancock on October 2, 2012. (Dkt. No. 7). Defendants move to dismiss plaintiffs' complaint arguing that Salvatore and the Town of Hancock were not timely served within 60 days of the filing of the complaint, in accordance with this Court's Local Rules. In addition, defendant Salvatore argues that service was insufficient because he did not receive a mailed copy of the complaint. Plaintiffs do not offer any evidence or argument in opposition but request that, should the Court agree with defendants, that plaintiffs be granted additional time to re-serve defendants. *See* Dkt. No. 12, p. 5.

## A. Town of Hancock

Rule 4(m) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion on its own after notice to the plaintiff-must dismiss

the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

Local Rule 4.1(b) requires "service of process upon all defendants within sixty (60) days of the filing of the complaint. This expedited service is necessary to ensure adequate time for pretrial discovery and motion practice. In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4." N.D.N.Y. L.R. 4.1(b); *see also New York State Teamsters Council Health and Hosp. Fund v. C & D Specialized Transp., Inc.,* 1995 WL 79176, at *1 (N.D.N.Y.1995) (Local Rule 4.1(b) requires service of process preferably within 60 days from the date the complaint is filed with the clerk of the court, but in any case within the time allowed by Fed.R.Civ.P. 4).

Here, the Town of Hancock was served, via the Town Clerk, on October 2, 2012. While this was not within the 60 day time period set forth in Local Rule 4.1(b), service was effectuated within 120 days as provided in Fed.R.Civ.P. 4(m). Defendants do not claim that Melody Oliver was not authorized to accept service on behalf of the Town. While plaintiffs failed to complete service within 60 days after filing the complaint, in violation of the local rules, plaintiffs completed service within 120 days of when the complaint was filed and established personal jurisdiction over the Town of Hancock. *See Edsell v. Indep. Freightway, Inc.,* 1995 WL 375827, at *3 (N.D.N.Y.1995). Accordingly, defendants' motion to dismiss the complaint against the Town of Hancock based upon insufficient service is denied.

## B. Salvatore [4]

### 1. Official Capacity

Service of process upon a municipal office is governed by Federal Rule of Civil Procedure 4(j)(2) which states that service may be completed by: "(A) delivering a copy of the summons and the complaint to its chief executive officer; or (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Fed.R.Civ.P. 4(j)(2).

**\*4** C.P.L.R. § 307(2), provides that:

Personal service on a state officer sued solely in an official capacity or state agency, which shall be required to obtain personal jurisdiction over such an officer or agency, shall be made by 1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

Service on a town board or town supervisor is sufficient where the pleadings are left with the town clerk. *Schwasnick,* 2010 WL 2679935, at *3 (citing *Contento v. Veteran,* 1981 LEXIS 13478, at *3 (S.D.N.Y.1981) (finding that serving the town clerk on behalf of town board members and the town supervisor in their personal capacities was only insufficient because the plaintiff did not mail a copy to the defendant after personal service)); *see also Wendell v. N.Y. State Ins. Dep't,* 2007 LEXIS 62314 *10–12 (E.D.N.Y.2007) (sufficiency of service on Superintendent in his individual capacity determined under Rule 4(e) and C.P.L. R. 308, in his official capacity under Rule 4(j)(2) and C.P.L.R. 307).

Based upon the record herein, service upon Melody Oliver, on behalf of Salvatore in his official capacity, is sufficient.

### 2. Individual Capacity

Service of process upon an individual within a judicial district of the United States is governed by Rule 4(e) which states that service may be completed by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e).

Pursuant to N.Y.C.P.L.R. § 308(2), service of process on an individual is sufficient where the summons is left with a "person of suitable age and discretion at the actual place of business" and mailing a copy to the same. Serving the Town Clerk on behalf of the Town Supervisor in his individual capacity is insufficient if the plaintiff does not mail copy after personal service. *See Allen,* 2011 WL 1061019, at *4 (collecting cases).

Without evidence indicating that the summons and complaint were also mailed to Salvatore, the claims against Salvatore, in his individual capacity, must be dismissed. The record contains no proof of service indicating that Salvatore was personally served the summons and complaint within the 120–day statutory window of Rule 4(m). Moreover, there is no proof of mailing. Therefore, plaintiffs claims against Salvatore, in his individual capacity, must be dismissed. *See Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999).

**C. Request for Additional Time**

 **\*5** Good cause to excuse deficient service generally requires proof of "exceptional circumstances" that were "beyond [the plaintiff's] control." *Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V.,* 451 F.Supp.2d 585, 591 (S.D.N.Y.2006). In order to establish good cause for an extension of time for service a plaintiff must show "reasonably diligent efforts" to serve defendants within the allotted time frame. *Forte v. Lutheran Augustana Extended Care and Rehab. Ctr.,* 2009 WL 4722325, at *3 (E.D.N.Y.2009) (citations omitted).

In this matter, plaintiffs have failed to establish set forth any argument to establish "good cause" with respect to

the efforts to serve Salvatore as an individual. Plaintiffs allege that their agent was "told by Melody Oliver that she was authorized to accept service". There is no affidavit in the record from the process server attesting to this conversation. And even so, plaintiffs have not explained their failure to comply with § 308 or their failure to make additional efforts to serve Salvatore in his individual capacity. Thus, plaintiffs' request for an extension of time to re-serve Salvatore is denied.

## II. DEFENDANTS' MOTION TO DISMISS UNDER 12(B)(6)

**A. STANDARD**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings without considering the substantive merits of the case. *Global Network Commc'ns v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006); *Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Robinson v. Town of Kent, N.Y.,* No. 11 Civ. 2875, 2012 WL 3024766, at *3–4 (S.D.N.Y.2012) (citing *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient facts "to 'sho[w] that the pleader is entitled to relief[.]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their]

face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[.]" *Id.* at 570.

**\*6** The Second Circuit has held that, on a motion to dismiss, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech. Inc.,* 987 F.2d 142, 150 (2d Cir.1993). The Second Circuit has clarified, however, that "[b]ecause this standard has been misinterpreted on occasion, we reiterate ... that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citation and footnote omitted). [5]

## B. Substantive Due Process Claims
The Fourteenth Amendment provides, in relevant part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to demonstrate a violation of either substantive or procedural due process rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought. *Puckett v. City of Glen Cove,* 631 F.Supp.2d 226, 236 (E.D.N.Y.2009) (citing *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999)). To establish a substantive due process violation, a plaintiff must demonstrate that: (1) there is a valid property interest; and (2) defendants infringed on that property right in an arbitrary or irrational manner. *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 784 (2d Cir.2007).

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (holding that the plaintiff must have more than a unilateral expectation; the plaintiff must have a legitimate claim of entitlement to the benefit). "In order for an interest in a particular land-use permit to qualify as a property interest for the purposes of the ... due process clause[,] a landowner must show a 'clear entitlement' to that benefit." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263–64 (2d Cir.1999). "This inquiry stems from the view that a property interest can sometimes exist in what is sought—in addition to the property interest that exists in what is owned—provided there is a 'legitimate claim of entitlement' to the benefit in question." *Zahra v. Town of Southold,* 48 F.3d 674, 679–80 (2d Cir.1995.

"[I]n order to establish a federally protectable property interest in a state or local permit for which a plaintiff has applied, the plaintiff must show that, at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case." *See id.* at 263 n. 1. "The analysis focuses on the extent to which the deciding authority may exercise discretion in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision. *Zahra,* 48 F.3d at 679–80; *see also Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir.1995) (homeowner had property interest in an excavation permit because superintendent of highways had no discretion to decline to issue it if the application stated the nature, location, extent and purpose of the proposed excavations).

**\*7** Defendants argue that the denial of an application for permission to develop property does not implicate a vested property interest if the government has the authority to grant or deny the application. Defendants claim that Local Law # 1 affords the Code Enforcement Officer discretion in deciding whether to issue building permits. Defendants further argue that even assuming plaintiffs properly plead a vested property interest, plaintiffs' substantive due process claims are subject to dismissal because the complaint does not allege egregious and arbitrary conduct. Defendants set forth different

arguments in support of dismissal of Norwoods' and Orlowskis' portions of the complaint.

**1. Local Law # 1**

The relevant law in this matter is Local Law # 1 formally entitled, "A Local Law Providing for the Administration and Enforcement of the New York State Uniform Fire Prevention and Building Code". The relevant portions provide:

Section 3. Code Enforcement Officer and Inspectors

(a) The office of Code Enforcement Officer is hereby created. The Code Enforcement Officer shall administer and enforce all the provisions of the Uniform Code, the Energy Code and this local law. The Code Enforcement Officer shall have the following powers and duties:

(1) to receive, review and approve or disapprove applications for Building Permits [ ... ]

Section 4.

(a) Building Permits Required. Except as otherwise provided in subdivision (b) of this section, a Building Permit shall be required for any work which must conform to the Uniform Code and/or the Energy Code, including, but not limited to, the construction, enlargement, improvement, removal, relocation or demolition of any building or structure or any portion thereof, and the installation of a solid fuel burning heating appliance, chimney or flue in any dwelling unit. No person shall commence any work for which a Building Permit is required without first having obtained a Building Permit from the Code Enforcement Officer.

(f) Issuance of Building Permits. An application for a Building Permit shall be examined to ascertain whether the proposed work is in compliance with the applicable requirements of the Uniform Code and Energy Code. The Code Enforcement Officer shall issue a Building Permit if the proposed work is in compliance with the applicable requirements of the Uniform Code and Energy Code.

**2. Norwood Plaintiffs**

The Norwood plaintiffs argue that Salvatore directed them to expend monies before even accepting the application for the building permit. The Norwood plaintiffs argue that this demand is in contravention of Local Law # 1 because the CEO is not empowered with the authority to refuse to accept the application for a permit. In response, defendants argue that it is "indisputable that on November 24, 2008, plaintiffs Norwood submitted a signed building permit application to the Town and paid the required fee". [6] Defendants claim that upon receipt of that application, Salvatore had broad discretion to review and approve or disapprove the application.

**\*8** In a case involving a similar code provision, the district court in the Eastern District, held that the plaintiff sufficiently plead a property interest in obtaining a building permit. In *Hampton Bays Connections, Inc. v. Duffy,* 127 F.Supp.2d 364, 378 (E.D.N.Y.2001), the plaintiffs claimed that the defendants deprived them of their substantive due process rights by arbitrarily denying land use permits including an application for a building permit for the construction of a McDonald's. The applicable code provided, "[a]ny person wishing to construct a building must obtain a building permit from the Building Inspector". The Court cited to the relevant portions of the Town Code:

the Town Code does state that after receiving the application, the Building Inspector "shall examine the premises for which" the application has been received "for the purpose of ensuring compliance with laws, ordinances and regulations governing building construction", shall examine the application, as well as the plans, specifications and documents filed therewith, shall refer the application to the Town Director of Natural Resources, who will determine whether an additional permit is necessary for construction in a Wetlands area, and shall issue a building permit upon approval of the application. If the application, together with plans, specifications and other documents filed therewith, describes proposed work which does not conform to all of the requirements of the applicable building regulations, the building official shall disapprove the same.

*Id.* at 379 (internal citations omitted).

The Court found that, "[t]he Town Code does not explicitly set forth whether the Building Inspector must approve certain applications, whether he may deny

an application, or the circumstances under which the Building Inspector will approve or deny an application." *Id.*

The Court held:

> Given these provisions of the Town Code, the Court finds that the Building Inspector has very little discretion when deciding whether a permit should issue. Rather, the Town Code indicates that if the application meets all relevant regulations and ordinances, then the Building Inspector shall approve the application and issue the permit.

The Court acknowledge that, "later in the litigation, it may become clear that the Building Inspector does exercise his discretion when he applies the relevant building ordinances and regulations to a particular application". *Id.* However, the Court concluded, "at this early stage in the litigation, without information regarding the types of ordinances and regulations that are applicable to this case and the manner in which they are examined, the Court finds that the Building Inspector does not retain sufficient discretion to defeat the plaintiffs' substantive due process claim." *Id.* (citing *inter alia RRI Realty Corp. v. Inc. Vill. of Southampton,* 870 F.2d 911, 918 (2d Cir.1985)).

Viewing the evidence in a light most favorable to plaintiff, as the Court must do on a motion to dismiss, the Court finds that the Local Law does not provide the CEO with the discretion to direct that "prep" work must be performed prior to the issuance of a building permit. Moreover, pursuant to Section 4(f), the CEO is not vested with broad discretionary authority to grant or deny a permit or application. Section (f) clearly provides that a permit shall be issued if the proposed work is in compliance with the applicable codes. Here, the record does not contain any information relevant to the issue of whether Norwood plaintiffs' application or proposed work complied with the Uniform or Energy Code.

**\*9** In cases where courts have found that the plaintiff does not possess a property interest in a permit, those cases involved distinguishable codes and regulations that provided the governmental body with broad discretion

over whether a permit was granted. *See A.B. C. Home Furnishings, Inc. v. Town of East Hampton,* 947 F.Supp. 635, 645 (E.D.N.Y.1996) (both the Town Code, and the permit application expressly provide that the permit "may" be revoked under certain circumstances and according to the permit application signed by the plaintiff, without notice or a hearing, providing the defendants with sufficient discretion in the determination as to whether to revoke a permit to defeat ABC's claim of a property interest); *see also Application/Action of 89 JPS, L.L.C. v. Joint Vill. of Lake Placid and Town of N. Elba Review Bd.,* 2011 WL 4344020, at \*15 (N.D.N.Y.2011) (pursuant to the Land Use Code at issue, the defendant had the discretion to "approve, approve with stipulated conditions, modification or disapprove any application" presented); *see also Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester,* 2013 WL 135216, at \*11 (S.D.N.Y.2013) (the plain language of the statute gives discretion to the mayor or local licensing authority to grant the license "as he shall deem proper," and to limit licenses to those who meet the standard of "good character."). In this matter, Local Law # 1 does not contain such broad discretionary language.

The Court has reviewed the cases cited by defendants in support of the motion to dismiss and notes that those cases involved motions for summary judgment or motions after a jury trial. *See RRI,* 870 F.2d 911; *see also Tomlins v. Vill. of Wappinger Falls,* 812 F.Supp.2d 357, 368 (S.D.N.Y.2001). Applying *Hampton Bay* to the facts at hand, at this stage of the litigation, the Norwood plaintiffs have adequately plead a property interest in the building permit.

To meet the second prong, plaintiff must establish that the government action transgresses "the outer limit" of legitimate government action and that the officials actions were "shocking, abusive, capricious or arbitrary". *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 385 (E.D.N.Y.2005).

Here, plaintiffs allege that Salvatore willfully, maliciously, selectively, wrongfully and intentionally denied them the ability to rebuild their home. Plaintiffs assert that defendants acted "in an arbitrary and irrational manner" and issued "onerous and unreasonable demands" directing plaintiffs to "perform unnecessary work, which wrongfully depleted the funds that were available to plaintiffs to complete the reconstruction of their home".

Plaintiffs contend that the demands were made for the purposes of "supporting a racist agenda and 'de facto' zoning scheme designed to exclude minorities from residing in the Town of Hancock".

Taking all of the plaintiffs' allegations together and viewing them in the light most favorable to the plaintiff, the Court finds that the Norwood plaintiffs have sufficiently stated an arbitrary denial and a substantive due process claim with respect to the denial of the building permit.

### 3. Orlowski Plaintiffs

**\*10** The Orlowski plaintiffs claim that they "clearly had a property interest in their manufactured home". Defendants argue that the issue is not whether they had a property interest in the manufactured home, but rather, whether they had a property interest in the location of the home.

While not discussed by either party, the ripeness doctrine precludes the Orlowski plaintiffs from seeking review in this Court. Land use challenges, whether pursued as a takings claim under the Fifth Amendment or as violations of equal protection or due process, are subject to the ripeness requirement articulated in *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), which states that a land use challenge is not ripe for judicial review until the government entity charged with implementing the relevant regulations has reached a "final decision" regarding their application to the property at issue. *Lost Trail LLC v. Town of Weston,* 289 F. App'x 443, 444 (2d Cir.2008). Where there has been no final, definitive decision alleged either in the complaint or in plaintiffs' opposition papers that prohibited plaintiffs from developing and using the property, there is no constitutional violation. *See Grossi v. City of New York,* 2009 WL 4456307, at \*5 (E.D.N.Y.2009) (the plaintiff failed to complete the paperwork and file the application with the appropriate offices) (citing *Goldfine v. Kelly,* 80 F.Supp.2d 153, 160 (S.D.N.Y.2000) ("Informal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action.")).

In this matter, the Orlowski plaintiffs do not allege that they applied for a building permit to move their home, nor do they allege that they were denied the right to file any such application. At best, the Orlowski

plaintiffs "informally" discussed whether they needed to apply for a permit with Salvatore. Defendants were not presented with an application and thus, made no decision regarding any building permit application. Consequently, the Orlowski plaintiffs claims are not ripe for review. *See Homefront Org., Inc. v. Motz,* 570 F.Supp.2d 398, 406–11 (E.D.N.Y.2008) (finding claims not ripe for review when "plaintiffs cannot even argue that they made, and were denied, a meaningful application"). [7] Defendants' motion to dismiss the Orlowski plaintiffs' substantive due process claims is granted.

### C. Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To prevail on an equal protection claim based on a theory of selective enforcement, plaintiffs must show both (1) that they were treated differently from other similarly situated businesses and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc.,* 507 F.3d at 790. Where plaintiffs merely alleged less favorable treatment than "similarly situated", plaintiffs fail to state viable equal protection claim. *Ruston v. Town Bd. for the Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010). In order to prevail, plaintiffs must allege facts plausibly indicating that the defendants would have enforced similar regulations when faced with the request of another resident whose situation was similar to the plaintiffs. *Nemeth v. Vill. of Hancock,* 2011 WL 56063, at \*6 (N.D.N.Y.2011). At the motion to dismiss stage, a court must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated. Thus, "[w]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim [and][c]onclusory allegations of selective treatment are insufficient to state an equal protection claim." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills,* 815 F.Supp.2d 679, 698 (S.D.N.Y.2011).

### 1. Norwood plaintiffs

**\*11** Defendants argue that plaintiffs complaint fails to allege an equal protection claim because they failed to plead that they were treated differently from similarly situated individuals. Defendants claim that the Norwood plaintiffs failed to identify any such similarly situated individual and only identified Joel May in response to the within motion. Moreover, defendants claim that even assuming that plaintiffs' allegations are deemed true as to May, plaintiffs fail to allege a sufficient degree of similarity to sustain a cause of action.

In the complaint, the Norwood plaintiffs allege that they have been deprived of equal protection:

> Compared with other similar situations involving other property owners in the Town of Hancock, plaintiffs Norwood have been adversely selectively treated.

The Norwood plaintiffs' portion of the complaint does not refer to Joel May. Because "[t]he totality of [p]laintiffs' allegations regarding[their] Equal Protection claim is a conclusory assertion, without any detail", the claim is subject to dismissal. *See Dellutri v. Vill. of Elmsford,* 2012 WL 4473268, at \*15 (S.D.N.Y.2012) (the plaintiff alleged that the defendant differed in its "treatment to other similarly situated property owners."). In plaintiffs' opposition to the within motion, counsel states, "[p]laintiffs Norwood were treated differently from the Mays, who are similarly situated in that they won property in the same local jurisdiction". Even assuming the Court accepted the assertions regarding Mr. May contained in the Norwood plaintiffs' opposition to this motion, plaintiffs allegations, are insufficient. Plaintiffs do not allege Joel May or the Mays applied for, and were denied, a building permit, under similar circumstances. Possible comparators for the treatment alleged by the plaintiffs herein may be other residents who applied for permits and whose complaints were treated differently, but the Norwood plaintiffs do not identify any such people or allege their existence. *See Caldarola v. Town of Smithtown,* 2010 WL 6442698, at \*9 (E.D.N.Y.2010). The Norwood plaintiffs fail to allege that defendants permitted other landowners with substantially similar properties to develop their land without the need for "prep work" prior to receiving a building permit. Plaintiffs' conclusory statements that defendants acted maliciously and with an intent to harm plaintiffs fail as a matter of law. *See Grossi,* 2009 WL 4456307, at \*9.

Based upon the complaint, even viewing the evidence in a light most favorable to the Norwood plaintiffs, the Court finds that the Norwood plaintiffs have failed to sufficiently allege that they were similarly situated to any property owner.

### 2. Orlowski plaintiffs

In the complaint, the Orlowski plaintiffs allege:

> At this Court appearance, the plaintiffs Orlowski indicated to defendant Salvatore that the same onerous requirements did not apply to the next-door neighbor of the plaintiffs, Joel May, who installed a manufactured home without a permit in 2008, connected it to utilities without a building permit, and has occupied it since then without a certificate of occupancy.

> \* \* \*

**\*12** Compared with other similar situations involving other property owners in the Town of Hancock, plaintiffs Orlowski have been adversely selectively treated.

Assuming the allegations in the complaint as true, the Court finds that the Orlowski plaintiffs have sufficiently plead that they were similarly situated to May. However, upon review of the complaint, the Court finds that plaintiffs have failed to establish the second element necessary for an equal protection claim. Plaintiffs' allegations with respect to "malicious or bad faith intent to injure" are wholly conclusory. Plaintiffs allege:

> As a result of the actions of defendant Salvatore in falsely indicating that it was proper for plaintiffs Orlowski to relocate their manufactured home, and then issuing false violations contrary to his specific directions, and willfully, maliciously, selectively, wrongfully and intentionally prosecuting plaintiffs Orlowski in an effort to prevent them from utilizing their manufactured home, in selectively prosecuting plaintiffs Orlowski for

relocating a manufactured home while allowing their next door neighbor Joel may to do so openly and without sanction, defendants have deprived plaintiffs Orlowski of a substantial property interest.

See Pl. Cmplt at ¶ 17.

However, plaintiffs fail to explain Salvatore's motive. *See Laidlaw Energy and Envtl., Inc. v. Town of Ellicottville, New York,* 2011 WL 4954881, at \*11 (W.D.N.Y.2011) (the plaintiff's complaint was filled with allegations regarding the defendant's illicit motives but an economic interest did not equate to malicious motives nor were the allegations compatible with an intention to injure the plaintiff). Without more than mere conclusory allegations, this does not suffice to establish an intent to harm plaintiffs.

### 3. Leave to Amend

Pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure,* leave to amend a pleading shall be freely given when justice so requires. *See Livingston v. Piskor,* 215 F.R.D. 84, 85 (W.D.N.Y.2003). "Absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, *Rule 15*'s mandate must be obeyed." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 283 (2d Cir.2000) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). In their opposition to defendants' motion, plaintiffs seek leave to amend the complaint. *See* Dkt. No. 12, p. 14. Plaintiffs did not file a cross motion nor did they file a proposed amended complaint. "While the Court is skeptical that plaintiffs can cure the deficiencies, the Court finds it would not be futile to permit plaintiffs the opportunity to amend other portions of their pleading ." *MacPherson v. Town of Southampton,* 738 F.Supp.2d 353, 375 (E.D.N.Y.2010) (the plaintiffs' opposition papers contain a general request for "an opportunity to amend their pleading as *Rule 15* permits, in the event that the Court finds anything lacking."). If the Norwood plaintiffs are able to allege that similarly situated property owners were treated differently, naming such owners, and that they were treated differently as a result of malice, bad faith or intentional discrimination, the Norwood plaintiffs could allege an equal protection claim sufficient to pass *Rule 12(b)(6)* muster. Accordingly, the Norwood plaintiffs' are granted leave to replead their equal protection claim only. *See A.B. C. Home*

*Furnishings, Inc. v. Town of East Hampton,* 947 F.Supp. 635, 647 (E.D.N.Y.1996).

**\*13** With respect to the Orlowski plaintiffs, since there is no evidence of undue prejudice to defendants or dilatory motives by plaintiffs, the Court grants plaintiffs' motion to amend their complaint. Plaintiffs' amended complaint may not add any additional claims, but simply include additional facts in support of their arguments on the equal protection claim.

### D. Norwood's Request for Declaratory Relief

Defendants argue that this Court lacks subject matter jurisdiction over the Norwood plaintiffs' request for declaratory relief because plaintiffs failed to commence an Article 78 proceeding in state court within the applicable statute of limitations. Plaintiffs do not present any argument in support of this claim but assert, "these claims [ ... ] are properly made, however, [plaintiffs] respectfully leave determination of this portion of the complaint within the sound discretion of this Honorable Court". Because plaintiffs fail to sufficiently respond to defendants' arguments for the dismissal of this claim, defendants' burden with regard to those arguments is modest. *See Douglas v. New York State Adirondack Park Agency,* 2012 WL 3999763, at \*30 (N.D.N.Y.2012).

Article 78 affords meaningful and constitutionally-adequate post-deprivation dueprocess. *C.C.S.comUSA, Inc. v. Gerhauser,* 2012 WL 1118625, at \*7 (E.D.N.Y.2012) (citing *inter alia Manza v. Newhard,* 2012 WL 917286, at \*2 (2d Cir.2012) (noting that Article 78 provided plaintiff with adequate post-deprivation due process)); *see also Hampton Bays,* 127 F.Supp.2d at 381 (E.D.N.Y.2001) (availability of Article 78 proceeding precluded procedural due process claim arising from denial of building permit). A proceeding pursuant to N.Y.C.P.L.R. Art. 78 is available to challenge whether an ordinance was enacted in accordance with the proper procedures. *Save Pine Bush, Inc. v. City of Albany,* 70 N.Y.2d 193, 202, 518 N.Y.S.2d 943, 512 N.E.2d 526 (1987). The statute of limitations for Article 78 proceedings is four months. N.Y.C.P.L.R. § 217; *Erie Boulevard Triangle Corp. v. City of Schenectady,* 250 F.Supp.2d 22, 36 (N.D.N.Y.2003) (citing *Matter of Save the Pine Bush v. City of Albany,* 70 N.Y.2d 193, 203, 518 N.Y.S.2d 943, 512 N.E.2d 526 (1987)).

In the Third Cause of Action, the Norwood plaintiffs seek a judgment declaring that plaintiffs are entitled to a building permit and Certificate of Occupancy. Plaintiffs claim that Salvatore improperly ordered plaintiffs to perform work in anticipation of a building permit in an effort to advance his "racist agenda." The claim for declaratory judgment is, "an inappropriate vehicle" because plaintiffs are not challenging the validity of any portion of the Code. See *Sandy Hollow Assoc. LLC v. Inc. Vill. of Port Washington N.,* 2010 WL 6419570, at *24–26 (E.D.N.Y.2010) (citing *Janiak v. Town of Greenville,* 203 A.D.2d 329, 331, 610 N.Y.S.2d 286 (2d Dep't 1994) (declaratory judgment action is the appropriate vehicle for bringing a challenge that is "clearly legislative in nature, as evinced by its general applicability, indefinite duration and formal adoption")). Since plaintiffs' claim is that Salvatore acted beyond the scope of his authority under the Code, the proper forum for plaintiffs' claims was an Article 78 proceeding in the appropriate New York State Supreme Court. *Id.* (citing N.Y. C.P.L.R. § 7803); *see also Trager v. Town of Clifton Park,* 303 A.D.2d 875, 877, 756 N.Y.S.2d 669 (3d Dep't 2003) (claim alleging that "defendant illegally and arbitrarily imposed, and then increased, certain municipal fees" "should have been challenged in a CPLR article 78 proceeding"). In the complaint, the Norwood plaintiffs allege that Salvatore demanded that they perform "prep work" in July 2009 and that he reiterated those demands in September 2009. Plaintiffs' time to bring an Article 78 proceeding has expired. Because plaintiffs did not challenge Salvatore's exercise of authority within four months, plaintiffs are now barred from alleging such claims here.

**\*14** Defendants' motion to dismiss the Norwood plaintiffs' third cause of action for declaratory relief is granted.

### E. Orlowski Plaintiffs' Claim for Malicious Prosecution
Defendants vaguely argue that the Orlowski plaintiffs' malicious prosecution claim must be dismissed because it is barred by the applicable statute of limitations. As noted *supra,* plaintiffs failed to present any clear argument in support of this claim.

Initially, the Court notes that plaintiffs' malicious prosecution claims are ambiguous and it is unclear whether the claim is asserted pursuant to federal and/or state law. In the complaint, the Orlowski plaintiffs' third cause of action is for "malicious

prosecution pursuant to 42 USC 1983". However, in their opposition to defendants' motion to dismiss, the Orlowski plaintiffs allege that their "state law claim" for malicious prosecution is "properly made". While neither party presents any cohesive argument in support or in opposition to this claim, the Court, upon it's own independent review, finds that plaintiffs' malicious prosecution claim, regardless of how it is plead, is subject to dismissal.

In order to state a viable claim for malicious prosecution in New York, a plaintiff must show: (1) the initiation and continuation of criminal process against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) the lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions. *See Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003). In addition, to prevail upon a Section 1983 malicious prosecution claim, a plaintiff must also show that there was a Fourth Amendment "seizure". *Washington v. Cnty. of Rockland,* 373 F.3d 310, 316 (2d Cir.2004). To satisfy the constitutional element, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating plaintiff's personal liberty and privacy interests under the Fourth Amendment. *Id.*

Here, plaintiffs § 1983 malicious prosecution claim is insufficient because plaintiffs failed to plead the seizure element. The Second Circuit has held that "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Dellutri v. Vill.of Elmsford,* 2012 WL 4473268, at *12 (S.D.N.Y.2012) (citing *Burg v. Gosselin,* 591 F.3d 95, 98 (2d Cir.2010)). Some courts have held that a criminal process involving multiple court appearances effects a seizure under the Fourth Amendment. *Id.* (citations omitted). "However, the weight of district court authority in circumstances [ ... ] involving a plaintiff charged with non-felony offenses who was neither arraigned nor physically detained but who might have made a number of court appearances, counsels against finding a constitutional injury." *Id.* (citation omitted); *see also Manbeck v. Micka,* 640 F.Supp.2d 351, 370 (S.D.N.Y.2009) (finding that a seizure had not occurred where plaintiff had not been detained at any point after she had been "issued appearance tickets to appear in Town Justice Court to answer misdemeanor charges of violations of the Town's Zoning Laws" and had a civil

jury trial on the alleged violations); *see also Subirats v. D'Angelo,* 938 F.Supp. 143, 149 (E.D.N.Y.1996) (the plaintiff was issued two summonses to appear in a state court as a result of his alleged violation of the Huntington Town Code).

**\*15** Here, not only have plaintiffs failed to plead a "seizure" to satisfy the constitutional element, plaintiffs have failed to specify the number of court appearances made in connection with the charge. *See Dellutri,* 2012 WL 4473268 at \*12 (the plaintiff did not identify the number of court appearances he made in connection with his trial). There is no evidence that plaintiffs were required to post bail, or that their ability to travel was limited. Given the vague allegations in the complaint, the Court grants defendants' motion to dismiss plaintiffs' 1983 claim for malicious prosecution.

To the extent that plaintiffs intend to assert a claim for malicious prosecution under New York State law, that claim is also subject to dismissal. The statute of limitations under New York law for malicious prosecution is one year. *See* N.Y. CPLR § 215(3); *see also Brown v. Seniuk,* 2002 WL 32096576, at \*3 (E.D.N.Y.2002) (the Statute of Limitations for actions for malicious prosecution is three years under 42 U.S.C. § 1983, and one year under New York state law). The cause of action accrues when there is a favorable termination of criminal proceedings against the plaintiff. *Baggett v. Town of Lloyd,* 2011 WL 4565865, at \*4 (N.D.N.Y.2011) (citing *Roman v. Comp USA, Inc.,* 38 A.D.3d 751, 832 N.Y.S.2d 270 (2d Dep't 2007)).

In this matter, plaintiffs allege that they were found "not guilty" after a trial on October 25, 2010. Therefore, because more than one year elapsed between the termination of the proceedings and the filing of the complaint, plaintiffs state law claim for malicious prosecution is untimely and must be dismissed.

## F. Qualified Immunity

Defendants claim that dismissal is warranted based upon qualified immunity. "The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). For a constitutional right to be

"clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Mollica v. Volker,* 229 F.3d 366, 370–71 (2d Cir.2000) (quoting *Anderson v. Creiehton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting [the] officials was clearly established but was violated, the officials will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.' " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007) (quotation and other citation omitted).

**\*16** The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner,* 494 F.3d at 367 (citing *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for an official to believe that his conduct did not violate a clearly established right, i.e., whether officials of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case." *Id.* (quotation and other citations omitted). If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman,* 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (quotation omitted); *see also Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (quotation omitted).

Having carefully considered the present record, the Court is not well-positioned at this early stage to dismiss plaintiff's claims on the basis of qualified

immunity. The Court finds that "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004). For the Court to find that defendants are entitled to qualified immunity, it would have to engage in improper credibility determinations, which it is unwilling to do. *See Robison v. Via,* 821 F.2d 913, 923–24 (2d Cir.1987).

## CONCLUSION

**IT IS HEREBY**

**ORDERED** that defendants' motion to dismiss plaintiffs' complaint (Dkt. No. 8) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS;** it is

**ORDERED,** that defendant Town of Hancock's motion to dismiss plaintiffs' complaint due to insufficient service is **DENIED;** it is further

**ORDERED,** that defendant Salvatore's motion to dismiss plaintiffs' claims against him in his official capacity, for lack of personal jurisdiction, is **DENIED;** it is further

**ORDERED,** that defendant Salvatore's motion to dismiss plaintiffs' claims against him in his individual capacity, for lack of personal jurisdiction, is **GRANTED;** it is further

**ORDERED,** that defendants' motion to dismiss Norwood plaintiffs' substantive due process claims is **DENIED;** it is further

**\*17 ORDERED,** that defendants' motion to dismiss Orlowski plaintiffs' substantive due process claims is **GRANTED;** it is further

**ORDERED,** that defendants' motion to dismiss Norwood plaintiffs' equal protection claims is **GRANTED with leave to amend as discussed** *supra;* it is further

**ORDERED,** that defendants' motion to dismiss Orlowski plaintiffs' equal protection claims is **GRANTED with leave to amend as discussed** *supra;* it is further

**ORDERED,** that defendants' motion to dismiss Norwood plaintiffs' third cause of action for declaratory relief is **GRANTED;** it is further

**ORDERED,** that defendants' motion to dismiss the Orlowski plaintiffs' malicious prosecution claims is **GRANTED;** it is further

**ORDERED,** that defendants' motion to dismiss the complaint based upon qualified immunity is **DENIED;** it is further

**ORDERED,** that plaintiffs shall file and serve their amended complaint with respect to equal protection claims only, consistent with this Order, within fourteen days of the date of this Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1499599

## Footnotes

1    The background information is taken from plaintiffs' complaint and is presumed true for the purposes of this motion. These are not findings of fact by the Court.

2    The letter was not annexed to plaintiffs' complaint.

3    The letter is not part of the record herein.

4    Defendant does not specify whether he seeks dismissal of all claims, in both his individual and official capacity, based upon lack of personal jurisdiction. However, the Court will assume the motion applies to all claims asserted against Salvatore.

5    At this early juncture, the Court declines to convert this motion to dismiss to one for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. *See, e.g., Global Network Commc'ns, Inc.,* 458 F.3d 150, 155 (2d Cir.2006) (holding that "[t]he conversion requirement of Rule 12(b) ... deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence [outside] the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it" (citations omitted)).

6    Defendants annexed a copy of the alleged building permit application to the reply papers. The application has not been properly authenticated.

7    As the Court has found that the Orlowski plaintiffs' substantive due process claims are not ripe for review, the Court takes no position on whether the Orlowski plaintiffs possessed a vested property right or whether defendants' actions were egregious and/or arbitrary.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.


# *Rossi v. Stevens*

United States District Court for the Southern District of New York

May 2, 2005, Decided; May 2, 2005, Filed

04 Civ. 1836 (CM)(LMS)

**Reporter**
2005 U.S. Dist. LEXIS 47198 *

Rudolph Rossi, Plaintiff, - against - B. Stevens, R. Pangborn, M. Miller, R. Snedden, M. Rynders, Correction Officers; A. Montegari, Sergeant; J. Temple, Hearing Officer; Donald Selsky, Director of Special Housing; William Phillips, Superintendent of Green Haven Prison; and Glenn Goord, Commissioner of the Department of Correction, Defendants.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by *Rossi v. Stevens, 2008 U.S. Dist. LEXIS 76868 (S.D.N.Y., Sept. 30, 2008)*

Motion denied by *Rossi v. Stevens, 2015 U.S. Dist. LEXIS 178691 (S.D.N.Y., Mar. 16, 2015)*

## Core Terms

inmates, religious, exhausted, courts, prison, grievance, allegations, recommend, mail, respectfully, assault, Temple, accommodation, due process claim, injunctive relief, head covering, personal involvement, misbehavior, administrative remedy, correction officer, prison official, diet, excessive force, notice, constitutional right, disciplinary hearing, rights, motion to dismiss, disciplinary, contends

**Counsel:** [*1] For Rudolph Rossi, Petitioner: Evan Mandel, Rishi Bhandari, LEAD ATTORNEYS, Mandel Bhandari, L.L.P., New York, NY.

For Officer B. Stevens, Officer, individually and in his official capacity, R. Pangborn, Officer, individually and in his official capacity, M Rynders, Officer, individually and in his official capacity, Supt. A. Montegari, Seargent, individually and in his official capacity, Donald Selsky, Director of Special Housing, individually and in his official capacity, William Phillips, Superintendent of Green Haven Prison, individually and in his official capacity, Glenn Goord, Commissioner of the Department of Correction Services, individually and in

his official capacity, Respondents: Jose Luis Velez, LEAD ATTORNEY, State of New York, Office of the Attorney General, New York, NY; Inna Reznik, Attorney General of the State of New York, New York, NY.

For M. Miller, Officer, individually and in his official capacity, R. Snedden, Officer, individually and in his official capacity, J. Temple, Hearing officer, individually and in his official capacity, Respondents: Jose Luis Velez, LEAD ATTORNEY, State of New York, Office of the Attorney General, New York, NY; Inna Reznik, Attorney [*2] General of the State of New York, New York, NY.

**Judges:** LISA MARGARET SMITH, UNITED STATES MAGISTRATE JUDGE. THE HONORABLE COLLEEN MCMAHON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LISA MARGARET SMITH

## Opinion

### REPORT AND RECOMMENDATION

**TO: THE HONORABLE COLLEEN MCMAHON,**

**UNITED STATES DISTRICT JUDGE**

Plaintiff Rudolph Rossi, proceeding pro se and in forma pauperis, brings this Complaint pursuant to *42 U.S.C. § 1983* against the above-named Defendants. Plaintiff filed his Complaint on February 20, 2005, [1] seeking money damages and declaratory and injunctive relief based on Defendants' alleged violations of Plaintiff's *First*, *Fourth*, *Eighth*, and *Fourteenth Amendment* rights. The claims arise from an incident that occurred at Green

---

[1] Plaintiff's Complaint was stamped "Received" by this Court's Pro Se office on that date.

Haven Correctional Facility.

On July 14, 2004, Defendants filed a Motion to Dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, asserting that Plaintiff has failed to exhaust his administrative remedies, and has failed to state a claim upon which relief can be granted. Defendants also assert that they are entitled to *Eleventh Amendment* immunity and that Plaintiff is not entitled to injunctive relief. For **[*3]** reasons stated below, I conclude, and respectfully recommend that Your Honor should conclude, that Defendants' Motion to Dismiss should be granted in part and denied in part. Specifically, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has stated a claim of excessive force, Plaintiff has stated a denial of due process claim, but only with respect to Defendant Temple, Plaintiff has failed to state a denial of religious accommodation claim, and Plaintiff has stated a denial of access to courts claim, but only with respect to Superintendent Phillips. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's excessive force claim should proceed as against Defendants Stevens, Pangborn, Miller, Snedden, Rhynders, and Montegari; Plaintiff's due process claim should proceed only as against Defendant Temple; Plaintiff's religious accommodation claim should be dismissed; and Plaintiff's access to courts claim should proceed only as against Defendant Phillips.

## Facts Alleged in Plaintiff's Complaint [2]

At all relevant times, **[*4]** Plaintiff was an inmate at Green Haven Correctional Facility. [3] *See* Complaint (Docket # 2) at P 3. Plaintiff alleges that on July 30, 2003, he was "arbitrarily singled out from a group of prisoners under the false pretext that [he] had contraband in [his] left pocket]." *Id.* at P 13. Plaintiff next alleges that Correction Officer Stevens and Correction Officer Panghorn escorted Plaintiff to a "secluded corner," where he was searched. [4] *Id.* at P 14. According to Plaintiff's Complaint, Rossi was then "pushed into the wall, struck in the back of the head and

---

[2] For purposes of this Motion, the allegations in Plaintiff's Complaint are accepted as true.

[3] Plaintiff is currently incarcerated at Southport Correctional Facility.

[4] According to Plaintiff's Complaint, the Correction Officers did not find any contraband on Plaintiff's person. *See* Complaint at P 14.

wrestled to the floor." [5] *Id.* Plaintiff contends that following this alleged assault he was handcuffed and again assaulted by Correction Officers Stevens, Panghorn, Miller, Snedden, and Rhynders [6] "under the supervision of Sgt. Montegari." *Id.* at PP 15-16. [7]

Following this incident Plaintiff was taken to the Special Housing Unit ("SHU") at Green Haven Correctional Facility, where he was "seen by medical" and where he had his injuries photographed. *Id.* at P 17. Plaintiff claims that as a result of the alleged assaults he sustained injuries to his head, ribs, back, legs, shoulder, and arm. *Id.* at P 18. Plaintiff states that physical therapy was "required" for his shoulder and that he continues to suffer from pain. *Id.*

Plaintiff further claims that after the alleged incident occurred, Correction Officers Stevens, Panghorn, Miller, Snedden, Rhynders, and Sergeant Montegari "falsified documents to justify their brutal conduct." *Id.* at P 19. Specifically, Rossi contends that Correction Officers **[*6]** Stevens and Panghorn wrote a misbehavior report falsely accusing Plaintiff of refusing a direct order, violating pat frisk procedure, and assaulting prison staff. *Id.* at P 20 .

Plaintiff's Complaint also contains allegations concerning the Tier III hearing that was conducted following the filing of the misbehavior report. Plaintiff asserts that Defendant Temple, the hearing officer who presided over Plaintiff's Tier III hearing, violated Plaintiff's due process rights by denying Plaintiff the right to have his hearing conducted by a fair and impartial hearing officer, the right to "present documentary evidence," the right to receive "written specification" of the grounds for the Tier III hearing, and the right to "substantial evidence." *Id.* at P 21. Plaintiff was found guilty of all charges. As a result, Plaintiff was placed in SHU confinement for a period of twelve months and lost

---

[5] It appears that only Correction Officers Stevens and Panghorn were involved in this initial assault.

[6] Although this Defendant's name is spelled "Rynders" in the caption, the **[*5]** correct spelling is Rhynders. *See* Eagen Declaration, Ex. B (Inter-Departmental Communication filed by Correction Officer Rhynders).

[7] Following the initial assault by Correction Officers Stevens and Panghorn, Plaintiff claims that he was assaulted two more times, the latter of which involved only Correction Officers Miller and Rhynders and an unknown correction officer. This unknown correction officer is not named as a Defendant in Plaintiff's Complaint.

all privileges. Id. at P 22.

Plaintiff appealed Defendant Temple's decision to Defendant Selsky, who is the Director of the Special Housing Unit. Plaintiff states the following as grounds for his appeal: (1) the misbehavior report read into the record during the hearing did not state that Plaintiff assaulted [*7] prison staff, (2) Plaintiff was denied the right to submit relevant documentary evidence, (3) an extension was not granted to continue the hearing beyond the fourteen-day time period, [8] (4) Plaintiff was denied the right to have his hearing conducted by a fair and impartial hearing officer, and (5) the "statement of evidence" upon which Defendant Temple relied in rendering his decision did not support the charge brought against Plaintiff that he had assaulted prison staff. Id. at P 23. Plaintiff further states that after Defendant Temple's decision was affirmed, Plaintiff's request for reconsideration was "ignored." Id. at P 24, 25. Plaintiff contends that Defendant Selsky violated Plaintiff's due process rights by affirming Defendant Temple's decision. Id. at P 23-24, 28.

Plaintiff further alleges that during his confinement in SHU he was, inter alia, not given "a proper diet consistent with [his] religious beliefs," and that his outgoing mail, including legal mail, was "discrimina[torily] thrown out." Id. at P 26.

## DISCUSSION

### Exhaustion of Administrative Remedies

The Prison Litigation Reform Act provides,
> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The Supreme Court has held that this mandatory exhaustion requirement "applies to all inmate suits about prison [*9] life, whether they involve general or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). [9] The Supreme Court's decision in Porter makes clear that a prisoner must exhaust every claim that he or she wishes to assert before filing a suit in federal court. See Porter, 534 U.S. at 532. Exhaustion is required even where the specific form of relief sought is not available through administrative procedures. See e.g. Booth v. Churner, 532 U.S. 731, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2000). In addition, an inmate plaintiff's complaint must plead the elements of exhaustion with sufficient particularity and support. See e.g. Fields v. Brown, 2002 U.S. Dist. LEXIS 18548, at *8 (S.D.N.Y. Oct. 1, 2002) (holding that a plaintiff "must allege in his [or her] complaint that he [or she] has exhausted his [or her] administrative remedies and attach the appropriate documentation, including administrative decisions, demonstrating exhaustion.")

Although the law remains unsettled as to precisely what constitutes exhaustion, it is generally accepted that a prisoner must grieve his or her complaint about prison conditions through the highest level of administrative review before filing a lawsuit in federal court. See Abney v McGinnis, 01 Civ. 8444 (SAS), 2002 U.S. Dist. LEXIS 12180, at *8 (citing Hemphill v. New York, 198 F. Supp. 2d 546, 548 (S.D.N.Y. Apr. 19, 2002) ("Inmates must therefore exhaust all administrative remedies, at all levels of appeal, in order for their claims to survive a motion to dismiss."))

In New York, inmates may file grievances with respect to nearly every aspect of custody. See Sulton v.

---

[8] Section 251-5.1(b) of Title 7 of the Official Compilation of Codes, Rules and Regulations of the State of New York provides, "[t]he disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any [*8] delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals." Here, Defendants have not offered evidence to rebut Plaintiff's claim that the hearing was not completed within the fourteen-day time period, nor is there evidence in the record to show that informing Plaintiff of the reasons for such a delay would have jeopardized institutional safety or correctional goals.

---

[9] Prior to Porter, the law in the Second Circuit was that the exhaustion requirement under the PLRA did not apply to all claims. See e.g. Nussle v. Willette, 224 F.3d 95 (2d Cir. 2000) (holding that the exhaustion requirement [*10] was not meant to apply to assault and excessive force claims). The Supreme Court's holding in Porter modified the law of the Second Circuit such that exhaustion of administrative remedies is required in all cases involving incidents or events within prison walls regardless of whether available administrative remedies are adequate.

*Greiner, 00 Civ. 0727 (RWS), 2000 U.S. Dist. LEXIS 17887, at *7 (S.D.N.Y. Dec. 11, 2000)* ("New York inmates can file grievances with the inmate grievance committee on practically any issue affecting [*11] their confinement.") For instance, under *7 N.Y.C.R.R. § 701.2(a)* an inmate may grieve the application of any prison regulation. The Inmate Grievance Program in New York entails a three-step review process under which an inmate's grievance is first reviewed by a committee of inmates and Department of Correction employees; the committee's decision is subject to review by the superintendent of the correctional facility. Inmates may then appeal the decision of the superintendent to the Central Office Review Committee ("CORC") for a final administrative determination. It is only upon such a final determination that an inmate can be said to have exhausted his or her administrative remedies.

Courts have delineated circumstances under which exhaustion may be excused. For instance, in *Thomas v. New York State Dep't of Corr. Servs., No. 00 Civ. 7163 (NRB), 2002 U.S. Dist. LEXIS 18341, 2002 WL 31164546, at *3 (S.D.N.Y Sept. 30, 2002)*, the district court determined that the prisoner's failure to exhaust was excused because the prisoner made a reasonable attempt to file a grievance and was prevented from doing so by prison officials, thus rendering the grievance procedure "unavailable" for purposes of exhaustion.

Here, Plaintiff's [*12] Complaint asserts excessive force, denial of due process, denial of religious accommodation, and denial of reasonable access to the courts claims. Plaintiff's religious accommodation claim has two prongs. Specifically, Plaintiff contends that prison regulations violate Plaintiff's *First* and *Fourteenth Amendment* rights by restricting Plaintiff's ability to maintain a diet that is consistent with his religious beliefs (Directive 4932) and by restricting Plaintiff from wearing a religious head covering (Directive 4202).

Defendants concede in their moving papers that Plaintiff has exhausted his administrative remedies with respect to his excessive force claim. Defendants also concede in their moving papers that Plaintiff has exhausted his administrative remedies with respect to the religious head covering component of his religious accommodation claim and his denial of access to courts claim, although Defendant maintains that none of the Defendants were named in Plaintiff's head covering and access to courts grievances. Accordingly, Defendants contend, Plaintiff's religious head covering and access to courts claims have not been exhausted as against

Defendants Goord and Phillips because [*13] a grievance was not filed and/or fully exhausted by Plaintiff against Defendants Goord and Phillips for denying him religious accommodation and reasonable access to the courts. Defendants also contend that a grievance was not filed and/or fully exhausted by Plaintiff against Defendants Stevens, Pangborn, Temple, and Selsky for denying Plaintiff due process. In addition, at a pretrial conference before the undersigned on April 5, 2005, Defendants conceded that Plaintiff has exhausted his administrative remedies with respect to the religious diet component of his religious accommodation claim, and may have exhausted his religious head covering claim. [10]

Because Defendants have conceded that Plaintiff has exhausted his excessive force and religious diet claims, I will address the exhaustion issue only with respect to Plaintiff's denial of due [*14] process, religious head covering, and access to courts claims.

Plaintiff's Denial of Due Process Claim

Defendants assert correctly that Congress has replaced the "general rule of non-exhaustion with a general rule of exhaustion," *Porter, 534 U.S. at 525*. This Circuit has, however, held that the affirmative defense of exhaustion is subject to estoppel. See *Ziemba v. Wezner, 366 F.3d 161, 162, 163 (2d Cir. 2004)* (finding that prison officials prevented the plaintiff from exhausting his administrative remedies by beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another prison, and thus were estopped from asserting failure to exhaust as an affirmative defense).

Shortly after deciding Ziemba this Circuit considered a quintet of cases concerning the nature and scope of the exhaustion requirement, and directed the district courts to ascertain, *inter alia*, whether a plaintiff has plausibly alleged "special circumstances" to justify his or her failure to comply with the PLRA's exhaustion requirement. *Hemphill v. State of New York, 380 F.3d 680 (2d Cir. 2004)*; *Ortiz v. McBride, 380 F.3d 649 (2d Cir. 2004)*; *Giano v. Goord, 380 F.3d 670 (2d Cir. 2004)*;

---

[10] In a letter to the Court dated April 12, 2005, Defendants concede that Plaintiff has exhausted his religious head covering claim, but reiterate the claim first asserted in their moving papers that Plaintiff has not exhausted this claim as against Defendants Goord and Phillips because neither of these Defendants was named in Plaintiff's grievance.

**[*15]** *Johnson v. Testman, 380 F.3d 691 (2d Cir. 2004)*; *Abney v. McGinnis, 380 F.3d 663 (2d Cir. 2004)*.

The Second Circuit's decision in Giano is particularly instructive. The plaintiff in Giano submitted to a urine test on September 30, 1996. Subsequently the defendants tampered with the plaintiff's urine sample and, as a result, a misbehavior report was issued against the plaintiff. The plaintiff claimed that the defendants took these actions in retaliation for the plaintiff having filed a lawsuit against prison officials. At the ensuing disciplinary hearing several of the defendants allegedly presented false documents and false testimony. Retaliation against the plaintiff by the defendants continued in November 1996. At a second disciplinary hearing the defendants again presented false documents and false testimony. The plaintiff appealed the decision to Commissioner Goord. The plaintiff's appeal contained arguments similar to that which Rossi has raised. In particular, Giano claimed that the hearing officer "could not act in an impartial manner," and that "no proper foundation had been laid" for the charges brought against him. *Giano, 380 F.3d at 674* (quoting Petitioner's appeal to Commissioner **[*16]** Goord). Commissioner Goord affirmed the result of the second disciplinary hearing.

The district court (Arcara, J.) sua sponte issued an order requiring the plaintiff to detail his efforts to exhaust his administrative remedies. In response to that order, Giano submitted a statement explaining that he had pursued his retaliation claims through the disciplinary process via an appeal to Commissioner Goord, arguing, as has Rossi, that New York prison regulations and Directive 4040 state that disciplinary decisions and dispositions are non-grievable and that Giano was therefore prohibited from filing a grievance for the harm that the defendants allegedly caused.

The district court dismissed Giano's complaint, concluding that he had failed to satisfy the PLRA's exhaustion requirement. The Court of Appeals vacated the district court's decision based on its holding in *Lawrence v. Goord, 238 F.3d 182 (2d Cir. 2001)*, in which the Court determined that the PLRA did not require inmates to exhaust retaliation claims. Following Porter the case was remanded to the district court, and Giano filed a timely Notice of Appeal.

On appeal the Second Circuit determined that special circumstances justified Giano's **[*17]** failure to comply with administrative procedural requirements. Specifically, the Court of Appeals determined that "the plaintiff reasonably interpreted DOCS regulations to mean that his only administrative recourse was to appeal his disciplinary conviction." *Giano, 380 F.3d at 676*. The Court of Appeals further stated that it was not appropriate to analogize the PLRA's exhaustion requirement to the procedural default rule applicable in the habeas context. *Id. at 678*. The Court of Appeals explained that "[w]hat is justification in the PLRA context for not following procedural requirements . . . must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." Id.

Directive 4040 provides, in pertinent part, ". . . the individual decisions or dispositions of the following are not grievable: . . . disciplinary proceedings." Understandably this provision could have led an uncounselled inmate such as Plaintiff to believe that he could not pursue matters relating to his disciplinary hearing through the Inmate Grievance Procedure. Defendants argue that because Plaintiff's allegations regarding his **[*18]** disciplinary hearing do not concern the disposition of the hearing, Directive 4040 is inapplicable. In other words, Defendants argue that because Plaintiff's claims regarding his disciplinary hearing are at heart due process claims, such claims were grievable and Plaintiff was not precluded by Directive 4040 from grieving such claims. Plaintiff cannot be expected to grasp such legal niceties. As with the plaintiff in Giano, Plaintiff's failure to file a grievance with respect to his denial of due process claim "was justified by his reasonable belief that DOCS regulations foreclosed such recourse." *Giano, 380 F.3d at 678*.

Because New York rules preclude Plaintiff from filing a grievance with respect to this issue now, I find, and respectfully recommend that Your Honor find, that administrative remedies are not "available" to Rossi, and that such lack of availability is due to justified behavior by Plaintiff. See *7 N.Y.C.R.R. § 701.7(a)(1)* ("An inmate must submit a complaint to the grievance clerk within 14 calendar days of an alleged occurrence on Inmate Grievance Complaint Form # 2131"); see also *Giano, 380 F.3d at 679-80*. I therefore conclude, and respectfully recommend that Your Honor **[*19]** should conclude, that Plaintiff has exhausted his denial of due process claim.

Plaintiff's Denial of Access to Courts Claim

As with Plaintiff's religious head covering claim, Defendants contend that a grievance was not filed

and/or fully exhausted by Plaintiff against Defendants Goord and Phillips for denying him access to the courts. Defendants assert that "[i]f plaintiff wanted to pursue a claim against [Defendants Goord and Phillips], he should have filed a grievance against them to put them on notice and should have provided the Inmate Grievance Resolution Committee with enough detail regarding the alleged incident[s] so that it could evaluate the merits of his grievance and take the appropriate course of action." Defendants' Memorandum at 6. In support of their argument Defendants point to the Sixth Circuit's requirement that an inmate's grievance "name each person who will be a defendant in the lawsuit." See Curry v. Scott, 249 F.3d 493, 504-05 (6th Cir. 2001).

Defendants' argument is unavailing not only because Sixth Circuit case law is not binding on this Circuit, but also because case law in this Circuit adheres to a less stringent approach. The PLRA's exhaustion requirement [*20] is designed to " 'afford [] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d at 697 (quoting Porter, 534 U.S. at 524-25). This Circuit has construed the PLRA's exhaustion requirement to be akin to the rules of notice pleading, which prescribe that a complaint "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234 (2d Cir. 2004). This Circuit has thus determined that a grievance is sufficient if it alerts prison officials to the nature of the wrong for which redress is sought. Johnson, 380 F.3d at 697 (citation omitted). As with notice pleading, " 'the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.' " Id. (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002)). Based upon this standard, the Court of Appeals found that although the plaintiff in Johnson v. Testman did not name the defendant in the answer he gave initially during [*21] his disciplinary proceeding, Johnson's submissions on appeal described the defendant clearly and afforded prison officials all the information necessary to commence an investigation into the underlying incident. Further, under New York's Administrative Code Rossi was not required to name either Defendant in his grievance. 7 N.Y.C.R.R. 701.7(a)(1)(i) provides,

> In addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint.

Here, Plaintiff's submissions with respect to his denial of access to courts claim comport with the exhaustion requirements as construed in this Circuit. Plaintiff's submissions were sufficient in terms of putting prison officials on notice of Rossi's concerns regarding the integrity of outgoing mail from SHU. On August 20, 2003, Plaintiff filed a "Grievance Complaint" that contained two headings: "Description of Incident" and "Action Requested." See Plaintiff's Opposition, Ex. C. Plaintiff maintains that he never received a response to this grievance. [*22] Plaintiff further states that he filed a second "complaint and grievance" on August 30, 2003, and a third "complaint" on February 10, 2004. [11] These two submissions were addressed to Defendant Goord and state explicitly that they concern the inaction of Defendant Phillips. The content of these submissions, considered in the context of this Circuit's liberal approach to exhaustion, lead me to conclude that Plaintiff had identified Defendants Goord and Phillips clearly and had afforded prison officials all the information necessary to commence an investigation into Plaintiff's allegations concerning outgoing mail from SHU. Further, accepting as true Plaintiff's allegation that prison officials never responded to his initial grievance, Plaintiff cannot be found to have failed to exhaust. See Giano, 380 F.3d at 677 (citing Foulk v. Charrier, 262 F.3d 687 (8th Cir 2001) (noting that special circumstances may render administrative remedies "unavailable," and finding that remedies were not available to the plaintiff where the warden did not respond to the inmate's grievance during the time period required by regulations)). I therefore conclude, and respectfully recommend that Your Honor should [*23] conclude, that Plaintiff has exhausted his access to courts claim as against Defendants Goord and Phillips.

## Plaintiff's Religious Head Covering Claim

The same can be said of Plaintiff's efforts to exhaust the religious head covering component of his religious accommodation claim. As with the grievances filed with respect to Plaintiff's access to courts claim, Plaintiff's

---

[11] Plaintiff explains that this latter filing was made after Plaintiff received notice from the District Court for the Northern District of New York that his objections to a magistrate judge's ruling were not received by the district court and that a decision had been rendered against him. See Plaintiff's Opposition at 3.

submissions with respect to the head covering claim were sufficient in terms of putting prison officials on notice of Rossi's concerns regarding his desire to wear a religious head covering, and how Directive 4202 allegedly infringed Plaintiff's *First* and *Fourteenth Amendment* rights. See Eagen Declaration, Ex. C. Further, the superintendent's decision makes clear that Plaintiff's submissions sufficiently apprised the prison of the situation to which Rossi objected. See id. I therefore find, and respectfully **[*24]** recommend that Your Honor find, that Plaintiff has exhausted his religious head covering claim as against Defendants Goord and Phillips.

Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has exhausted his administrative remedies with respect to all claims raised in the underlying action.

### *Eleventh Amendment* Immunity

Absent a waiver on the part of the state or a valid congressional override, the *Eleventh Amendment* prohibits federal courts from entertaining suits by private parties against the states. *Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*. The *Eleventh Amendment* also bars suits against state officials if the state is the real party interest, regardless of whether the state is named as a party to the action. *Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)*. Accordingly, when a state official is named as a party to litigation, as is the case here, the court must determine whether the action is in reality a suit against the state. *Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)*. As a general rule a suit is against the sovereign if the parties are seeking damages that would be paid from public funds in the state **[*25]** treasury.

The *Eleventh Amendment* thus bars recovery against a state official who is sued in his or her official capacity. The *Eleventh Amendment* does not, however, protect a state official from personal liability if he or she is sued in his or her individual or personal capacity. *Graham, 473 U.S. at 166-67*. The *Eleventh Amendment* does not protect state officials from personal liability when their actions violate Federal law, even if a state official is following a state law that purports to require such action. *Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988)* (citation omitted) (noting Justice Frankfurter's discussion of the intervening years following enactment of the

original Civil Rights Act of 1866 during which every case before the Supreme Court invoking "under color of state law" provisions " 'involved action taken either in strict pursuance of some specific command of state law or within the scope of executive discretion in the administration of state laws,'" and noting that the Supreme Court uniformly found that acting in conformity with state law did not shield actors from liability). State officials thus can be personally liable for carrying out unconstitutional state policies. **[*26]** Id.

Here, Defendants contend that although Plaintiff is suing Defendants in their personal and official capacities, "there is really no question that plaintiff is suing these defendants in their official capacity." Defendants' Memorandum at 11. Defendants maintain that the state is the real party in interest in the underlying suit and that the *Eleventh Amendment* therefore bars the suit, including any claim for money damages against the Defendants in their official capacity. In assessing whether the *Eleventh Amendment* bars recovery in this action, it is thus incumbent upon this Court to determine whether Plaintiff has sued Defendants in their personal or official capacities. In other words, the Court must ascertain whether the state is the real party in interest.

Personal or individual capacity suits seek to impose personal liability on a government official for actions he or she took under color of state law. *Shabazz v. Coughlin, 852 F.2d 697, 700 (2d Cir. 1988)* (citing *Graham, 473 U.S. at 165*). Official capacity suits effectively are suits against a governmental entity. *Shabazz, 852 F.2d at 700* (citing *Graham, 473 U.S. at 165-66*); see also *Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* **[*27]** (noting that official capacity suits "generally represent another way of pleading an action against an entity of which an officer is an agent.")

Here, the record demonstrates that Plaintiff has in fact brought suit against Defendants in their personal capacities. First, Rossi seeks compensatory and punitive damages, which are unavailable in an official capacity action. See e.g. *Shabazz, 852 F.2d at 700* (finding that state official Defendants were not immune from suit under the *Eleventh Amendment* where Plaintiff sought punitive and compensatory damages). Second, Rossi alleges the personal involvement of each of the Defendants in the alleged constitutional violations, an issue that is relevant only to personal capacity claims. Third, Defendants acknowledge the existence of personal capacity claims by arguing lack of personal

involvement in their Motion to Dismiss.

I therefore conclude, and respectfully recommend that Your Honor should conclude, that although the *Eleventh Amendment* bars Rossi from prosecuting his damages action against Defendants in their official capacities, the *Eleventh Amendment* does not bar Rossi from pursuing his claims against Defendants in their individual capacities. **[*28]** See e.g. *Gittens v. Sullivan, 720 F. Supp. 40, 44 (S.D.N.Y. Sept. 19, 1989)* ("[W]here . . . a defendant is sued in his [or her] personal capacity as well [as his or her official capacity], he [or she] loses the protection of the *Eleventh Amendment* and may be held personally liable for damages.") To establish personal liability on a *§ 1983* claim, it is sufficient to demonstrate that the state official, acting under color of law, caused the deprivation of a federal right. *Graham, 473 U.S. at 166* (citing *Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961)*. A state official in a personal capacity action may, however, be able to assert personal immunity defenses, such as lack of personal involvement, which will be discussed *infra*.

#### Federal Rule of Civil Procedure 12(b)(6)

Under *Federal Rule of Civil Procedure 12(b)(6)*, a plaintiff's complaint may be dismissed if it fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. In ruling on a 12(b)(6) motion to dismiss, "the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint," and is to "assume all well-pleaded factual allegations to be true, and to view **[*29]** all reasonable inferences that can be drawn from such allegations in the light most favorable to the plaintiff." *Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir. 1999)* (internal citations omitted). An action will not be dismissed pursuant to *Rule 12(b)(6)* " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.' " *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). This rule applies with "even greater force" to claims of civil rights violations. *Easton v. Sundram, 947 F.2d 1011, 1015 (2d Cir. 1991)*. When determining whether a plaintiff has alleged facts sufficient to withstand a motion to dismiss, complaints from pro se plaintiffs are construed liberally and held " 'to less stringent standards than formal pleadings drafted by lawyers.' " *Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997)* (quoting *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d*

*652 (1972)* (per curiam)). Moreover, the Second Circuit has held that "[a] complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir. 1995)*.

#### Plaintiff's **[*30]** Excessive Force Claim

Plaintiff alleges that he was subjected to excessive force by Defendants Stevens, Panghorn, Miller, Snedden, and Rhynders "under the supervision of Sgt. Montegari." Complaint at P 15. At a pretrial conference before the undersigned on April 5, 2005, Defendants conceded that Plaintiff has exhausted his excessive force claim and that he states a claim that should proceed with discovery. Moreover, Defendants have not moved to dismiss as to Plaintiff's excessive force claim. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's excessive force claim should proceed with discovery.

#### Plaintiff's Denial of Due Process Claim

Plaintiff argues that Defendants Stevens, Pangborn, Temple and Selsky violated his due process rights. To state a cognizable *§ 1983* due process claim, a plaintiff must demonstrate that he or she possessed a protected liberty or property interest and that he or she was deprived of that interest without due process of law. *Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir.1996)*; *Frazier v. Coughlin, 81 F.3d 313, 316 (2d Cir.1996)*.

The constitutionally protected interest in this case is the right of liberty. "A prisoner's **[*31]** liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richardson, 364 F.3d 60, 64 (2d Cir. 2004)* (quoting *Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*); see also *Welch v. Bartlett, 196 F.3d 389, 394 n. 4 (2d Cir. 1999)* (New York state law "create[s] a liberty interest in not being confined to the SHU.") In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, noting that "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Palmer, 364 F.3d at 64* (quoting *Sealey v. Giltner, 197 F.3d 578, 586*

*(2d Cir.1999))*.

Defendants contend that even if the Court finds that Plaintiff has demonstrated that his SHU confinement amounted to a violation of Rossi's liberty interest, thus triggering due process protections, Plaintiff received all the process that he was due.

The Supreme Court has **[*32]** set forth a balancing test for determining the process due an inmate. *Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)*. Under this balancing test courts consider (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural safeguards would entail. *Mathews, 424 U.S. at 335*.

To comply with the minimum requirements of due process in connection with a prison disciplinary proceeding, the state must afford the following to prisoners: (1) written notice of the charges brought against the inmate at least twenty-four hours before the hearing, (2) the opportunity to call witnesses and present evidence so long as doing so will not jeopardize institutional safety or correctional goals, (3) a fair and impartial hearing officer, and (4) a written statement of the disposition, including the evidence relied on and the reasons for the disciplinary action taken. *Samuels v. Selsky, 01 Civ. 8235 (AGS), 2002 U.S. Dist. LEXIS 17089, at *11 (S.D.N.Y. Sept. 12, 2002)*; **[*33]** see also *Gittens v. Sullivan, 720 F. Supp. 40, 42 (S.D.N.Y. Sept. 19, 1989)* (citing *Wolff v. McDonnell, 418 U.S. 539, 563-67, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974))*. Since *Wolff* the Supreme Court has clarified that judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence. *Welch v. Kennedy, No. 03-CV-0293 (SR), 2005 U.S. Dist. LEXIS 7206, 2005 WL 735941, at *4 (W.D.N.Y. Mar. 30, 2005)*. This standard is satisfied if there is any evidence in the record to support the disciplinary ruling so long as such evidence is reliable. *Id*.

### Defendants Stevens and Pangborn

Plaintiff contends that Defendants Stevens and Pangborn violated his due process rights by filing a misbehavior report that falsely accused Plaintiff of

refusing a direct order, violating pat frisk procedure, and assaulting prison staff. Complaint at P 20. Although inmates have the right not to be deprived of a protected liberty interest without due process of law, inmates do not have constitutionally guaranteed immunity from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest. *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)*; see also *Greaves v. State of New York, 958 F. Supp. 142, 144 (S.D.N.Y. Jan. 29, 1997)* **[*34]** (citation omitted) (". . . [T]he failure to conduct a constitutionally adequate disciplinary hearing may give rise to a *Section 1983* action, but the mere filing of a false misbehavior report against an inmate does not.")

I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to state a viable due process claim as to Defendants Stevens and Pangborn.

### Defendants Temple and Selsky

Plaintiff contends that Defendant Temple violated Plaintiff's right to have his hearing conducted by a fair and impartial hearing officer, right to "present documentary evidence," right to receive "written specification" of the grounds for the Tier III hearing, and right to "substantial evidence." Complaint at P 21. Plaintiff further contends that Defendant Selsky violated his due process rights by affirming Defendant Temple's decision. Complaint at PP 21, 22. I will first address Plaintiff's allegations as against Defendant Temple.

As to the impartial hearing officer prong of Plaintiff's due process claim, Wolff requires that a hearing officer not be so insufficiently impartial as to present "a hazard of arbitrary decision making." *Wolff, 418 U.S. at 571*. In New **[*35]** York there is a "presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975)*. This Circuit has held that such a presumption of honesty and integrity applies to prison officers, and that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts. *Rivera v. Senkowski, 62 F.3d 80, 86 (2d Cir. 1995)* (noting the presumption that a prison official's acts to maintain order are done for a proper purpose); see also *Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996)*. Such a presumption notwithstanding, under some circumstances the bias of a hearing officer may rise to the level of a due process violation. See *Powell v. Ward, 392 F. Supp. 628, 633*

*(S.D.N.Y. Apr. 23, 1975)*, modified, *542 F.2d 101 (2d Cir. 1976)* (finding that it is implicit in the notions of fairness in the *Due Process Clause* that a hearing officer should not have been an investigative officer or witness).

Here, Plaintiff asserts that Defendant Temple testified on behalf of Defendants Stevens and Pangborn, explaining that the correction officers could not recall the incident in question. See Plaintiff's Opposition at 8. **[*36]** Defendants have not offered any evidence to rebut either this particular allegation, or Plaintiff's primary allegation that Defendant Temple was not impartial. Moreover, the Court has not been provided with a transcript from the hearing and is therefore unable to ascertain whether Defendant Temple conducted the hearing in a fair and impartial manner. Because the Court is constrained on a Motion to Dismiss to accept as true Plaintiff's allegations, and because Defendants have not presented evidence to rebut such allegations, I find, and respectfully recommend that Your Honor find, that Plaintiff has stated a claim with respect to the impartial hearing officer prong of his due process claim.

Plaintiff also claims that he was denied the right to present documentary evidence. As noted supra, inmates have the right to present documentary evidence at a disciplinary hearing so long as doing so does not threaten institutional safety or correctional goals. *Wolff, 418 U.S. at 566*. ". . . [A]n **[*37]** inmate's right to present documentary evidence in his [or her] defense does not entail an obligation on the part of prison officials to retrieve every document that an inmate requests for his [or her] case." *Crawford v. Braun, 99 Civ. 5851 (JCF), 2002 U.S. Dist. LEXIS 22978, at * 28 (S.D.N.Y. Sept. 4, 2002)*. Further, " 'prison officials must have the necessary discretion to keep [a prison disciplinary] hearing within reasonable limits." Id. (quoting *Wolff, 418 U.S. at 566*).

Defendant contends that because Plaintiff has failed to specify what documents he had in his possession, or that DOCS had in its possession, that would have been material or relevant to the charges brought against him, Plaintiff's conclusory assertions fail to plead a claim for relief. Although Plaintiff's Complaint is devoid of such specificity, Plaintiff identifies in his Opposition to Defendants' Motion the documents that he sought to present at his disciplinary hearing. Plaintiff states that he sought permission to present as evidence the photographs of his injuries and a copy of Defendant Stevens' injury report. See Plaintiff's Opposition at 8.

Plaintiff contends that both of these requests were "denied without **[*38]** explanation." [12] Id. Accordingly, I find, and respectfully recommend that Your Honor find, that Plaintiff has stated a claim with respect to the documentary evidence prong of his due process claim.

Plaintiff further asserts that he did not receive "written specification of the particulars." The Court construes this prong of Plaintiff's due process claim to be an assertion that Rossi was not afforded written notice of the charges brought against him. Plaintiff claims that "[t]he misbehavior report read into the record [at the disciplinary hearing] did not say that [Plaintiff] assaulted anyone," and that "no misbehavior report charging [Plaintiff] for assault on staff was read into the record [at the disciplinary hearing]." Complaint at PP 23-24. Plaintiff further explains in his Opposition to Defendants' Motion that the misbehavior report that was read into the record at the hearing "was written by [Defendant] Panghorn[,] who alleged that after disobeying a direct order and violating pat frisk procedures, plaintiff **[*39]** spun off the wall to his left, was wrestled to the floor, handcuffed and taken to the box. The misbehavior report did not allege or charge plaintiff with assault on staff and no other misbehavior report was read into the record." Plaintiff's Opposition at 7.

Defendants argue that Plaintiff did in fact receive written specification of the charges brought against him, including the allegation that he assaulted staff. As support for this argument, Defendants point to Paragraph 20 of Plaintiff's Complaint wherein Plaintiff states, "Defendants Stevens and Pangborn wrote misbehavior reports that falsely accused me of refusing a direct order, violating pat frisk procedure and assault on staff." Defendants contend that because Plaintiff "concedes" that the misbehavior report charged him with assault, he received written specification of the charges against him. Although the reports filed by Correction Officers Pangborn and Stevens do not use words such as "assault," the language contained therein is sufficient to apprise Plaintiff that he was being charged with assaulting staff. The Inter-Departmental communication filed by Defendant Pangborn states that Plaintiff "swung and hit C.O. Stevens **[*40]** with his right closed fist." Eagen Declaration, Ex. B. Defendant Stevens similarly states, "Inmate Rossi spun to his left and with a closed right hand struck me in the left side of my head in the temple area." Id. Accordingly, I find, and

---

[12] The Court notes that Defendant's alleged refusal to let Rossi present this evidence does not appear to be justified by either institutional safety or correctional goals.

respectfully recommend that Your Honor find, that Plaintiff has failed to establish that he was not afforded sufficient notice of the charges brought against him.

Finally, Plaintiff contends that he was denied the right to "substantial evidence." The Court construes this prong of Plaintiff's due process claim to be an assertion that Defendant Temple failed to marshal substantial evidence to support the charge of assault.

"A misbehavior report by itself can constitute substantial evidence to support a determination of guilt in a prison disciplinary matter." *Pearsall v. Coughlin, 182 A.D.2d 884, 581 N.Y.S.2d 913 (3rd Dept. Apr. 2, 1992)* (citing *Matter of Curl v. Kelly*, 125 A.D.2d 948, 510 N.Y.S.2d 346 (4th Dept. Dec. 19, 1986)); see also *Godwin v. Goord, 270 A.D.2d 881, 706 N.Y.S.2d 288 (4th Dept. Mar. 29, 2000)* ("The misbehavior reports, augmented by the testimony of several staff members, constitute substantial evidence supporting the determination that petitioner violated various inmate rules.") Here, **[*41]** the record contains several detailed eyewitness reports of Plaintiff's alleged assault on prison staff. See Eagen Declaration, Ex. B. In particular, the reports filed by Defendants Pangborn and Stevens set forth the time, date and place as well as the circumstances leading to the alleged assault. The reports also detail how Plaintiff allegedly assaulted Correction Officer Stevens. Such reports were therefore sufficiently relevant and probative to support the finding that Plaintiff assaulted prison staff. Moreover, although Plaintiff maintains that Defendants' characterization of how Plaintiff assaulted correction officers is "physically impossible" and "unbelievable," such contradictions with Plaintiff's version of the underlying events simply presented a question of credibility for Defendant Temple to resolve. See *Flynn v. Coombe, 239 A.D.2d 725, 657 N.Y.S.2d 494 (3rd Dept. May 15, 1997)*. Accordingly, I find that the substantial evidence prong of Plaintiff's due process claim fails to state a claim for relief.

As to Defendant Selsky, Plaintiff argues that Defendant Selsky violated his due process rights by affirming Defendant Temple's decision. Complaint at PP 23-24. The Supreme Court has recognized **[*42]** that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence. See e.g. *Douglas v. Buder, 412 U.S. 430, 432, 93 S. Ct. 2199, 37 L. Ed. 2d 52 (1973)* (per curiam) (revocation of probation); *Schware v. Board of Bar Examiners, 353 U.S. 232, 239, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957)* (denial of admission to bar); *United States ex rel.*

*Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 106, 47 S. Ct. 302, 71 L. Ed. 560 (1927)* (deportation). In *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill, 472 U.S. 445, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)*, a case involving revocation of good time credits following disciplinary proceedings, the Supreme Court held that ". . . the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board . . . ." *Hill, 472 U.S. at 455*. The Hill Court further elaborated that "[t]his standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced . . . .'" id. (citing *United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. at 106*), and that "[a]scertaining whether this standard is satisfied does not require examination of the entire record, independent assessment **[*43]** of the credibility of witnesses, or weighing of the evidence." *Hill, 472 U.S. at 455*. Rather, the relevant inquiry is whether there is any evidence in the record to support the conclusion reached by the disciplinary board. Id. Because there was evidence in the record to support Defendant Temple's decision, namely the misbehavior report, I find that Plaintiff has failed to state a due process claim as to Defendant Selsky.

I therefore conclude, and respectfully recommend Your Honor should conclude, that Plaintiff has failed to state a due process claim as to Defendants Stevens, Pangborn, and Selsky, and that Plaintiff's due process claims as against these Defendants should be dismissed. I further conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has stated a due process claim as to Defendant Temple, but only with respect to his allegations that he was denied a fair and impartial hearing officer and the right to present documentary evidence.

Plaintiff's Religious Accommodation Claim

Plaintiff alleges that during the course of his confinement in SHU he has been denied religious accommodation. Specifically, Plaintiff claims that Defendants infringed **[*44]** his constitutional right to the free exercise [13] of religion by prohibiting Rossi from

_____

[13] Plaintiff also appears to assert a violation of the **Establishment Clause** by arguing that Directive 4202 "only allows 'certain' Rastafarians to wear a religious head covering but denies me the same right." See Complaint at P 34.

wearing a religious head covering and by failing to provide Rossi with "a proper diet consistent with [his] religious beliefs," known as an Ital diet. [14] Complaint at P 26.

The *First Amendment to the United States Constitution* states, in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const., Amend. I.* Prison **[*45]** inmates retain "those *First Amendment* rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrective system." *Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974); see also Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); Price v. Johnston, 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948).* The Supreme Court has recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," *Procunier v. Martinez, 416 U.S. 396, 405, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974),* and accordingly has "tempered" its scrutiny of challenged prison regulations. *Benjamin v. Coughlin, 708 F. Supp. 570, 572 (S.D.N.Y. Mar. 13, 1989).* In the seminal case of *Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987),* the Supreme Court explained that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner, 482 U.S. at 89; see also Farid, 850 F.2d at 926* (citations omitted) (" '[P]rison regulations alleged to infringe constitutional rights are judged under a "reasonableness" **[*46]** test less restrictive than that ordinarily applied to alleged infringements of constitutional rights.' ")

In Turner, the Supreme Court identified the following four factors as being relevant to whether a challenged prison regulation is valid as reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison

regulation and the legitimate governmental interest put forward to justify it, (2) whether there are alternative means of exercising the right that remain open to prison inmates, (3) what is the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there is an absence of ready alternatives, which is evidence of the reasonableness of a prison regulation. *Turner, 482 U.S. at 89-90.*

*Plaintiff's Religious Head Covering Claim*

The religious head covering that Rastafarians wear, known as a crown, is worn to keep impurities from a Rastafarian's dreadlocks, to shield Rastafarians from the eyes of non-Rastafarians, and "to keep the curious from touching [Rastafarians]." *Benjamin, 708 F. Supp. at 574.* Most crowns are **[*47]** large, loosely knit or crocheted circular wool caps. The crown can pose a security risk because it may be used for hiding contraband. Searching the crown necessitates increased contact between guards and inmates and thus increases the threat of confrontations between guards and inmates. It has been noted that prohibitions on wearing the crown are not uniform throughout DOCS facilities. *Id. at 574.*

Application of the Turner four-part test demonstrates that prison regulations governing the wearing of the crown do not impermissibly infringe on Plaintiff's *First Amendment* rights. For instance, there is a valid, rational connection between the prohibition on crowns in certain areas of a prison and the security interests put forward to justify such a prohibition. As noted, because of the shape and size of the crown, it can readily be used to conceal and transport weapons, controlled substances, and other contraband and thus poses a threat to prison guards and other inmates. Plaintiff has therefore not met his burden of showing that the restriction on wearing the religious crown impermissibly infringes on his constitutional rights. See e.g. *Benjamin, 708 F. Supp. at 575* (holding that the plaintiffs **[*48]** had not met their burden of showing that the restriction on the wearing of the religious crown impermissibly infringed on their constitutional rights). Even if prison officials permit only "certain" Rastafarians to wear a religious crown, as Plaintiff contends, Plaintiff nonetheless has not stated a viable claim under the *First Amendment.*

*Plaintiff's Religious Diet Claim*

---

[14] As to the religious diet component of Plaintiff's religious accommodation claim, Plaintiff claims that during his confinement in SHU he has not been allowed to receive packages or purchase food from the commissary. Rossi contends that receiving packages and purchasing food at the commissary are his only "alternative" means of accommodating his religious diet. Plaintiff thus appears to argue that Defendants' imposition of said restrictions resulted in Plaintiff being denied an Ital diet.

The Ital diet symbolizes "a belief in life and an avoidance of symbols of death." _Id. at 575_. Individual dietary practices vary among Rastafarian individuals and sects, both inside and outside prison. To name but a few variations of the Ital diet, generally Rastafarians do not eat meat and pork, and some do not eat fish or dairy products. Some Rastafarians refuse to eat vegetables that have been cooked for more than a few minutes, while other Rastafarians will eat only food that they have prepared themselves. _Id. at 575_. At Green Haven Correctional Facility, when pork is served DOCS provides a meat substitute meats to all inmates to accommodate the religious requirements of Jewish and Muslim prisoners. Id. No such substitute is offered when other types of meat are served. Id. Courts in this district have determined that **[*49]** it would be both expensive and an administrative burden for Defendants to provide Rastafarian inmates with a diet containing only natural foods and nutritionally adequate meat substitutes. Although there may appear to be inequality of treatment among Jewish and Muslim prisoners on the one hand and Rastafarians on the other, this perceived inequality reflects the fact that it would be more difficult to accommodate Rastafarians because their definitions of the Ital diet are so varied. To provide Rastafarians with an Ital diet that was in accord with the religious views of each and every imprisoned Rastafarian would impose undue financial and administrative burdens on Defendants, and would thus have a significant impact on the allocation of prison resources generally. As with the religious head covering component of his claim, Plaintiff has failed to establish that Defendants' failure to provide him with an Ital diet impermissibly infringes on his constitutional rights.

I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's religious accommodation claim should be dismissed because Rossi fails to state a claim upon which relief can be granted.

Plaintiff's **[*50]** Denial of Access to Courts Claim

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his [or her] claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." _Washington v. James, 782 F.2d 1134 (2d Cir. 1986)_ (citing _Bounds v. Smith, 430 U.S. 817, 821-23, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)_; _Wolff v. McDonnell, 418 U.S. at 577-80_; _Davidson v. Scully, 694 F.2d 50, 53 (2d Cir. 1982)_; _Corby v. Conboy, 457 F.2d 251, 253-54 (2d Cir. 1972))_. Courts have protected the right of reasonable access to the courts by, inter alia, prohibiting state prison officials from actively interfering with inmates' attempts to prepare and file legal documents. See e.g. _Johnson v. Avery, 393 U.S. 483, 484, 489-490, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969)_; _Ex parte Hull, 312 U.S. 546, 547-549, 61 S. Ct. 640, 85 L. Ed. 1034 (1941)_. Interference with legal mail implicates a prison inmate's rights to access to the courts and to free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

To state a claim for denial of access to the courts -- in this case due to interference with legal mail -- a plaintiff must allege that the defendant "took or was responsible for actions that **[*51]** 'hindered [a plaintiff's] efforts to pursue a legal claim.' " _Davis v. Goord, 320 F.3d 346 (2d Cir. 2003)_ (quoting _Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir.1997)_ (citation omitted)). To survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff, such as the dismissal of an otherwise meritorious legal claim. See _Lewis v. Casey, 518 U.S. 343, 353, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)_.

Plaintiff's Complaint can reasonably be read to allege that state prison officials intentionally violated Rossi's right of reasonable access to the courts, see _Bounds v. Smith, 430 U.S. at 821_, and his right to send legal mail. Plaintiff claims that on August 30, 2003, he filed a "complaint and Grievance against Defendant Phillips for refusing to provide the SHU in Green Haven Prison with a closed and sealed mailbox for outgoing mail so the prison guards would not throw out my mail to family and the Court." Complaint at P 44. Plaintiff then refers to two separate incidents of interference with his outgoing mail. Specifically, Plaintiff alleges that on October 30, 2003, he mailed "papers" **[*52]** to the District Court for the Northern District of New York and that such papers were never mailed, id. at P 47, and that in or about December 2003 Plaintiff mailed "another set of legal papers" to the District Court for the Northern District of New York and that these legal papers were never mailed. Id. at P 49. On both occasions Plaintiff handed his mail to the "11-7 night guard," which Plaintiff states is the method for sending mail from SHU. Id. at PP 47, 49. Plaintiff further alleges that "[a]s a result, an adverse decision was rendered against me by the Court and I am now precluded from appealing the issue." Id. at P 50.

Defendants argue that Plaintiff cannot establish violation of his constitutional right to reasonable access to the courts because he has failed to demonstrate that the infringement of such right resulted in actual injury. Defendants' Memorandum at 23; see *Christopher v. Harbury, 536 U.S. 403, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002)*. In particular, Defendants maintain that Plaintiff "has failed to identify his predicate claim and the remedy to which he would be entitled but for the conduct of the defendants." Defendants' Memorandum at 24.

"However unsettled the basis of the constitutional right **[*53]** of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher, 536 U.S. at 415*. In *Lewis v. Casey, supra*, the Supreme Court made clear that the actual injury requirement applies in equal force in the prison litigation context. *Lewis, 518 U.S. at 351-52* (stating that inmates asserting denial of access to the courts were required to demonstrate actual injury, and could do so by showing that the inmate had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint). "[T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher, 536 U.S. at 415*. The *Christopher* Court further explained that the underlying claim must be "described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id. at 416*.

In *Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986)*, **[*54]** the Second Circuit determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. The Second Circuit explained in *Washington* that "[c]ensorship of an inmate's mail is justified only if it furthers 'one or more of the substantial governmental interests of security, order, and rehabilitation.' " *Washington, 782 F.2d at 1139* (quoting *Procunier, 416 U.S. at 413*). Such interference with prisoners' mail "must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier, 416 U.S. at 413*.

In *Washington*, the original complaint and the affidavits updating the complaint refer to two separate incidents of interference with mail, one in the original complaint and one in the subsequently filed affidavit. The Second Circuit found that such facts indicated an alleged continuing activity rather than a single isolated instance. Moreover, the fact that the **[*55]** plaintiff sought injunctive relief further indicated that the plaintiff claimed the conduct was continuous. In this case, Plaintiff's allegations similarly indicate an alleged continuing activity rather than a single isolated instance. Moreover, Plaintiff's request for injunctive relief indicates a pattern of continuing activity. Although Plaintiff does not state explicitly the nature of the underlying claim, [15] the allegations in his Complaint, coupled with his memorandum of law, can fairly be read to allege that state prison officials had intentionally violated his right of reasonable access to the courts and his right to receive and send legal mail. Accepting Plaintiff's allegations as true, and construing all reasonable inferences in Plaintiff's favor, the Court cannot say that under no circumstances could Rossi prove that Defendants' interference with his outgoing legal mail violated his constitutional rights. All that the Federal Rules of Civil Procedure require is "a short and plain statement of the claim" that will give the defendant fair notice of the nature of the claim and the grounds upon which it rests. *Conley v. Gibson, 355 U.S. at 47*; *Fed. R. Civ. P. 8(a)(2)*. Plaintiff **[*56]** has satisfied this standard. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's allegations are sufficient to survive a 12(b)(6) motion.

Personal Involvement of Defendants Goord and Phillips

Personal involvement of a defendant in an alleged constitutional deprivation is "a prerequisite to an award of damages under *§ 1983*." *Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)*. "Liability may not be premised on the *respondeat superior* or vicarious liability doctrines, 'nor may a defendant be held liable merely by his [or her] connection to the events through links in the chain of command.' " *Morris v. Eversley, 282 F. Supp. 2d 196, 203 (S.D.N.Y. Sept. 23, 2003)* (quoting *Reynolds v. Goord, No. 98 Civ. 6722 (DLC), 2000 U.S.*

---

[15] In his Opposition to Defendants' Motion, Plaintiff explains that the "legal papers" that were thrown out by "prison officials" were "Plaintiff's Notice of Objections to the Magistrate Judge's ruling in Rossi v. Goord 00-CV-1521 (LEK)." Plaintiff's Opposition at 7.

Dist. LEXIS 2140, 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000)).

A supervisory official can be said to have been personally involved in a constitutional violation only if that official: [*57] (1) directly participated in the alleged violation, (2) failed to remedy the wrong after learning of the violation through a report or appeal, (3) created a custom or policy fostering such violations, or allowed such a policy to continue, (4) was grossly negligent in supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986); Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (finding that a supervisory official may be found personally liable if he or she has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act.")

Defendants Goord and Phillips [16] argue that they cannot be held liable because they were not personally involved in the alleged deprivation of Plaintiff's constitutional rights. Because I concluded supra that Plaintiff's religious accommodation claim should be dismissed for failure to state a claim, I will address Defendants' arguments only in the context of Plaintiff's access to [*58] courts claim.

As to Defendant Goord, Plaintiff cannot establish the commissioner's personal involvement by any of the five methods enumerated above. First, there is no evidence in the record to establish that Defendant Goord was personally involved in the alleged deprivation of Plaintiff's right of access to the courts. Rather, Plaintiff alleges in his Complaint that unnamed "prison guards" were responsible for throwing out Plaintiff's legal mail. Complaint at P 44. Plaintiff cannot therefore demonstrate that Defendant Goord directly participated in the alleged violation of his rights.

---

[16] Point III in the Table of Contents of Defendants' Reply contains the following heading: "Plaintiff's Claims Against Defendants Goord, Selsky and Phillips Should Be Dismissed For Lack of Personal Involvement." The section covering Defendants' personal involvement argument does not, however, address Defendant Selsky. Even if Defendants meant to include Defendant Selsky in their argument that Plaintiff has failed to establish the personal involvement of Defendants, the point would be moot because of my earlier conclusion that Plaintiff has failed to state a claim as against Defendant Selsky.

With respect [*59] to the other four methods for establishing personal involvement, Plaintiff has failed to show that Defendant Goord was informed of the constitutional violation and did nothing to remedy the wrong, created a policy or custom fostering unconstitutional practices, or allowed such a policy to continue, was grossly negligent in supervising subordinates who caused the violation, or was deliberately indifferent to Plaintiff's rights by his failure to act on information indicating that unconstitutional acts were occurring. Here, Plaintiff's only contact with Defendant Goord consisted of several letters that Rossi wrote to the commissioner and replies that Rossi received from Captain Keyser and Deputy Commissioner Leclaire, the latter of which referenced Plaintiff's letter to Defendant Goord. Such correspondence does not demonstrate personal involvement on the part of Defendant Goord. Neither a "[r]eceipt of letter or grievances," Woods v. Goord, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist. LEXIS 7157, 2002 WL 731691, at *7 (S.D.N.Y. Apr. 23, 2002) (collecting cases), nor "allegations that an official ignored a prisoner's letter," Atkins v. County of Orange, 251 F. Supp. 2d 1225, 1233 (S.D.N.Y. Mar. 14, 2003), is sufficient [*60] to establish personal involvement for purposes of § 1983. See Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (concluding that there was no personal involvement where official received two letters from a prisoner, and referred the first to the official responsible for a decision, and replied to the second by stating that a decision had been rendered). Further, "[i]f a supervisor investigates an inmate's grievances and finds them to be unsubstantiated, there is 'nothing in the record indicating that [defendant] . . . turned a blind eye.' " Morris, 282 F. Supp. 2d at 208 (quoting Moncrieffe v. Witbeck, No. 97 Civ. 253, 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000)). Similarly, where a supervisor refers allegations for investigation, it cannot be said that the supervisor failed to take action to protect a plaintiff. In this case, the letter from Deputy Commissioner Leclaire to Plaintiff indicates that Plaintiff's letter to Defendant Goord apprising the commissioner of alleged mail tampering was forwarded to facility officials at the prison for investigation. See Plaintiff's Opposition at Ex. C. The letter from Captain Keyser indicates that such an investigation was conducted. Id. Accordingly, [*61] I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to establish the personal involvement of Defendant Goord in the constitutional violations alleged here.

Plaintiff has, however, offered evidence sufficient to

establish the personal involvement of Defendant Phillips. Specifically, Plaintiff has sufficiently alleged that Defendant Phillips, because of his supervisory capacity, was in a position to remedy the alleged violation, failed to remedy the alleged violation, or knowingly allowed the alleged violation to continue. Plaintiff states in his Complaint that although he did not know who specifically interfered with his mail, Defendant Phillips was aware of the problem because Rossi spoke with Phillips on at least one occasion and informed the superintendent that his mail was being tampered with, intercepted, or otherwise violated. Complaint at P 46; Plaintiff's Opposition, Ex. C; see e.g. *Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir. 1985)* (holding that allegations that a supervisory official had notice of a problem before the fact and failed to remedy it are sufficient allegations of personal involvement to withstand a motion to dismiss). **[*62]** In addition, Plaintiff's letter of complaint to Defendant Goord prompted an investigation into the matter. It can be presumed that the superintendent of the facility was made aware of such an investigation. In fact, a copy of Captain Keyser's letter informing Plaintiff that mail leaving the SHU was being monitored, and a copy of Deputy Commissioner Leclaire's letter to Plaintiff, were provided to Defendant Phillips. Plaintiff's Opposition, Ex. C. Such evidence is sufficient to show that Phillips failed to remedy the problem, permitted the alleged violation to continue, or neglected to manage those who were committing the alleged violations of which he had been apprised. See e.g. *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)*. Accepting Plaintiff's allegations as true, as the Court must, permits an inference that Defendant Phillips did not take sufficient action to prevent the alleged violation of Plaintiff's constitutional rights. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has established the personal involvement of Defendant Goord in the constitutional violations alleged here.

**Injunctive Relief**

In addition to compensatory **[*63]** and punitive damages, Plaintiff seeks declaratory and injunctive relief. With respect to his excessive force and due process claims, Plaintiff seeks declaratory judgment that Defendants violated his right to be free from cruel and unusual punishment and his right to due process of law. Complaint at P 29. Plaintiff also seeks to have the disposition of the Tier III hearing annulled, all references thereto expunged from his record, and his "previous

status restored in full." Id. at P 30. With respect to his religious accommodation claim, Plaintiff seeks declaratory judgment that Directive 4202 violates Plaintiff's *First* and *Fourteenth Amendment* rights, id. at P 41, and injunctive relief such that Plaintiff would be permitted to wear a religious head covering and would be given "reasonable accommodations in which to exercise his religious dietary needs." Id. at P 42. As to his access to courts claim, Plaintiff seeks declaratory judgment that Defendants Goord and Phillips' failure to remedy the "mail problem" for inmates confined in SHU violates the *First Amendment*. Id. at P 53. Plaintiff also seeks injunctive relief directing Defendants to provide a closed, pad-locked mailbox in the SHU **[*64]** for outgoing mail. Id. at P 54.

"[I]nterim injunctive relief is an 'extraordinary and drastic remedy which should not be routinely granted.' " *Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981)* (quoting *Medical Society of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977))*. A federal court should grant injunctive relief against a state or municipal office "only in situations of most compelling necessity." *Vorbeck v. McNeal, 407 F. Supp. 733, 739 (E.D.Mo.)*, aff'd, 426 U.S. 943, 96 S. Ct. 3160, 49 L. Ed. 2d 1180 (1976); see also *Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)* (citations omitted), abrogated on other grounds, *Fromer v. Scully, 874 F.2d 69, 74 (2d Cir. 1989)* (holding that a mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested" or where "extreme or very serious damage will result from a denial of preliminary relief.")

In this Circuit the standard for determining whether to grant injunctive relief is well-settled. A movant must make the following showing: (1) irreparable harm and (2) either (a) a likelihood of success on the merits of the claim or (b) sufficiently serious questions going to the merits and **[*65]** a balance of hardships tipping decidedly toward the movant. *Covino v. Patrissi, 967 F.2d 73 (2d Cir. 1992)*. To demonstrate irreparable harm, a plaintiff must show an " 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.' " *Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999)* (quoting *Rodriguez v. DeBuono, 162 F.3d 56, 61 (2d Cir. 1998))*. Where an alleged deprivation of a constitutional right is involved, courts generally do not require a further showing of irreparable harm. See e.g. *Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984)*; *Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir.*

_1991)_ (noting that irreparable harm exists where deprivation of _First Amendment_ rights is alleged).

### Plaintiff's Due Process Claim

Plaintiff alleges that his due process rights were violated when he was, underline inter alia, denied a fair and impartial hearing officer and the right to present documentary evidence. Expungement is required where there has been a violation of an inmate's fundamental due process rights. See _Wolff, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935_; see also e.g. _Weiss v. Coughlin_, _199 A.D.2d 638, 639, 604 N.Y.S.2d 654 (3d Dept. 1993)._ **[*66]** Among the fundamental, judicially recognized rights is the right to present documentary evidence. See id. Because I concluded supra that Plaintiff has stated a claim as to the impartial hearing officer and documentary evidence prongs of his due process claim, the proper remedy would be annulment of the disposition of the hearing and expungement of Plaintiff's record. Plaintiff has not, however, established that he would suffer irreparable harm if injunctive relief is not granted. Thus, although Plaintiff has stated a claim that is sufficient to withstand Defendants' Motion to Dismiss, Plaintiff has not established that he is entitled to the injunctive relief that he seeks. As to the third component of Plaintiff's request for injunctive relief -- Plaintiff's request to have his "previous status restored in full" -- Plaintiff has not articulated what "previous status" he wishes to have restored and has therefore failed to establish that he is entitled to injunctive relief with respect to his incarcerated status. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff is not entitled to injunctive relief with respect to his due process claim.

### Plaintiff's **[*67]** Religious Accommodation Claim

As noted underline supra, a mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested" or where "extreme or very serious damage will result from a denial of preliminary relief." _Abdul Wali, 754 F.2d at 1025_. Plaintiff cannot make such a showing because, as discussed underline supra at page 29, Plaintiff has not stated a claim upon which relief can be granted. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff is not entitled to injunctive relief with respect to his religious accommodation claim.

### Plaintiff's Access to Courts Claim

As with Plaintiff's due process claim, I find that because Plaintiff has alleged a deprivation of his _First Amendment_ rights, he has, for purposes of the instant application for injunctive relief, established that he may suffer irreparable harm. Plaintiff has not, however, satisfied the second prong for establishing that he is entitled to injunctive relief. To be precise, Plaintiff has failed to establish sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward the movant. Plaintiff's arguments **[*68]** are devoid of any evidentiary support beyond the self-serving assertions in his Complaint and Opposition to Defendants' Motion. Although Plaintiff has stated a claim that is sufficient to withstand Defendants' Motion to Dismiss, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has not established that he is entitled to the extraordinary remedy of injunctive relief with respect to his access to courts claim.

### CONCLUSION

For the foregoing reasons I conclude, and respectfully recommend that Your Honor should conclude, that Defendants' Motion to Dismiss should be granted in part and denied in part. Specifically, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has stated a claim of excessive force, Plaintiff has stated a denial of due process claim, but only with respect to Defendant Temple, Plaintiff has failed to state a denial of religious accommodation claim, and Plaintiff has stated a denial of access to courts claim, but only with respect to Superintendent Phillips. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's excessive force claim should proceed as against **[*69]** Defendants Stevens, Pangborn, Miller, Snedden, Rhynders, and Montegari; Plaintiff's due process claim should proceed only as against Defendant Temple; Plaintiff's religious accommodation claim should be dismissed; and Plaintiff's access to courts claim should proceed only as against Defendant Phillips.

### NOTICE

Pursuant to _28 U.S.C. 636(b)(1)_, as amended, and _Fed. R. Civ. P. 72(b)_, the parties shall have ten (10) days, plus an additional three (3) days, pursuant to _Fed. R._

*Civ. P. 6(e)*, or a total of thirteen (13) working days, see *Fed. R. Civ. P. 6(a)*, from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Colleen McMahon at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge McMahon.

Dated: May 2, 2005

White Plains, New York

Respectfully **[*70]** Submitted,

/s/ Lisa Margaret Smith

LISA MARGARET SMITH

UNITED STATES MAGISTRATE JUDGE

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Alvarez v. County of Orange, N.Y., S.D.N.Y.,
March 25, 2015

2013 WL 311124
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

John BETTS, Plaintiff,
v.
Martha Anne SHEARMAN, et al., Defendants.

No. 12 Civ. 3195(JPO).
|
Jan. 24, 2013.

**Opinion**

*MEMORANDUM AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Plaintiff John Betts ("Betts") brings this civil rights action against Martha Anne Shearman ("Shearman"), the city of New York ("the City"), New York City Police Officer Pablo Rodriguez ("Rodriguez"), and an unidentified New York City Police Officer ("Jane Doe"). Betts sues Shearman and the officer defendants for constitutional violations under 42 U.S.C. § 1983, together with various state law claims.[1] Betts also asserts a *Monell* claim against the City. (Compl. at ¶¶ 51–58.) Shearman, the City, and Rodriguez have moved to dismiss the Complaint. (*See* Motion to Dismiss, Dkt. No. 10 ("Shearman Mot."); Motion to Dismiss, Dkt. No. 14 ("City Mot.").) For the reasons that follow, Defendants' motions to dismiss are granted.

**I. Background**

**A. Factual Background**[2]
On the night of January 20, 2011, Betts was at the apartment he shared with his wife, Shearman, located at 930 Fifth Avenue, Apartment 3C and 3D in New York, New York. (Compl. at ¶ 16.) Around 11:30 p.m., Shearman-allegedly under the influence of alcohol—became "verbally combative" towards Betts, at which

point Betts locked himself into a spare bedroom. (*Id.* at ¶¶ 17–18 .)

Shearman attempted to gain forcible entry into the bedroom, threatening to call the police if Betts did not let her into the room. (*Id.* at ¶¶ 18–19.) Betts does not address in his Complaint whether he did, in fact, open the door for Shearman. However, he contends that Shearman called the New York City Police Department that night, complaining of a fabricated incident of domestic assault.

(*Id.* at ¶¶ 20–21.) Around 1:00 a.m. on January 20, 2011,[3] police officers Rodriguez and Jane Doe responded to the call and "forcibly entered" the bedroom in which Betts was asleep. (*Id.* at ¶ 21.) Betts contends that around this same time, Rodriguez and Doe "coached" Shearman, helping her "fabricat[e] a contrived version of the events to justify a baseless and false arrest." (*Id.* at ¶ 22.)

According to Betts, Shearman falsely claimed that Betts had "slammed her arm against the ground," causing "substantial pain." (*Id.* at ¶ 23.) In responding to Shearman's allegations of abuse, Rodriguez and Jane Doe arrested Betts for resisting arrest (*id.* at ¶ 29), and Betts was later charged with assault in the third degree, resisting arrest, and harassment in the second degree. (*Id.* at ¶ 25.) Betts contends that the officers lacked probable cause for the arrest, and ignored obvious signs that Shearman lacked credibility as a claimant, noting that Shearman was "strung out," seemed "intoxicated and high," had made false accusations against Betts in the past, and evidenced no physical mark from the alleged assault. (*Id.* at ¶ 24.)

In addition to claiming that Shearman, Rodriguez, and Jane Doe "initiated a criminal prosecution against [him]," Betts also alleges that Rodriguez subjected Betts to "unreasonable and excessive force, all without provocation or justification," which "caused [Betts] to suffer injury to his shoulder." (*Id.* at ¶¶ 32–33.) Betts alleges that the accusatory instrument prepared by Jane Doe and Shearman contained "materially false, fabricated and contrived allegations," but the three defendants nevertheless forwarded the instrument to the New York County District Attorney's Office. (*Id.* at ¶ 34.) In April 2011, the criminal charges against Betts were "resolved in Betts' favor" and dismissed with prejudice. (*Id.* at ¶ 36.)

**\*2** Betts alleges that his rights were violated, and, as a "direct and proximate result," of Defendants' actions, he was (1) incarcerated for a day; (2) "subjected to

limitations on his freedom;" (3) "forced to endure the harassment, humiliations, hardships and inhumanities associated with arrest and incarceration;" and (4) suffered, *inter alia,* "mental anguish, depression, mental shock, mental trauma, and post traumatic stress disorder." (*Id.* at ¶¶ 46–47.) Betts also alleges that Defendants' actions caused him to lose his business, which in turn resulted in substantial financial loss. (*Id.* at ¶¶ 48–49.)

### B. Procedural History

Betts filed the Complaint in this action on April 23, 2012. (*See generally* Compl.) Shearman and Rodriguez, jointly with the City, filed separate motions to dismiss on August 28, 2012. (*See generally* Shearman Mot.; City Mot.) Betts replied to the motions to dismiss on September 26, 2012 (Memorandum of Law in Opp. to Shearman, Dkt. No. 18 ("Betts' Opp. 1); Memorandum of Law in Opp. to City, Dkt. No. 17 ("Betts' Opp. 2").) Shearman and Rodriguez, together with the City, separately replied to Betts' opposition memorandums on October 9, 2012. (Shearman Reply Memorandum, Dkt. No. 19 ("Shearman Rep."); City Reply Memorandum, Dkt. No. 20 ("City Rep.").)

## II. Discussion

### A. Legal Standard

**1. Motion to Dismiss**

Whenever deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 572 (2007). Moreover, in examining such a motion, a court must draw "all inferences in the light most favorable to the non-moving party's favor." *In re NYSE Specialists Sec. Litig,* 503 F.3d 89, 95 (2d Cir.2007). Though Rule 8(a) requires no more than a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), a plaintiffs allegations must nevertheless engender a plausible claim. *See Twombly,* 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). While this standard is deferential to plaintiffs, in the sense it takes their factual allegations as true, this "tenet" is "inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Put another way, "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**2. Incorporation of Documents by Reference**

"In assessing the legal sufficiency of a claim, the Court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference." *John v. N.Y.C. Dep't of Corrs.,* 183 F.Supp.2d 619, 627 (S.D.N.Y.2002) (internal citations omitted), *vacated in part on other grounds by* 130 Fed. Appx. 506 (2d Cir.2005). In this Circuit, a complaint is deemed to include as well "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit," *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000), "or matters of which judicial notice may be taken." *Guo Hua Ke v. Morton,* No. 10 Civ. 8671, 2012 WL 4715211, at *3 (S.D.N.Y. Sept. 30, 2012) (quotations omitted).

**\*3** When a district court is confronted with matters outside the pleadings while considering a Rule 12(b)(6) motion, it has two options: it must (1) "exclude the additional material and decide the motion on the complaint alone," *or* (2) "convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000)). The Second Circuit construes this conversion requirement strictly, noting that "where there is a legitimate possibility that the district court relied on inappropriate material in granting the motion," reversal of that district court's decision is appropriate. *Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir.1999). However, mere attachment "of an affidavit or exhibit to a Rule 12(b)(6) motion" will not, "without more, establish that conversion is required." *Id.*

Here, the City and Rodriguez, in their motion to dismiss, attached as an exhibit a copy of the Domestic Incident Report ("DIR") for the incident between Betts and Shearman that night. (*See* Declaration of Carolyn K. Depoian in Support, Dkt. No. 16 ("Depoian Decl."), at Ex. B.) Betts attached that same DIR to his oppositions to Shearman's and the City's respective motions, together with the accusatory instrument prepared by the authorities in this case, and an additional Betts declaration. (*See* Betts' Opp. 1 at

Exs. 2–4; Betts' Opp. 2 at Exs. 2–4.) In his opposition, Betts asserts that since Shearman submitted a declaration detailing her version of events, he too may submit a declaration for this Court to consider. (Betts' Opp. 1 at 6.) However, this assertion misstates the law. First, this Court is not required to consider matters outside the pleadings, and second, even if a Court looks to some matters outside the Complaint-namely those that are integral to the Complaint or those of which it may take judicial notice-it may do so without converting the motion to dismiss into one for summary judgment.

Neither Betts' nor Shearman's declaration will be considered. (Betts' Opp. 1 at Ex. 4; Declaration of Anne Shearman–Berts, Dkt. No. 12 ("Shearman Decl.").) However, the Court will consider the DIR and the accusatory instrument in Betts' misdemeanor prosecution for harassment, as both documents are uncontested in validity, integral to Betts' Complaint, and available to both parties. *See, e.g., Obilo v. City Univ. of City of New York,* No. Civ. 01–5118, 2003 WL 1809471, at *5 (E.D.N.Y. Apr. 7, 2003) ("In sum, at the very least the contents of the Notice of Claim can be considered and judicial notice can be taken of the incident report, police complaint and two DD5s [4] completed by Burgess. There is a strong argument that the contents of the incident report, police complaint, the two DD5s and plaintiff's handwritten statement can properly be considered as integral to plaintiff's complaint.") Given the nature of Betts' claims, which include malicious prosecution and false arrest, the eventual charges levied against him—described in the criminal court complaint—along with the DIR, provide crucial details associated with Betts' allegations. And though Betts claims that Shearman fabricated the assault that allegedly occurred on the evening in question (Compl. at ¶¶ 20, 22), central to his claim is the fact that the DIR too contained fabricated information, which led, in turn, to his prosecution (*Id.* at ¶¶ 25, 34.)

### 3. Qualified Immunity

**\*4** As a defense to Betts' § 1983 claims, Rodriguez asserts qualified immunity as a defense. (Memorandum of Law in Support of Motion, Dkt. No. 15 ("City Memo."), at 13.) Qualified immunity protects police officers from liability associated with their discretionary actions whenever: (1) "[the] 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known,' " *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *or* (2) "it was 'objectively reasonable ... to believe that [their] actions were lawful at the time of the challenged act.' " *Id.* (quoting *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (internal quotations omitted)). Qualified immunity is an affirmative defense; however, it reflects "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis in original). Thus, it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss. *See Pan i v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998) ("It is also well established that an affirmative defense of official immunity should be resolved as early as possible by the court, and may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint." (internal citations omitted)); *Torres v. Vill. of Sleepy Hollow,* 379 F.Supp.2d 478, 483 (S.D.N.Y.2005) ("[T]he availability of qualified immunity ought to be decided by a court at the earliest possible opportunity—preferably at the outset of the case, at which point plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial.").

In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, [5] the Second Circuit has defined the standard of qualified immunity as one of "arguable probable cause." *Cerrone,* 246 F.3d at 202. Arguable probable cause is present whenever " 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.' " *Id.* at 203 (quoting *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997)). Put another way, so long as (1) "it was objectively reasonable for the officer to believe that probable cause existed," *or* (2) "officers of reasonable competence could disagree on whether the probable cause test was met," an officer will be entitled to qualified immunity on such claims. *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991); *see also Cerrone,* 246 F.3d at 203 ("It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."); *Williams v. City of Mount*

*Vernon,* 428 F.Supp.2d 146, 155 (S.D.N.Y.2006) ("In situations where probable cause is required, this standard requires something less than actual probable cause.").

**\*5** Additionally, "qualified immunity is not established by claiming 'the defendant did not do what plaintiff said he did.' " *Williams,* 428 F.Supp.2d at 155. It is not enough that an officer defendant offers contradictory assertions as to the events in question, because at this stage of the litigation, "where [t]he facts asserted in plaintiff's Complaint tell a different story, and on a motion to dismiss, where discovery has not yet occurred, [a court] must presume that plaintiff's version of events is true." *Id.; see also Torres,* 379 F.Supp.2d at 483 ("Nothing in *Saucier* can be read to deprive the plaintiff of his Seventh Amendment right to have a jury resolve all disputed issues of material fact. If plaintiff's version of the facts is wrong and defendant's is correct, then the defendant will prevail, not on the ground of qualified immunity, but because he did nothing wrong.").

### B. Plaintiff's § 1983 Claims Against Rodriguez

Betts asserts various constitutional violations that allegedly give rise to causes of action pursuant to 42 U.S.C. § 1983. (*See* Compl. at ¶¶ 22, 31, 33, 39, 40, 41.) "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161 (1992). "In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). Here, Betts' § 1983 claims fail as a matter of law, as Rodriguez is entitled to qualified immunity with respect to some, and as for others, Betts fails to state a claim.

### 1. False Arrest

Betts alleges that he was arrested without probable cause (Compl. at ¶¶ 30, 31), and Rodriguez asserts qualified immunity as a defense. (City Memo. at 13.) "To prevail on a claim for false arrest, the plaintiff must prove that (1) the defendant intended to confine or arrest the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the arrest was not otherwise privileged (i.e., the arrest was not supported by probable cause)." *Travis v. Vill. of Dobbs Ferry,* 355 F.Supp.2d 740, 746–47 (S.D.N.Y.2005)

(citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995)). An officer sued for false arrest under § 1983 must "have had personal involvement in the arrest in order to be held liable" pursuant to that section. *Id.; see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Whenever a police officer has probable cause to make an arrest, such arrest cannot be false, as it is "otherwise privileged" under the law. *See Singer,* 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). "It is well established that an arrest without probable cause is a constitutional violation." *Williams,* 428 F.Supp. at 154. But, even where probable cause is, in fact, lacking, qualified immunity may nevertheless shield the officer who acts reasonably under the circumstances. *Id.* at 155 ("When examining qualified immunity in the context of a suit for damages based on an arrest allegedly without probable cause, courts must grant a defendant qualified immunity 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " (quoting *Golino,* 950 F.2d at 870)).

**\*6** Betts alleges that Rodriguez arrested him without probable cause. (Compl. at ¶¶ 24, 27–30, 41.) Specifically, Betts asserts that there were serious credibility problems with Shearman's story, and that the police, even though called to the house by Shearman, should have recognized that they lacked probable cause with respect to any of the eventual charges levied against him. (*Id.* at ¶ 24.) Even assuming that Betts did not resist arrest (*id.* at ¶ 30), the allegations themselves establish that Rodriguez had arguable probable cause to arrest Betts on the evening in question. Neither the ultimate disposition of an action, nor the crimes eventually charged, are dispositive of a probable cause determination. *Accord Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006) ("[W]e conclude here that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the validity of the *arrest,* and not on the

validity of each charge." (emphasis in original)). Betts was eventually charged with Assault in the Third Degree, Resisting Arrest, and Harassment in the Second Degree. (Betts' Opp. at Ex. 3.) Thus, if Rodriguez had arguable probable cause for any of those counts, Betts' claims fail as a matter of law, as Rodriguez is entitled to qualified immunity.

Though Betts claims that Shearman falsely accused him of assault, he admits that she phoned the police, which brought Rodriguez to the home that evening. Thus, whether or not Shearman's claims to the police were true, the police nevertheless were properly dispatched to the apartment upon notification of a possible incident of domestic violence. Of course, this phone call alone is likely not sufficient to establish probable cause for an arrest, as any reasonable police officer would also examine the situation upon arrival in order to make a final probable cause determination. Thus, Betts' claim of false arrest stems from Shearman's alleged lack of credibility at the time. Betts contends that Shearman was so "strung out" that no reasonable police officer could have believed her allegations. (Compl. at ¶ 24.) Moreover, he adds that there was no physical evidence of an assault, buttressing Betts' claim that Shearman fabricated the incident and diminishing the reasonableness of a probable cause finding. (*Id.*) Under Betts' description of the facts in his Complaint, it is clear that he would have stated a claim for false arrest had Shearman's accusation not occurred—as there is no information from the face of the Complaint or the documents referenced therein that suggests, under Defendants' version of the facts, that any harassment or resistance to arrest occurred outside of the alleged incident of domestic assault. However, Shearman's allegation, which Betts admits she made to the police on at least two occasions that evening —on the phone and in person—though perhaps false, was undisputedly one tile in the informational mosaic presented to Rodriguez on the night of January 20. Thus, the question becomes, were Rodriguez's actions "*objectively reasonable* 'as measured by reference to clearly established law,' and 'the information the ... officers possessed[?]' " *Lee,* 136 F.3d at 101–02 (quoting *Harlow,* 457 U.S. at 818 and *Anderson v. Creighton,* 483 U.S.635, 641 (1987) (internal citations omitted)).

**\*7** The fact that Shearman was allegedly displaying signs of intoxication and drug use does not automatically negate the content of her domestic incident report. Complainants are not always saints, but their saintliness—or lack thereof —tends to bear on their credibility, not necessarily on their status as victims. Of course, a putative victim may be so devoid of indicia of credibility that an officer may be unjustified in arresting the alleged perpetrator. However, that victim's intoxication does not, without more, *require* an officer to depart from a given scene without effectuating an arrest. *See Singer,* 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."); *see also McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded.").

For example, in *Lee v. Sandberg,* Connecticut State Troopers were dispatched to a home twice during a night in response to two domestic disturbance calls made by one Mrs. Lee. *Lee,* 136 F.3d at 98. After the first incident, Mrs. Lee stated her husband, Mr. Lee had pushed her, and the officers on the scene observed that "white saliva stained the corners of her mouth," she was "disheveled," she had slurred speech, and her eyes were "red and glassy." *Id.* at 97. Additionally, Mrs. Lee changed her story several times and was not bruised where she was allegedly pushed. *Id.* One of the State Troopers recommended an emergency psychiatric evaluation for Mrs. Lee, upon learning from her husband that she was on medication. After a second domestic disturbance call, which occurred after Mrs. Lee's doctor had determined her intoxicated but not dissociative, the police arrested Mr. Lee when his wife claimed that he had hit her in a "karate-chop" on the arm, despite the fact that, again, there were no "signs of physical assault on Mrs. Lee's arm, such as bruising or swelling. *Id.* at 98.

In *Lee,* the District Court denied summary judgment, holding that "the issue of whether the State Troopers had probable cause to arrest plaintiff hinged on whether Mrs. Lee was a credible informant ." *Id.* at 100. Citing her erratic behavior, disheveled appearance, and psychiatric problems, the District Court surmised that there was a genuine issue of material fact as to Mrs. Lee's credibility and the reasonableness of the Officers'

actions in arresting Mr. Lee for disorderly conduct. *Id.* On appeal, the Second Circuit disagreed, vacating the district court's determination that "a jury could well find the [State Troopers'] actions in arresting Mr. Lee for disorderly conduct were objectively unreasonable—*i.e.* that no reasonable officer, viewing the totality of the circumstances, could conclude that there was probable cause to arrest [the plaintiff] for disorderly conduct." *Id.* at 100 (quotations omitted). Citing the "extraordinarily difficult judgment decisions that law enforcement officers must make in domestic violence situations, and the presence of factors ... that suggest that Mrs. Lee's statements were not incredible," the court held that the officer defendants' actions were objectively reasonable, and thus, entitled to qualified immunity. *Id.*

**\*8** As further support for its arguable probable cause finding, the *Lee* court also cited Connecticut law, which demands that officers who determine "upon speedy information that a family violence crime ... has been committed ... shall arrest the person or persons suspected of its commission and charge such person or persons with the appropriate crime." *Id.* at 103–04 (quoting Conn. Gen.Stat. Ann. § 46b–38a(3)). New York law demands a similar response from its police officers, providing in relevant part:

> a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that:
>
> ... (c) a misdemeanor constituting a family offense ... has been committed by such person against such family or household member, unless the victim requests otherwise. The officer shall neither inquire as to whether the victim seeks an arrest of such person or threaten the arrest of any person for the purpose of discouraging requests for police intervention.

N.Y. C.P.L. § 140.10(4)(c). Any officer investigating a report of such a crime must also:

> prepare and file a written report of the incident ... including statements made by the victim and by any witnesses, and make any additional reports required by local law enforcement policy or regulations. Such report shall be prepared and filed, whether or not an arrest is

made as a result of the officers' investigation, and shall be retained by the law enforcement agency for a period of not less than four years.

*Id.* at § 140.10(5). This statute, like the one at issue in *Lee,* "reflects the legislature's attempt to eliminate indifference by law enforcement agencies when responding to reports of domestic violence and to prevent further injury to victims of family violence." *Lee,* 136 F.3d at 104. And when a victim lucidly complains of abuse, neither the lack of physical injury nor the alleged assailant's conflicting account necessarily dooms a subsequent arrest as an unreasonable one.

Here, assuming that Shearman had been drinking and appeared "strung out," central to Betts' claim is that she nevertheless twice made false allegations to the police regarding the events of the evening in question. However, whether the allegations were eventually proved to be false or not has no bearing on the question of Rodriguez's qualified immunity. Instead, qualified immunity demands objective reasonableness in light of the circumstances— nothing more. *See, e.g., Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) ("[E]ven if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights."). Here, the Complaint does not allege that Shearman "partially disavow[ed]" [6] her statement and only cites Shearman's intoxication as a reason to doubt her credibility. (Compl. at ¶ 24.) Given that Shearman was lucid enough to make a sworn statement on the DIR, which corroborated the claim in her original call to the police that she had been assaulted by Betts, it was objectively reasonable for Rodriguez to arrest Betts on suspicion of assault in the third degree. [7]

**\*9** Betts alleges that Shearman's claims of assault were fabricated, and perhaps they were. The issue is not the ultimate disposition of the charges against Betts, but rather, the sufficiency of his Complaint and the objective reasonableness of Rodriguez's actions on the night in question. While the credibility of an alleged victim indeed bears on the reasonableness of a putative perpetrator's arrest, police officers are trained to take victims' accounts seriously, even where their stories may later prove false. *Cf. Miloslavsky v. AES Eng'ring Soc'y,*

808 F.Supp. 351, 355 (S.D.N.Y.1992) ( "The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."), *aff'd,* 993 F.2d 1534 (2d Cir.1993); *State v. Amarillo,* 198 Conn. 285, 310, 503 A.2d 146, 161 (1986) ("It is generally agreed ... that a comparable showing [of reliability] is not needed to establish veracity when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim." (citation and internal quotation marks omitted; alterations in original)). Moreover, a police officer is not "required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. *Martinez v. Simonetti,* 202 F.3d 625, 635 (2d Cir.2000) (quoting *Ricciuti v. N.Y. C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) (quotations omitted)). Put another way, on the night in question, Rodriguez was neither "require[d]" nor "allow[ed]" to "sit as prosecutor, judge, or jury." *Id.* at 635–36 (quoting *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989) (quotations omitted).

Additionally, Betts alleges that Rodriguez "assisted Shearman in making a false allegation," and that he "coached her in fabricating a contrived version of the events to justify a baseless and false arrest." (Compl. at ¶ 22.) But these allegations do not plausibly state a claim. Even at the motion to dismiss stage, a pleader must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal,* 556 U.S. at 670 (emphasis in original) (quotations omitted). A complaint will face dismissal where it "pleads facts that are 'merely consistent with' a defendant's liability," meaning it " 'stops short of the line between possibility and plausibility.' " *Id.,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). Here, while it is of course *possible* that Rodriguez coached Shearman into giving a false statement of the alleged domestic assault, what is far more *plausible* is that Shearman made her statement of her own volition, especially since it was allegedly consistent with her original phone call to the police. Nor does Betts allege specific facts rendering plausible the conclusory assertion that Rodriguez "coached" Shearman with respect to her statement. In one sense, Betts claims that Shearman made two false accusations-one, when she called the police to their home in the first place, stating that she had been assaulted, and the other when she spoke with the officers who arrived as they completed their mandatory DIR. But, at the same time, Betts alleges that Shearman

was coached in this second statement, aided in her fabrication by Rodriguez—a contradictory assertion. In sum, Rodriguez's arrest of Betts was reasonable under the circumstances, and Betts' contention that Rodriguez coached Shearman in making a statement that she had already made once before that same evening is implausible and insufficiently pleaded. [8] Thus, Rodriguez is entitled to qualified immunity on Betts' § 1983 false arrest claim.

### 2. False Imprisonment

**\*10** Betts also asserts a § 1983 false imprisonment claim against Rodriguez, arguing that he was imprisoned —suffering a deprivation of liberty—due to his arrest. (Compl. at ¶¶ 31, 41, 46.) Rodriguez moves to dismiss on the basis of qualified immunity. (City Memo. at 13.) False imprisonment is substantially the same as false arrest, requiring that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Weyant,* 101 F.3d at 853 (quotations omitted; alterations in original). Here, as in the aforementioned false arrest context, though Betts was arrested and imprisoned, Rodriguez has qualified immunity with respect to Betts' claims, as there was arguable probable cause for his actions. Put another way, even if Betts' confinement was "not otherwise privileged," Rodriguez is immune from suit as to this charge, as reasonable officers could disagree as to the nature of Rodriguez's actions. *See, e.g., Anderson,* 483 U.S. at 641 ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials-like other officials who act in ways they reasonably believe to be lawful-should not be held personally liable.").

### 3. Excessive Force

Betts also claims that Rodriguez "subjected [Betts] to unreasonable and excessive force, all without provocation and justification and caused [Betts] to suffer injury to his shoulder." (Compl. at ¶ 33.) Rodriguez moves to dismiss the excessive force claim on the ground that Betts' allegations fail Rule 8's particularity requirement. (City Memo. at 18.) While Rule 8 does not require "detailed factual allegations," *Twombly,* 550 U.S. at 555, it does "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678.

"A claim for use of excessive force under § 1983 may be established if the force used was excessive or unreasonable in light of the circumstances." *Williams,* 428 F.Supp.2d at 157. In examining whether an officer's use of force is "reasonable" under a given set of circumstances, a court will balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake ." *Graham v. Conner,* 490 U.S. 386, 396 (1989) (internal quotations omitted). Here, there is no question that there was an intrusion on Betts' Fourth Amendment interests, and presumably he was handcuffed during the course of his arrest. (Compl. at ¶ 33.) However, Betts states no facts or circumstances—even in the broadest sense—from which this Court could conclude that he states a plausible claim that Rodriguez levied an unreasonable amount of force against him in effectuating the arrest. It is true that minor injury may indeed give rise to a claim of excessive force. *See Robison,* 821 F.2d at 924 (holding that the fact that plaintiff's injuries were neither "permanent" nor "severe," together with her failure to seek medical treatment for her injuries, did not necessitate dismissal of her claim of excessive force at the summary judgment stage). Accordingly, "[a] lack of an allegation of serious physical injury stemming from [a plaintiff's] arrest and search does not, therefore, require a Rule 12(b)(6) dismissal." *Messina v. Mazzeo,* 854 F.Supp. 116, 130 (E.D.N.Y.1994). However, "[b]ecause the test is now one of objective reasonableness—without any reference to the officers' subjective state of mind—a motion to dismiss an excessive force claim is appropriate if, accepting all of the allegations as true, it is clear that the force used by the officers was objectively reasonable under the circumstances." *Id.* at 128–29.

**\*11** Had Berts included context together with his conclusory assertion that his shoulder was somehow injured, he likely would have stated a claim. *See, e.g., Johnson v. Glick,* 481 F.2d 1028, 1029–30 (2d Cir.1973) (reversing the district court's dismissal of Plaintiff's excessive force claim under 12(b)(6), where he alleged that Defendant had struck him twice on the head and denied him medical attention);[9] *Messina,* 854 F.Supp. at 131 (denying Defendant's 12(b)(6) motion with respect to Plaintiff's excessive force claim when Plaintiff alleged "repeated slaps and blows at the scene of the arrest, in the police car, and at the station house" along with "physical injuries to his right wrist, abdomen, face and

legs, causing him to suffer intense pain, and emotional pain and suffering"); *cf. Santiago v. Yarde,* 487 F.Supp. 52, 54 (S.D.N.Y.1980) ("The limited and minor nature of plaintiff's alleged injuries provides insufficient support for plaintiff's claim that he was maliciously abused by defendant. He does not claim he was struck, or kicked in any way, or that he received or sought medical treatment.") However, here, there are no facts from which it can be concluded that Rodriguez used anything other than reasonable force in restraining Betts, only a bare assertion. *Cf. First Nationwide Bank v. Gelt Funding,* 27 F.3d 763, 771 (2d Cir.1994) ("Under Rule 12(b)(6), the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." (internal quotations omitted)).

Given the possibility that Berts may be able to contextualize his claim with facts that bolster this particular allegation's plausibility, this Court dismisses the excessive force allegation without prejudice, giving Betts leave to replead this claim.

### 4. Malicious Prosecution and Abuse of Process

Betts also asserts malicious prosecution claims under § 1983, claiming that Rodriguez, together with the City and Shearman, maliciously prosecuted him and maliciously abused process in preparing a "false accusatory instrument" and subsequently arresting and incarcerating him. (Compl. at ¶¶ 34, 41.) Rodriguez moves to dismiss both allegations on the grounds of failure to state a claim and qualified immunity. (City Memo. at 9– 13.)

"Freedom from malicious prosecution is a constitutional right that has long been clearly established." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). In order "[t]o sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Id.* Thus, in this Circuit, to state a § 1983 claim for malicious prosecution, a plaintiff must show: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice," *id.,* together with either an arrest made pursuant to a warrant—*i.e.* legal process, or a "post-

arraignment deprivation of liberty." *Singer,* 63 F.3d at 117. The Second Circuit has held that where police officers "swear out a complaint" and later "file it in a criminal court," they have commenced a criminal action, "put[ting] in motion proceedings that rendered the defendant at all times subject to the orders of the court, see § 510.40(2), and foreseeably requir[e] him to incur the expense of a lawyer and the inconvenience and perhaps expense of multiple court appearances." *Swartz v. Insogna,* No. 11 Civ. 2846, 2013 WL 28364, —— F.3d ——, at *5 (2d Cir. Jan. 3, 2013).

**\*12** Here, as discussed, Rodriguez is entitled to qualified immunity on the probable cause prong of this claim, as he had arguable probable cause for the arrest.[10] And while of course forwarding inaccurate or misleading information to the prosecutor could constitute malice in this context, *Lowth,* 82 F.3d at 573 ("[M]alice does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." (citations and quotations omitted)), here, Betts' naked assertions that the police fabricated the information corroborated by Shearman are implausible at best.

Betts also asserts an abuse of process claim under § 1983. (*Id* . at ¶ 41.) Rodriguez moves to dismiss the allegation on the ground that Betts' malicious abuse of process claim fails to state a claim. (City Memo. at 15.) Whereas malicious prosecution is associated with the "improper issuance of process," abuse of process reflects the "improper use of process after it is regularly issued." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994) (quotations omitted). As with false arrest, imprisonment, and malicious prosecution, the elements of a § 1983 claim for malicious abuse of process stem from New York state law. *Id.* In order to state such a claim, a plaintiff must show that a defendant: "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* Improper motive behind an arrest or prosecution is not sufficient to state a malicious abuse of process claim. *See, e.g., Jones v. Maples/Trump,* No. 98 Civ. 7132, 2002 WL 287752, at *7 (S.D.N.Y. Feb. 26, 2002) ("Not every use of process motivated by selfishness or maliciousness gives rise to an abuse of process claim."). Instead, to state such a claim, a plaintiff must allege that defendants "aimed to achieve

a collateral purpose beyond or in addition to [Plaintiff's] criminal prosecution." *Savino v. City of New York,* 331 F.3d 63, 78 (2d Cir.2003).

Here, Betts' Complaint makes no allegation of a collateral objective pursued by Rodriguez in a perversion of legal process; nowhere does Betts state that Rodriguez initiated his arrest in order to effectuate some other, nefarious aim. *But see Bd. of Educ. of Farmingdale UnionFree Sch. Dist. v. Farmingdale Classroom Teachers' Ass'n.,* 38 N.Y.2d 397, 404 380 N.Y.S.2d 635 (Ct.App.1975) (Plaintiff stated a claim for abuse of process where it claimed defendants were perverting process to "inflict economic harm on the school district"); *Dean v. Koc hen dorfer,* 237 N.Y. 384, 143 N.E. 229 (Ct.App.1924) (Plaintiff stated a claim for abuse of process where Defendant issued a warrant for the collateral purpose that Defendant "might lecture and chide [Plaintiff] under the guise of judicial action"). As Betts alleges no collateral objective, his abuse of process claims must be dismissed.

### 5. Right to a Fair Trial

**\*13** Betts also appears to assert a claim that he was denied his right to a fair trial in violation of his Fifth and Fourteenth Amendment rights. (Compl. at ¶ 41.) Rodriguez moves to dismiss this claim as duplicative of Betts' malicious prosecution and false arrest/imprisonment allegations. (City Memo. at 16.)

Betts may bring a right to a fair trial claim alongside his other § 1983 claims without suffering summary dismissal as a matter of law. *See Nibbs v. City of New York,* 800 F.Supp.2d 574, 576 (S.D.N .Y.2011) ("The Court is not persuaded that the distinction Defendants suggest is relevant. *Ricciuti* did not base its holding upon the existence of separate pieces of evidence supporting each claim. On the contrary, courts in this District have regularly found *Ricciuti* to stand for the proposition that a claim for denial of a right to a fair trial may be brought alongside one for malicious prosecution even where both are supported by the same evidence." (citing *Brandon v. City of New York,* 705 F.Supp.2d 261, 276 (S.D.N.Y.2010) and *Jovanovic v. City of New York,* No. 04 Civ. 8437, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006)). This claim nevertheless fails the plausibility requirement of *Twombly* and *Iqbal.*

"When a police officer creates false information ... and forwards that information to prosecutors, he violates

the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti,* 124 F.3d at 130. Here, Betts makes only threadbare allegations that somehow Rodriguez and Jane Doe "coached" Shearman into giving a false written statement for the DIR. (Compl. at ¶ 22.) Given that Betts' own Complaint alleges that Shearman originally called the police of her own volition and stated that Betts "among other things, ... had assaulted her," it is implausible to suggest that any subsequent statement to that same effect was somehow coached by the police. Shearman's allegations very well may have been fabricated —the ultimate disposition of the action against Betts is not the issue—but the allegation that Rodriguez somehow elicited the fabrication, when the alleged fabrication had already been shared with the police prior to Rodriguez's arrival at the home, is implausible.

### 6. Jane Doe

Had the claims against Jane Doe differed from those against Rodriguez, and had her conduct been alleged in such a way that permitted Berts' claims against her to go forward, Plaintiff's claims against Jane Doe would have survived. However, here, Betts does not distinguish between Jane Doe's conduct and Rodriguez's except to note that Rodriguez exhibited excessive force. Thus, Betts' claims against Jane Doe are accordingly dismissed with prejudice for the aforementioned reasons pertaining to Betts' claims against Rodriguez.

### C. Plaintiff's § 1983 Claims Against Shearman

Betts also asserts § 1983 claims for false arrest, false imprisonment, malicious prosecution, abuse of process, and denial of a right to a fair trial against Shearman. (*See generally* Compl. at ¶¶ 15–50.) Because Shearman is not a state actor, and was not acting under color of state law, as required by § 1983, Betts' claims against her fail. *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 941 F.2d 1292, 1295–96 (2d Cir.1991) ("Because the United States Constitution regulates only the Government, not private

parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' ").

**\*14** While private parties may indeed be sued pursuant to § 1983, such claims may survive only where a plaintiff alleges facts "demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. Cty. of Nassau,* 292 F.3d 307, 324 (2d Cir.2002). Thus, Shearman is suable under § 1983 only if she conspired with the police or was a "willful participant in joint activity with the State or its agents." *Id.* (quotations omitted). It is well established that a private party does not become a "willful participant" by merely invoking the assistance of the police. *See, e.g., Liver v. Hair Anew,* No. 99 Civ. 11117, 2000 WL 223828, at *2 (S.D.N.Y. Feb. 25, 2000) ("Where a private person merely seeks the assistance of the police to quell a disturbance, the private party is not 'jointly engaged' in the police officer's conduct so as to render it a state actor under § 1983."); *Young v. Suffolk County,* 705 F.Supp.2d 183, 196 (E.D.N.Y.2010) ("The provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of § 1983." (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999) ("Healey's provision of background information to a police officer does not by itself make Healey a joint participant in state action under § 1983[and] Officer Fitzgerald's active role in attempting to resolve the dispute after Healey requested police assistance in preventing further disturbance also does not, without more, establish that Healey acted under color of law." (alteration in the original))).

Berts also alleges that Shearman conspired with Rodriguez and Jane Doe to violate his constitutional rights pursuant to § 1983. (Compl. at ¶ 34.) "In order to survive a motion to dismiss on his § 1983 conspiracy claim, [Defendant] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello,* 292 F.3d at 324–25. Moreover, in this Circuit, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Id.* at 325 (quotations omitted).

Put another way, "diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quotations omitted). Here, Betts has "fail[ed] to specify in detail the factual basis necessary to enable appellees intelligently to prepare their defense." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Instead, the Complaint merely states in a conclusory fashion that the three individual defendants conspired to deprive him of his rights, presumably through the officers' alleged "coaching" of Shearman. Given that it is implausible that Shearman was coached into providing a statement consistent with her earlier allegation—made before police arrived on the premises—and given that § 1983 is aimed at state actors, or those private citizens who "willful[ly] participa[tes] in joint activity with the State or its agents," *Ciambriello,* 292 F.3d at 324, Betts fails to state a claim against Shearman.

### D. Plaintiff's *Monell* Claim Against the City
 **\*15** Plaintiff also alleges that the City has a "custom, policy and practice" of "improper training" and "improper supervision" that permitted constitutional violations and "tacitly permitt[ed] the subornation of perjury," the "fabrication of evidence, the coaching of witnesses in domestic cases, and the commencement and continuation of criminal prosecutions without probable cause." (Compl. at ¶ 52.) The City moves to dismiss this allegation for failure to state a claim. (City Memo. at 21.)

It is axiomatic that municipalities cannot be held liable pursuant to § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 (1978). Instead, a plaintiff asserting a § 1983 claim against a municipality must allege that the town or City "under color of some official policy, 'caused' an employee to violate a person's constitutional rights." *Saenz v. Lucas,* No. 07 Civ. 10534, 2008 WL 2735867, at \*5 (S.D.N.Y. July 9, 2008) (quoting *Monell,* 436 U.S. at 692); *see also Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) ("To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

Thus, if, pursuant to policy or custom, a municipality's agents engage in constitutional violations, liability will attach. *Monell,* 436 U.S. at 692. To allege such a policy or custom, the plaintiff may assert: "(1) the existence of

a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; *or* (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." *Saenz,* 2008 WL 2735867, at \*5 (emphasis added).

While a court may not apply a heightened pleading standard to *Monell* claims, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993), "boilerplate" conclusions as to municipal liability will not suffice, even at this early stage of the litigation. *See, e.g., In re Dayton,* 786 F.Supp.2d 809, 822–23 (S.D.N.Y.2011) ("This boilerplate recitation of the elements of a *Monell* claim is insufficient to survive a motion to dismiss."); *Brodeur v. City of New York,* No. 99 Civ. 651, 2002 WL 424688, at \*6 (S.D.N.Y. Mar. 18, 2002) ("However, absent from the complaint are specific factual allegations sufficient to establish that a municipal policy or custom caused [Plaintiff's] alleged injury. If anything, [Plaintiff] alleges that City officials sought to deprive him of his civil rights out of a sense of personal animus towards him, not as an outgrowth of a municipal policy or custom." (internal citation omitted)); *George v. Burton,* No. 00 Civ. 143, 2001 WL 12010, at \*2 (S.D.N.Y. Jan. 4, 2001) ("[P]laintiff has failed to proffer any facts in his complaint from which we can infer such a pattern or practice.").

 **\*16** Here, Berts has done no more than state, in a conclusory fashion, that Jane Doe and Rodriguez "acted in accordance with [a] custom, policy and practice," which "allowed improper police procedures to be used and failed to prevent the occurrences" described in the Complaint. (Compl. at ¶ 53.) To state there is a policy does not make it so. And while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery, here, Berts has alleged no facts from which this Court could plausibly infer the existence of a custom or policy on the part of the City. *See Plair v. City of New York,* 789 F.Supp.2d 459, 469 (S.D.N.Y.2011) ("Here, the complaint lacks sufficient factual details concerning *Monell* liability

and contains boilerplate allegations of unconstitutional policies and practices. Specifically, Plaintiff conclusorily alleges that the City 'permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of plaintiff's beatings [which] constituted a municipal policy, practice or custom and led to plaintiff's assault.' " (internal citation omitted; alteration in original)).

### E. Plaintiff's State Law Claims

Betts asserts state law claims of false arrest, malicious prosecution, abuse of process, prima facie tort, and intentional infliction of emotional distress against all Defendants. (Compl. at ¶¶ 63–75.) This Court declines to exercise supplemental jurisdiction over Berts' state law claims, as all his other claims have been dismissed. 28 U.S.C. § 1367 ("(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction....").

### III. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.

Betts' claims against the City are DISMISSED with prejudice. Betts' claims against Rodriguez are DISMISSED with prejudice, except his excessive force claim, which is DISMISSED without prejudice, and with leave to REPLEAD within thirty days of this order. Betts' claims against Shearman are DISMISSED with prejudice. Jane Doe is terminated as a party.

The Clerk of the Court is directed to close the entries at Docket Numbers 10 and 14.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 311124

### Footnotes

1    Betts asserts false arrest, malicious prosecution, abuse of process, prima facie tort, and intentional infliction of emotional distress claims under New York State law. (Complaint, Dkt. No. 1 ("Compl."), at ¶¶ 63–75.)

2    All facts are taken from the Complaint unless otherwise indicated and are assumed true for the purposes of this motion. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) ("The court is required to accept as true all factual allegations in the complaint, and to consider documents attached to or incorporated by reference in the complaint." (internal citation omitted)).

3    It is unclear whether the evening in question was during the evening of January 20, stretching into the morning of January 21, or the evening of January 19, together with the early morning hours of January 20. Thus, for purposes of this opinion, the evening in question is referred to as "January 20."

4    A DD5 refers to a criminal complaint follow-up report, completed by police. *Id.* at *3.

5    "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

6    In *Ward v. City of New York,* No. 08 Civ. 7380, 2010 WL 3629536 (S.D.N.Y. Sept. 17, 2010), Judge Holwell, in a converted motion for summary judgment, stated that "given [the alleged victim's] age, her partial disavowal, her comments about feeling alienated from her mother, the fact that she first accused [the plaintiff] during an argument with her mother, or other facts known to the officers at the time," an issue of material fact existed as to the reasonableness of the officers' actions in arresting the plaintiff. *Id.* at * 1.

7    "A person is guilty of assault in the third degree when: 1. With intent to cause physical injury to another person, he causes such injury to such person or third person; or 2. He recklessly causes physical injury to another person; or 3. With criminal negligence, he causes physical injury to another person by means of a deadly weapon or a dangerous instrument." N.Y. Pen. L. § 120.00.

8    The cases cited by Betts to support this view are inopposite, tending to reflect circumstances where the police actively sought out a witness or complainant, coercing them to make certain statements, rather than a circumstance, as here, where an alleged victim reaches out to the police herself, and makes a confirmatory statement in the police's presence. *See, e.g., Zahrey v. City of New York,* 2009 WL 54495, at *10 (S.D.N.Y. Jan. 7, 2009).

9    "Although the [*Glick* Court's] reference to the guards' subjective state of mind is no longer good law in light of *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court's determination that plaintiff's complaint

survived summary dismissal based on the pleadings is significant." *Messina,* 854 F.Supp. at 129–30 (internal citation omitted).

10    Under New York law, "even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." However, "[i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact," which includes "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (quotations omitted). Here, as there is no evidence of such dissipation, this Court may employ the same probable cause analysis that applies in the false arrest context.

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 2371193
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Joel Brett SMITH, Plaintiff,
v.
Mary E. SABOL, et al., Defendants.

Civil No. 1:CV–11–1697.
|
May 30, 2013.

**Attorneys and Law Firms**

Joel Brett Smith, Yoe, PA, pro se.

Donald L. Reihart, Assistant Solicitor for York County,
York, PA, for Defendants.

**Opinion**

### MEMORANDUM

YVETTE KANE, Chief Judge.

**\*1** On September 12, 2011, Plaintiff Joel Brett Smith
("Smith") filed this civil rights action pursuant to 42
U.S.C. § 1983. At the time, Smith was incarcerated at the
State Correctional Institution at Chester, Pennsylvania,
but has since been released from prison. In the complaint
he names as defendants various employees at the
York Count Prison, Pennsylvania, his former place of
confinement. Presently pending is Smith's "Motion to
Withdraw Claim." (Doc. No. 24.) This filing will be
construed as a motion to voluntarily dismiss this action
pursuant to Federal Rule of Civil Procedure 41(a)(2). The
motion will be granted and, for the reasons that follow,
the dismissal will be with prejudice.

### I. Procedural Background

This matter proceeds on an amended complaint. (Doc.
No. 13.) In the amended complaint Smith names
York County Prison employees Warden Mary E.
Sabol, Captain Dairyman and Correctional Officer
Raffinsburger as defendants. He claims that on or about
January 14, 2010, he informed Defendants Dairyman and
Raffinsburger about problems between himself and two
other inmates confined at the York County Prison that

would lead to physical violence. Defendants informed
Smith that "there will be no problems and for [Plaintiff]
not to worry that it will be taken care of." (Doc. No.
13 at 1.) After informing Defendants of his concerns,
Smith alleges that he was assaulted by the two inmates he
complained about, and suffered injuries and physical pain.
He further maintains that responsibility for this incident
should also be placed on Mary Sabol because Dairyman
and Raffinsburger are her employees.

On June 1, 2012, Defendants filed a motion to dismiss the
complaint. (Doc. No. 16.) Following briefing, the motion
was granted in part and denied in part on December 6,
2012. The motion was granted to the extent that all claims
set forth against Defendant Sabol were dismissed. The
motion was denied in all other respects and the remaining
two (2) Defendants were directed to submit an answer to
the amended complaint. (Doc. No. 21.) An answer was
thereafter filed on December 26, 2012. (Doc. No. 22.)
Discovery is currently taking place. Dispositive motions
are due on July 19, 2013. (Doc. No. 23.) On May 9, 2013,
Smith filed the pending motion seeking to withdraw his
claim. (Doc. No. 24.) In the motion he states that he no
long seeks to continue with this action in that he does not
have the funds to retain an attorney and does not have the
education necessary to proceed.

### II. Discussion

The Court will construe Smith's "Motion to Withdraw
Claim" (Doc. No. 24) as a request for the voluntary
dismissal of this action. Due to the procedural posture
of this matter, the dismissal shall be pursuant to
Fed.R.Civ.P. 41(a)(2), and will be with prejudice. Rule
41 which addresses the dismissal of actions provides as
follows:

  (a) Voluntary Dismissal.

  (1) By the Plaintiff.

  (A) Without a Court Order. Subject to Rules 23(e),
  23.1(c), 23.2, and 66 and any applicable federal
  statute, the plaintiff may dismiss an action without
  court order by filing:

  **\*2** (i) a notice of dismissal before the opposing party
  serves either an answer or a motion for summary
  judgment; or

(ii) a stipulation of dismissal signed by all parties who have appeared.

(B) Effect. Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal-or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

(2) By Court Order; Effect. Except as provided in Rule 41(a) (1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.... Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed.R.Civ.P. 41(a). Procedurally, Rule 41(a)(1) is not available to Smith because Defendants have filed their answer to the complaint. (Doc. No. 22.) Consequently, his request for termination of this action will be construed as a request for voluntary dismissal pursuant to Rule 41(a) (2) and requires a court order. Further, due to the extent to which this matter has been litigated, and taking into consideration the judicial and other legal resources that have been invested to this point, the Court finds that it is appropriate that such dismissal shall be with prejudice.

It is well within a court's discretion to grant the dismissal with prejudice where it would be inequitable or prejudicial to defendant to allow plaintiff to refile the action. *See Chodorow v. Roswick,* 160 F.R.D. 522, 523 (E.D.Pa.1995). Factors to be considered in deciding whether to grant the dismissal with prejudice include: (1) the excessive and duplicative expense of a second litigation; (2) the effort and expense incurred by the defendant in preparing for trial; (3) the extent to which the current suit has progressed; (4) the plaintiff's diligence in bringing the motion to voluntarily dismiss and his explanation therefore; and (5) the pendency of a dispositive motion by the non-moving party. *See Dodge–Regupol, Inc. v. RB Rubber Products, Inc.,* 585 F.Supp.2d 645, 652 (M.D.Pa.2008).

If the Court dismissed this matter without prejudice, and Smith were to resurrect the action at some unspecified point in the future, there can be no doubt that Defendants would be significantly prejudiced by the excessive and duplicative expense of a second litigation. Moreover, it is clear from procedural history in this matter that significant judicial and other legal resources have already been expended on this litigation and that there has been forward progress to the point of discovery and preparation for the filing of a dispositive motion. After 1½ years of litigating this matter, Smith has decided that he no longer wishes to pursue this action. It may be that he has lost interest in doing so due to his release from prison. Further, even if the statute of limitations would not bar a second suit, it would be prejudicial to require Defendants to defend these claims again. For these reasons, Smith's motion will be granted, and the case will be dismissed with prejudice. An appropriate order follows.

### ORDER

**\*3 AND NOW, THIS 30th DAY OF MAY, 2013,** for the reasons set forth in the accompanying Memorandum, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. Plaintiff's "Motion to Withdraw Claim" (Doc. No. 24) is construed as a motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2).

2. Plaintiff's motion for voluntary dismissal (Doc. No. 24) is granted and this action is dismissed with prejudice pursuant to Fed .R. Ci. P. 41(a)(2).

3. The Clerk of Court is directed to **close this case.**

4. Any appeal from this order is deemed frivolous and not taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2371193

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
Appeal Filed by LOUIS BAUER, JR., ET AL v. CITY OF
ROSSFORD, OH, 6th Cir., May 11, 2017
2017 WL 1179053
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Western Division.

Louis T. BAUER, et al., Plaintiffs,
v.
CITY OF ROSSFORD, Defendant.

Case No. 3:16 CV 722
|
Signed 03/30/2017

**Attorneys and Law Firms**

Jeffrey M. Stopar, Semro Henry & Spinazze, Toledo, OH,
for Plaintiffs.

Amy M. Natyshak, Shawn A. Nelson, Marshall &
Melhorn, Toledo, OH, for Defendant.

**Opinion**

### MEMORANDUM OPINION AND ORDER

JACK ZOUHARY, U. S. DISTRICT JUDGE

### INTRODUCTION

**\*1** This case resembles a game of whack-a-mole. After
a year of litigation and an adverse summary judgment
ruling, Plaintiffs now seek to amend their Complaint a
second time to raise an entirely new legal theory (Docs.
33–34, 41). An overview of the procedural history of this
case is helpful to an understanding of whether another
leave to amend is appropriate.

### BACKGROUND

*Original Complaint.* Plaintiffs filed their Complaint in
March 2016—more than a year ago (Doc. 1). The thrust
of the Complaint was that the City of Rossford illegally
destroyed Plaintiffs' property, based on a demolition order
that, in turn, was based on an invalid settlement agreement
(*id.*). Bauer was allegedly arrested for "protesting the

demolition of his own house," and police officers told him
they would "accompany him to City Council Chambers"
if he decided to go to the City Council meeting that
evening (*id.* at ¶¶ 27–28). According to Bauer, this
"prevent[ed] him (again) from being heard regarding the
wrongful demolition of his property and den[ied] him his
First Amendment and Due Process rights" (*id.* at ¶ 28).

The Complaint enumerated five claims against the City
for: (1) an illegal taking in violation of the Fifth
Amendment; (2) deprivation of procedural due process
under the Fourteenth Amendment; (3) violation of the
Fourth Amendment's guarantee against unreasonable
searches and seizures; (4) demolition of property without
notice under Ohio law; and (5) wrongful demolition
(*id.* at ¶¶ 31–53). The wrongful demolition claim was
also brought against the City's contractor, Competitive
Hauling, Inc. (*id.* at ¶¶ 51–53).

The City answered in April 2016, and this Court held a
status conference in June. At that conference, the City
argued there was no legal basis for the Complaint's first,
fourth, and fifth claims. This Court ordered counsel to
exchange authorities concerning the arguments raised
by the City (Doc. 6). A few weeks later, Plaintiffs
requested leave to amend the Complaint to address the
City's arguments. That request was granted (Doc. 10).
Plaintiffs also acknowledged that the facts relevant to their
Amended Complaint were not in dispute. Both parties
then agreed to submit the legal issues for this Court to
decide on cross motions for summary judgment.

*Amended Complaint.* The Amended Complaint lists the
City as the only Defendant, and it enumerates claims for
violation of: (1) procedural due process under the
Fourteenth Amendment; (2) the right to be free from
unreasonable searches and seizures under the Fourth
Amendment; and (3) the freedom of speech under the
First Amendment (Doc. 11 at ¶¶ 29–40). With respect to
the Fourth Amendment claim, the Amended Complaint
states—in conclusory fashion—that "the actions and
inactions of the City as alleged herein constitute a
denial of Plaintiffs' right to be free from unlawful
searches and seizures, and are contrary to the Fourth
Amendment of the United States Constitution" (*id.* at
¶ 34). Plaintiffs explained the theory underlying that
claim as follows: "[T]here was no valid order for the
demolition. In addition, there was no valid settlement
agreement to provide a basis for the demolition and the

related police presence to enforce it. As such, the police officers were essentially sent to enforce an invalid civil settlement agreement" (*id.* at ¶ 25). Notably, the Amended Complaint makes no mention of the term "probable cause." And to the extent a lack of probable cause for arrest is implied, the only factual basis alleged is the purportedly invalid demolition order.

**\*2** *Summary Judgment.* On August 11, the parties jointly submitted Stipulations of Fact to be used by this Court in deciding cross motions for summary judgment (Doc. 13). In a status conference with this Court (Doc. 14), the parties also agreed that the threshold issue of the settlement agreement's validity would likely be case dispositive. The parties briefed summary judgment motions (Docs. 15–17, 19–21), and this Court held a record hearing on October 14 (Doc. 22). At this Court's request, the parties submitted additional briefing on an issue raised by Plaintiffs (Docs. 23–24). On November 4, this Court granted the City's Motion and denied Plaintiffs' Motion, holding both that the settlement agreement was valid and that Plaintiffs' due process claim failed in any event (Doc. 25).

Following the summary judgment ruling, this Court held another status conference. At that conference, Plaintiffs requested two weeks to evaluate what remained of their First and Fourth Amendment claims in light of this Court's ruling. That request was granted, and this Court scheduled a further status conference for the following month (Doc. 26). At that time, despite having nearly a month to consider the implications of this Court's ruling, Plaintiffs still were unable to articulate a basis for proceeding with their First and Fourth Amendment claims. Instead, they sought further discovery to supplement the record and more time to consult with a criminal lawyer to determine the viability of a Fourth Amendment claim. This Court granted Plaintiffs an additional three weeks (*id.*).

*Proposed New Complaint.* On December 27, Plaintiffs filed a Motion to Supplement Record, asking to re-open discovery and briefing on the issues resolved by summary judgment (Doc. 27). This Court denied Plaintiffs' Motion and gave Plaintiffs two weeks to advise whether they had any remaining claims (Doc. 30). At a status conference on January 18, 2017, Plaintiffs reported they reviewed some legal authority suggesting the police may not enforce a civil contract, and they stated their intention to proceed

with their Fourth Amendment claims on that basis. This Court ordered counsel to exchange the relevant authorities and discuss the merits of moving forward.

The following week, Plaintiffs requested leave to depose the arresting officers to assist in determining the validity of their Fourth Amendment claim (Doc. 31). Over the City's objection, this Court granted Plaintiffs' request (*id.*). Following those depositions, Plaintiffs announced they wanted to proceed with their Fourth Amendment claim on a new basis: the officers lacked probable cause to arrest Bauer. This Court pointed out that the pending Complaint makes no reference to "probable cause." Accordingly, this Court suggested Plaintiffs may not have adequately pled that as a basis for holding the City liable (Doc. 32). Plaintiffs requested and were given until March 10 to seek leave to amend to cure any deficiencies in their Amended Complaint (*id.*).

Plaintiffs then filed a proposed Second Amended Complaint that—for the first time—mentions probable cause (Doc. 34-1). Plaintiffs argue there is no need to amend because their First Amended Complaint adequately pleads First and Fourth Amendment claims. Alternatively, to the extent this Court disagrees, they seek leave to amend (Docs. 33–34). The City opposes the Motion (Doc. 41), arguing: (1) the officers had probable cause to arrest Bauer; (2) Plaintiffs were previously afforded an opportunity to amend; (3) Plaintiffs have caused undue delay and appear to have dilatory motives; (4) the City did not have notice of Plaintiffs' probable cause argument; (5) the City will be prejudiced if Plaintiffs are permitted to amend their Complaint again; and (6) Plaintiffs have not properly pled a Fourth Amendment claim for false arrest.

## LEGAL STANDARDS

**\*3** Federal Civil Rule 15(a)(2) instructs that this Court "should freely give leave [to amend] when justice so requires." But leave may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Riverview Health Institute LLC v. Med. Mutual of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010) (emphasis removed) (quoting *Foman v. Davis*, 371 U.S.

178, 182 (1962)). Moreover, "a party must act with due diligence if it intends to take advantage of [Rule 15(a)(2)'s] liberality." *Detrick v. Heidtman Steel Prods., Inc.*, 2017 WL 360552, at *5 (6th Cir. 2017) (quoting *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995)).

This Court has discretion to deny leave to amend following summary judgment. *Riverview Health Institute LLC*, 601 F.3d at 521. In fact, the Sixth Circuit—on several occasions—has upheld a district court's decision to deny leave following dispositive motion practice. *See, e.g.*, *Hiller v. HSBC Fin. Corp.*, 589 Fed.Appx. 320, 321 (6th Cir. 2015) (upholding denial of leave to amend after cross motions were briefed and argued); *Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 458–59 (6th Cir. 2013) ("[A]llowing amendment under these circumstances would encourage delay and bad faith on the part of plaintiffs and prejudice defendants who would have wasted time and expense attacking a hypothetical complaint."); *Kelso v. City of Toledo*, 77 Fed.Appx. 826, 834 (6th Cir. 2003) ("The Kelsos offer no explanation why the district court abused its discretion in denying them leave to file this amendment after summary judgment, and no reasons can be gleaned from the record. The Kelsos were well aware of these individuals' involvement ... long before the parties filed their summary judgment papers.").

This principle also has been affirmed by federal circuits around the country, often citing the reasoning articulated by the Fifth Circuit in *Freeman v. Continental Gin Co.*:

> A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim. Liberality in amendment is important to assure a party a fair opportunity to present his claims and defenses, but equal attention should be given to the proposition that there must be an end finally to a particular litigation.... Much of the value of summary judgment procedure in the cases for which it is appropriate ... would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back long thereafter

and fight on the basis of some other theory.

381 F.2d 459, 469–70 (5th Cir. 1967) (quotations and citations omitted); *see, e.g.*, *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 58 (1st Cir. 2006); *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994); *Humphreys v. Roche Biomedical Labs., Inc.*, 990 F.2d 1078, 1082 (8th Cir. 1993); *State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990); *Lussier v. Dugger*, 904 F.2d 661, 667 (11th Cir. 1990); *Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986); *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1196–97 (7th Cir. 1985); *Tenneco Resins, Inc. v. Reeves Bros., Inc.*, 752 F.2d 630, 635 (Fed. Cir. 1985); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2712 (4th ed. 2017) ("A litigant cannot amend as a matter of right under Rule 15(a) after a summary judgment has been rendered and a court ordinarily will be reluctant to allow leave to amend to a party against whom summary judgment has been entered." (footnotes omitted)).

## ANALYSIS

**\*4** Granting Plaintiffs leave to amend their Complaint a second time—more than a year after they filed their original Complaint, almost nine months after they last amended their Complaint, and almost five months after this Court granted Defendants' Motion for Summary Judgment—would be inequitable and would unduly prejudice Defendants. Granting leave to amend would also be futile, because Plaintiffs' proposed Second Amended Complaint still fails to state a plausible First or Fourth Amendment claim against *the City*—the only named Defendant.

Plaintiffs were aware of the circumstances surrounding Bauer's arrest when they filed their original Complaint. In fact, the original Complaint references both arresting officers (Doc. 1 at ¶ 22). Bauer now contends his conduct was insufficient to give the officers probable cause to arrest him, but he fails to explain how he only became aware of those facts after deposing the officers (Doc. 34 at 4). Bauer was there; he therefore knew all he needed to know to determine whether his conduct met the legal standard for arrest. He also knew all he needed to know about whether his First Amendment rights were violated.

Plaintiffs offer only one explanation for why they failed to previously allege more details concerning the factual bases of their claims—they do not think it was necessary. They are wrong. It is true a complaint need only contain a "short and plain statement of the claim," and it need not contain "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Fed. R. Civ. P. 8(a)(2)). Nevertheless, stating a plausible claim requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 679. Rather, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs' own characterization of the Amended Complaint's Fourth Amendment allegations demonstrates their failure to satisfy the *Iqbal/Twombly* standard: "In this case, Plaintiffs Amended Complaint states that Mr. Bauer was arrested and that his rights to be free from unlawful searches and seizures were violated. He has therefore pleaded a plausible and viable Fourth Amendment claim based on lack of probable cause" (Doc. 34 at 6). That is nothing more than an "unadorned, the-defendant-unlawfully-harmed me accusation." *Id.* It is not enough to state that Bauer was arrested and that his arrest was illegal. A plausible claim based on a lack of probable cause must—at a minimum—allege *facts suggesting there was no probable cause.* The Amended Complaint is silent as to Bauer's conduct other than to say he "was arrested for protesting the demolition of his own house" (Doc. 11 at ¶ 26).

Instead, the Amended Complaint focuses solely on Plaintiffs' theory that the police should not have been sent to help enforce an invalid demolition order. That is the only factual circumstance outlined in the Amended Complaint that even remotely approaches adequate notice of a theory underlying Plaintiffs' Fourth Amendment claims. But, as Defendants correctly point out (Doc. 41 at 10), the Amended Complaint could not have given them adequate notice of Plaintiffs' current probable cause theory, because it appears Plaintiffs did not even know it was their theory. Indeed, it took Plaintiffs months—in addition to significant prodding from this Court—before they were able to articulate that theory.

**\*5** Plaintiffs' First Amendment claims are similarly deficient. The Amended Complaint provides nothing more than conclusory allegations of a First Amendment violation. Plaintiffs again plead no *facts* allowing this Court to draw the reasonable inference that the officers arrested Bauer for exercising his First Amendment rights—Plaintiffs allege neither that the police lacked probable cause to arrest Bauer nor that their decision was in any way motivated by his protected speech. On the contrary, Plaintiffs allege the officers were instructed to "keep the peace," "make sure there were no problems during the demolition," and "arrest Bauer for obstructing official business if he gets in the way of contractors while they were demolishing" (Doc. 11 at ¶¶ 21–24). On its face, the Amended Complaint fails to suggest the officers wanted to limit Bauer's ability to lawfully protest. Likewise, Bauer's assertion that the officers told him they would accompany him to the City Council meeting does not plausibly suggest a First Amendment violation. Bauer does not allege the officers told him he would not be allowed to speak at the meeting or that he otherwise would be prohibited from lawfully protesting the destruction of his home. In short, the Amended Complaint fails to state a plausible claim under either the First or Fourth Amendment.

But even if this Court were to assume Plaintiffs had adequately alleged that one or more of *the officers* violated Bauer's constitutional rights, the Amended Complaint would still be deficient because it fails to allege facts (much less a legal theory) leading to an inference that *the City* is liable for those officers' conduct. "It is well established that a municipal entity may not be sued for injuries inflicted solely by its employees or agents under § 1983." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015). To state a claim against a municipality, Plaintiffs must show "the alleged federal violation occurred because of a municipal policy or custom." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 401–02 (6th Cir. 2016). Moreover, Plaintiffs must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Baynes*, 799 F.3d at 621 (quoting *Fair v. Franklin Cty., Ohio*, 215 F.3d 1325 (6th Cir. 2000) (table decision)).

Plaintiffs plead no facts concerning any "official policy or custom" of the City that could plausibly be responsible

for Bauer's allegedly unlawful arrest. All they offer is the bare allegation that the officers "were asked by Chief Goss to make [sure] that there were no problems during the demolition" (Doc. 11 at ¶ 22). This allegation does not plausibly suggest the City is liable for the officers' decision to arrest Bauer based on unspecified conduct at the demolition site. In sum, the Amended Complaint falls far short of providing the City adequate notice of the factual and legal bases for Plaintiffs' claims.

And the proposed Second Amended Complaint fares no better. Although the proposed Complaint adds minimal clarity with respect to the legal theories Plaintiffs intend to pursue (*see* Doc. 34-1 at ¶¶ 34, 38), it fails to address the factual bases underlying those theories. Moreover, the proposed Complaint adds nothing with respect to whether the City may be held liable for the officers' alleged constitutional violations. Thus, granting Plaintiffs leave to file the proposed Second Amended Complaint would be futile.

### CONCLUSION

This Court is not persuaded by Plaintiffs' recently hatched theory of the case. This case has always been about the allegedly invalid settlement agreement. That is what the parties agreed when the issues were first presented to this Court on cross motions for summary judgment. Plaintiffs may disagree with this Court's ruling on the settlement and, if so, their remedy is to pursue an appeal. They are not permitted to keep tossing up legal theories, hoping one will eventually stick. As one court remarked:

[It] is inequitable to Defendants to force them to chase Plaintiffs down blind legal alleys while Plaintiffs search for one leading to their desired destination. Rather, Plaintiffs must put their best legal foot forward, and the Court is under no obligation to permit them to test-drive various potential causes of action, using the defendant's responsive motion practice and the Court's opinions as a kind of roadmap in an effort to find a meritorious claim. "Plaintiffs must exercise due diligence in amending their complaints. As a corollary of that principle, busy trial courts, in the responsible exercise of their case management functions, may refuse to allow plaintiffs an endless number of trips to the well."

**\*6** *In re Keithley Instruments, Inc. Derivative Litigation*, 599 F. Supp. 2d 908, 916 (N.D. Ohio 2009) (quoting *Aponte-Torres*, 445 F.3d at 58).

This Court finds that Plaintiffs have not provided a sufficient explanation for why they should be granted leave to amend at this stage of the litigation. Plaintiffs have unduly delayed these proceedings, and this latest request to amend will prejudice the City. Further, this Court finds that granting leave to amend would be futile because the proposed Second Amended Complaint fails to state a plausible claim against the City. Plaintiffs' Motion to Amend is denied.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 1179053

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4828814
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

REPUBLIC OF COLOMBIA, acting on its own behalf
and on behalf of the departments it has the power
to represent, Department of Antioquia, Department
of Arauca, Department of Caldas, Department of
Chocó, Department of Cundinamarca, Department
of Putumayo, Department of Santander, Bogotá,
Capital District, individually, Department of
Amazonas, Department of Atlántico, Department
of Caquetá, Department of Córdoba, Department
of Guaviare, Department of Huila, Department of
Sucre, Department of Tolima, Department of Valle
Del Cauca, Department of Vichada, Department
of Bolivar, Department of Nariño, Department of
Norte De Santander, Department of Risaralda,
Department of San Andres Y Providencia, Plaintiffs,
v.

DIAGEO NORTH AMERICA, INC. formerly
known as UDV North America, Inc. formerly
known as Guinness UDV North America, Inc.
formerly known as IDV North America Inc.
formerly known as Hueblein, Inc., United Distillers
Manufacturing Inc., Diageo PLC, Seagram
Export Sales Company Inc., Pernod Ricard USA
LLC, and Pernod–Ricard S.A., Defendants,
Bank of America, N.A., Objector.

No. 04–CV–4372 (NGG)(VPP).
|
Sept. 30, 2011.

Attorneys and Law Firms

Milberg LLP, New York, NY, Nathaniel J. Palmer, Reid
Collins & Tsai LLP, Austin, TX, for Plaintiffs.

Laurie U. Mathews, Marty L. Steinberg, Samuel A.
Danon, Hunton & Williams, LLP, Miami, FL, Shawn
Patrick Regan, Hunton & William, Philip L. Graham,
Jordan Toumey Razza, Qian A. Gao, Sharon L. Nelles,
Sullivan & Cromwell, Barry Jay Glickman, David B.
Chenkin, Zeichner Ellman & Krause LLP, New York,
NY, Beth A. Levene, Matthew L. Fore, Peter J. Kahn,

William P. Ashworth, Williams & Connolly, LLP,
Washington, DC, for Defendants.

Opinion

MEMORANDUM AND ORDER

NICHOLAS G. GARAUFIS, District Judge.

**\*1** Plaintiffs Republic of Colombia, the Capital District
of Bogotá, and the Departments of Amazonas, Aracua,
Cordoba, Guaviare, Norte de Santander, Putumayo,
Risaralda, San Andres y Providencia, Sucre, and Vichada
(collectively "Withdrawing Plaintiffs") move pursuant to
Rule 41(a)(2) of the Federal Rules of Civil Procedure for
a court order dismissing without prejudice their claims
against a variety of liquor distillers and distributors
("Defendants"). (Docket Entry # 273.) In the alternative,
they request an order staying the proceedings as to
them. For the following reasons, the court converts the
Withdrawing Plaintiffs' motion into a motion to dismiss
*with* prejudice. That motion is GRANTED.

A full account of the plaintiffs' claims can be found in an
earlier memorandum and order in this case, *Republic of
Colombia, v. Diageo North America, Inc.,* 531 F.Supp.2d
365 (E.D.N.Y.2007), wherein the court granted in part
and denied in part Defendants' motion to dismiss ("2007
Order"). The court assumes the parties' familiarity with
the facts and procedural history of this case and so, for
the purposes of this order, it is enough to note that the
plaintiffs are Colombian governmental entities seeking
compensation for revenue lost because of Defendants'
alleged participation in a vast money laundering and
liquor smuggling conspiracy, *see id.* at 376–380, but that
the court held in its 2007 Order that the revenue rule bars
any claims based on lost taxes or costs associated with
enforcing Colombian tax laws, *see id.* at 383, 399 n. 11.

The Withdrawing Plaintiffs concede that they can
no longer continue to prosecute this action against
Defendants because, in light of the 2007 Order, all of
their claims are precluded by the revenue rule. (Pls.'
Mem. (Docket Entry # 274).) They seek dismissal without
prejudice, however, on the ground that the revenue rule is
"discretionary" and may be "waived" by the United States
Department of State. (*Id.*) The Withdrawing Plaintiffs
ask the court to solicit such a waiver. (*Id.*) Defendants,
on the other hand, maintain that the revenue rule is not
discretionary, and assert that the Withdrawing Plaintiffs'

motion, which comes over three years after the court issued its 2007 Order, is simply an effort to escape from various adverse discovery rulings while preserving an option to begin litigating anew under more favorable circumstances. (Defs.' Mem. (Docket Entry # 275).) They argue that the claims should be dismissed with prejudice, or, in the alternative, that non-prejudicial dismissal be conditioned on the Withdrawing Plaintiffs providing discovery. (*Id.*)

Court-ordered dismissals under Rule 41(a)(2) are left to the court's discretion. *See Cantanzano v. Wing,* 277 F.3d 99, 109 (2d Cir.2001); *see also* Fed.R.Civ.P. 41(a)(2) ("[A]n action *may* be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." (emphasis added)). In exercising such discretion, it is important to consider the prejudicial effect such an order may have on defendants. *See Cantanzano,* 277 F.3d at 109. The Second Circuit has developed a non-exhaustive list of factors that bear on whether a defendant would be harmed by a Rule 41(a)(2) dismissal without prejudice. They are:

> **\*2** (1) the plaintiff's diligence in bringing the motion; (2) any undue vexatiousness on the plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense and preparation for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss.

*Id.* at 109–10 (citing *Zagano v. Fordham Univ.,* 900 F.2d 12, 14 (2d Cir.1990)) (internal quotation marks omitted). Some, if not most, of these factors are influenced by the probable merit of the claims that a plaintiff is seeking to withdraw. Where a defendant has cast substantial doubt on the validity of a plaintiff's claims or where such claims are dubious on their face, the prospect of relitigation offers little value but threatens much cost.

In this case, granting the Withdrawing Plaintiffs' motion would do almost nothing to improve the Withdrawing Plaintiffs' ultimate chances of success, but might impose a substantial burden on Defendants. The claims in question have *already* been dismissed as a matter of law,[1] *see Diageo N.A., Inc.,* 531 F.Supp.2d at 399 n. 11, and the Withdrawing Plaintiffs' only hope for resuscitating

them rests on untested legal theories and unlikely factual developments. On the other hand, a dismissal without prejudice could require Defendants to litigate issues that are nearly identical to those on which they have already prevailed.

The fact that the revenue rule is not absolute does not mean that the Withdrawing Plaintiffs' claims are likely to become viable anytime in the future. It is true that the political branches can under certain circumstances consent to the adjudication of foreign tax claims notwithstanding the revenue rule, *see European Community v. RJR Nabisco, Inc.,* 355 F.3d 123, 131–32 (2d Cir.2004), *vacated and remanded,* 544 U.S. 1012, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005), *reinstated on remand,* 424 F.3d 175 (2d Cir.2005), *cert. denied,* 546 U.S. 1092, 126 S.Ct. 1045, 163 L.Ed.2d 858 (2006). But such consent has only been recognized "where the Untied States itself institutes a prosecution designed to punish those who have defrauded foreign governments of tax revenues, or where treaties between the United States and the sovereigns at issue provide for broad, reciprocal tax enforcement assistance." *Id.* at 132. Such governmental acts occur before an action is brought and are fundamentally different in nature than what is contemplated by the Withdrawing Plaintiffs—namely, a letter from the State Department. While the Second Circuit has suggested that the executive branch *"might* indicate its consent to the suit by other means, such as submitting a statement from the State Department or filing an amicus brief," *id.* (emphasis added), the Withdrawing Plaintiffs do not cite to any case where this has occurred. Moreover, even assuming that such a statement or brief would "waive" the revenue rule, it is not clear that such a waiver would be effective at all points in the litigation—for example, where, as here, the plaintiffs' claims had already been dismissed. The likelihood of even reaching these legal questions, however, is exceedingly remote. The plaintiffs here filed their first complaint almost seven years ago. (*See* Docket Entry # 1.) One of them, the Republic of Colombia, has direct access to the State Department and could have solicited from it an amicus brief or statement at any time.[2] Given that, after seven years, the State Department has declined to offer its opinion in this case, the court finds it unlikely that it will do so in the future. Finally, if the State Department's silence were enough to prevent a court from dismissing revenue-rule-barred claims with prejudice, either the State Department would be effectively required to participate in every case involving such claims, or some portion of

all claims pending in federal court would be never fully resolved.

 **\*3** What is more—and ultimately most important for the purposes of a Rule 41(a)(2) motion—dismissal of the Withdrawing Plaintiffs' claims without prejudice could harm Defendants. As noted above, this case began in 2004 and substantial motion practice and some discovery has already occurred at no doubt great expense to and effort by Defendants. In the unlikely event that the Withdrawing Plaintiffs' were able to successfully revive their claims, at least some of this work would need to be done again. Further, the Defendants have expressed concern about spoliation of evidence. (Defs.' Mem. 11–20.) They would be clearly prejudiced if the Withdrawing Plaintiffs were allowed to withdraw their claims without preserving discoverable material relevant to Defendants' defense. Yet, to keep the Withdrawing Plaintiffs involved in discovery when they have such slim odds of reviving their claims would be burdensome to all parties and to the court.

The court therefore does not grant the Withdrawing Plaintiffs' motion to dismiss without prejudice; it instead converts the motion into a motion to dismiss *with* prejudice and grants that motion. In *Gravatt v. Columbia University,* 845 F.2d 54, 56 (2d Cir.1988), the Second Circuit recognized that such a maneuver is permissible under Rule 41(a)(2), but it cautioned that moving plaintiffs should be given the option of withdrawing their motions and continuing to litigate. Although the Circuit stated in *Gravatt* that "a plaintiff *must* be afforded the opportunity to withdraw his motion," *id.* (emphasis added), the court does not read this rule as applying in all cases. *Gravatt* involved completely unlitigated claims.

*See id.* at 55. The Circuit expressly distinguished the facts in *Gravatt* from those in two earlier cases where the plaintiffs had already litigated their claims prior to moving for non-prejudicial dismissal under Rule 41(a)(2). *See id.* at 56 n. 2 (discussing *Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109 (2d Cir.1985) and *Grass v. Citibank, N.A.,* 90 F.R.D. 79 (S.D.N.Y.1979)). In those cases, the plaintiffs' motions to dismiss without prejudice were converted—or, in the court of appeals case, should have been converted—into motions to dismiss with prejudice, to be granted immediately. In the words of Judge Winter, "[r]easons of judicial economy alone would appear to dictate that one full and fair attempt to prove [a] claim is enough." *Wakefield,* 769 F.2d at 114. The same reasoning applies here. Under the 2007 Order, all of the Withdrawing Plaintiffs' claims must be dismissed, and, as resolved above, the court will not grant such a dismissal without prejudice. It therefore makes no sense for the court to allow the Withdrawing Plaintiffs the option of continuing in this action, when Defendants could at any time successfully move to dismiss them based on these two orders. Such a course of action would elevate form over substance, cost both parties more legal fees, and waste the court's time.

 **\*4** Accordingly, the Withdrawing Plaintiffs' Rule 41(a)(2) motion for dismissal without prejudice is converted into a motion for dismissal with prejudice and that motion is GRANTED.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4828814

Footnotes

1  The only reason why the Withdrawing Plaintiffs' claims were not expressly dismissed following the 2007 Order was that there were arguably questions of fact about what type of claims—commercial or sovereign—the Withdrawing Plaintiffs possessed. Now that the Withdrawing Plaintiffs have conceded that they have no viable claims, they must be dismissed from the action. The only issue is whether such dismissal should be with or without prejudice.

2  The revenue rule issues related to this case are not markedly different from those found in similar cases. Were the court to solicit the State Department's views on the application of the revenue rule here, it would have no principled reason for not doing so in future cases. The court declines to start down this path, and, accordingly, will not contact the State Department as requested by the Withdrawing Plaintiffs.

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.